UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

———————————————————————

WINN-DIXIE STORES, INC.,                    :
and BI-LO HOLDINGS, LLC,                     :
                                             :    Case No. 15-6480
Plaintiffs,                                  :
v.                                           :
                                             :
EASTERN MUSHROOM MARKETING              :    FIRST AMENDED COMPLAINT
COOPERATIVE, INC.,                           :
ROBERT A. FERANTO, JR t/a                    :
BELLA MUSHROOM FARMS,                        :
BROWNSTONE MUSHROOM FARMS,                   :
INC.,                                        :
TO-JO FRESH MUSHROOMS, INC.,                 :
CARDILE MUSHROOMS, INC.,                     :
CARDILE BROS. MUSHROOMS                      :
PACKAGING,                                   :
COUNTRY FRESH MUSHROOM CO.,                  :
FOREST MUSHROOMS INC.,                       :
FRANKLIN FARMS, INC.,                        :
GINO GASPARI & SONS, INC.,                   :
GASPARI BROS. INC.,                          :
GIORGI MUSHROOM COMPANY,                     :
GIORGIO FOODS, INC.,                         :
KAOLIN MUSHROOM FARMS, INC.,                 :
SOUTH MILL MUSHROOM SALES, INC.,             :
LRP MUSHROOMS INC.,                          :
LRP-M MUSHROOMS LLC,                         :
LEONE PIZZINI AND SON, INC.,                 :
MODERN MUSHROOM FARMS, INC.,                 :
SHER-ROCKEE MUSHROOM FARM,                   :
C & C CARRIAGE MUSHROOM CO.,                 :
OAKSHIRE MUSHROOM FARM, INC.,                :
PHILLIPS MUSHROOM FARMS, INC.,               :
HARVEST FRESH FARMS, INC.,                   :
LOUIS M. MARSON, JR., INC.,                  :
MARIO CUTONE MUSHROOM CO., INC.,             :
M.D. BASCIANI & SONS, INC.,                  :
MONTEREY MUSHROOMS, INC.,                    :
MASHA & TOTO, INC. t/a                       :
M & T MUSHROOMS,                             :
W & P MUSHROOM INC.,                         :

MUSHROOM ALLIANCE, INC.,
CREEKSIDE MUSHROOMS LTD.,
J-M FARMS, INC.,
UNITED MUSHROOM FARMS
COOPERATIVE, INC.,
JOHN PIA,
and MICHAEL PIA,

Defendants.
--------------------------------------------------------------X

## FIRST AMENDED COMPLAINT

## I.    NATURE OF THE ACTION

1.     Plaintiffs Winn-Dixie Stores, Inc. and Bi-Lo Holdings LLC, direct purchasers of mushrooms, bring this antitrust complaint to recover damages related to the payment of artificially-inflated prices for the mushrooms they purchased during the Conspiracy Period, from January 1, 2001 through the present, due to the illegal price-fixing scheme and conspiracy by EMMC and each of its members, acting collectively with each and every other EMMC member, with the participation of various nonmember third-parties.

2.     Each year American consumers spend over $800 million on mushrooms. The vast majority are fresh Agaricus mushrooms, the common table variety. During the Conspiracy Period, EMMC members controlled over 60 percent of all Agaricus mushrooms grown in the United States and approximately 90 percent of all Agaricus mushrooms grown in the eastern United States.

3.     Starting on or about January 1, 2001 and continuing until at least through 2008, the EMMC and each of its members identified below, acting collectively with each and every other EMMC member, engaged in an overarching scheme to unlawfully fix the price of fresh Agiricus Mushrooms in the United States by agreeing to set floor (minimum) prices for

mushrooms and by agreeing to collectively fund and effectuate the purchase or lease of mushrooms farms for the express purpose of reducing output, removing existing available production capacity from the market and artificially raising prices.

4. The actions of EMMC, each of its members identified below, acting collectively with each and every other EMMC member, and co-conspirators inflated the average prices for Agaricus mushrooms by <u>at least</u> 8 percent around the country.

5. The EMMC was central to this anticompetitive scheme for its ability to provide cover for the naked price-fixing and the anticompetitive supply control scheme under the aegis of being a purported agricultural cooperative under the Capper-Volstead Act. However, as explained in further detail below, the EMMC and its members were not entitled to any antitrust immunity under the Capper-Volstead Act as *inter alia* the EMMC's membership included non-growers which foreclosed any antitrust protection under the Act for EMMC or its members.

6. Nonetheless, EMMC members used the EMMC as a front to engage in naked price-fixing and implement a supply control scheme in support thereof. In addition, they concealed the membership and activities of EMMC, collectively agreed to interfere and did interfere with any non-EMMC growers who sought to sell at prices that were below the artificially-inflated prices set by EMMC and each of its members identified below, acting collectively with each and every other EMMC member, and collectively agreed to use acts to pressure independent growers to join the anticompetitive scheme agreed to and carried out by each of its members identified below, acting collectively with each and every other EMMC member, and the EMMC.

7. The conspiracy among EMMC members and nonmember third-parties to fix prices, and to restrict competition from non-EMMC farmers, was a *per se* illegal restraint of

trade in violation of Sections 1 and 2 of the Sherman Act, as well as Section 7 of the Clayton Act. Created simply as a pretext and front for naked price-fixing, EMMC did not engage in collective processing, preparing for market, handling, or marketing the products of its members. Rather, its primary function was to set the prices to which its members agreed and at which they individually sold their products. EMMC's actions provided no market efficiencies or other legitimate business value to its members or consumers.

8.      To form and effectuate this conspiracy, the Defendants performed multiple acts, including but not limited to the following:

        a.   meeting and agreeing to fix the price of Agaricus mushrooms;

        b.   discussing and agreeing upon the Supply Control campaign and collectively funding it;

        c.   buying multiple properties which were resold at a loss with permanent deed restrictions forbidding the conduct of any business related to the production of mushrooms;

        d.   entering into agreements with nonmembers to place deed restrictions on properties for which the cooperative purchased lease options;

        e.   filing deed restrictions on the lease-optioned properties prohibiting the conduct of any business related to the production of mushrooms for ten years; and

        f.   supporting and reinforcing the price-fixing scheme by collectively interfering with, penalizing and retaliating against any non-EMMC growers that sought to sell at prices that were below the artificially-inflated prices set by EMMC, and collectively pressuring independent growers to join EMMC and the Defendants' anticompetitive scheme.

9.      As part of this scheme, beginning in January 2001, and more specifically at the first meeting of the EMMC, on January 9, 2001, each of its members identified below, acting collectively with each and every other EMMC member, agreed to set minimum prices at

which their mushrooms would be sold, and at which packers and distributors would sell mushrooms to their customers. Subsequently in 2002, 2003, 2004 and 2005, each of its members identified below, acting collectively with each and every other EMMC member, agreed to set minimum prices at which their mushrooms would be sold, and at which packers and distributors would sell mushrooms to their customers.

10.     In addition, as part of this scheme, beginning in May 2001, EMMC, each of its members identified below, acting collectively with each and every other EMMC member, and nonmember third-parties, agreed to and collectively undertook a "Supply Control" campaign to impede and forestall competition from independent, non-EMMC farmers. EMMC and each of its members identified below, acting collectively with each and every other EMMC member, implemented their campaign by entering into agreements to eliminate a significant amount of the supply from competing mushroom growers. Each EMMC member had knowledge of each real estate transaction detailed herein, before the transaction was negotiated and finalized, and voted to approve each real estate transaction. In addition, each EMMC member had knowledge of and acquiesced in each real estate transaction detailed herein, including without limitation, signing the EMMC Membership Agreement (also detailed herein), in which each EMMC member agreed to be bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members, and in which each EMMC member agreed that the EMMC's Executive Committee could carry out the business and actions of the EMMC.

11.     Starting in May 2001, as detailed below, EMMC, acting as an agent of its members, with their knowledge, approval and acquiescence, purchased four mushroom farms with an annual combined growing capacity of approximately 29 million pounds, and then sold the four properties to nonmember purchasers at a combined total loss of over $1.2 million. The

non-member purchasers agreed with EMMC to place permanent deed restrictions on the properties. The deed restrictions prohibited the conduct of any business related to the growing of mushrooms. For example, one deed restriction read:

> This property shall never be used for the cultivation, growing, marketing, sale or distribution of fresh mushrooms, canned and/or processed mushrooms or related endeavors.

Each EMMC member listed below had knowledge of and approved the restrictions in this real estate transaction, including without limitation, approving the EMMC Executive Committee to carry out the "Supply Control" campaign.

12.     Similarly, in February and August 2002, EMMC, acting as an agent of its members, with their knowledge, approval and acquiescence, entered into lease options at a cost of over $1 million, on two additional mushroom farms with a combined annual growing capacity of approximately 14 million pounds. Under the lease options, nonmember third-parties agreed that EMMC could file deed restrictions on the two farms prohibiting any business related to growing mushrooms for a period of 10 years. Even though it never entered into leases on these farms, EMMC did file the deed restrictions. No mushrooms have been grown on the properties EMMC bought or had under lease option since the deed restrictions were imposed by EMMC. EMMC acting as an agent of its members, with their knowledge, approval and acquiescence, also bought one or more mushroom farms in Texas to remove the mushroom supply of those farms from the market.

13.     By imposing deed restrictions on the properties described above, EMMC and its members were able to substantially reduce the amount of land available for mushroom production and the supply of mushrooms. EMMC touted the success of the Supply Control campaign to its membership, claiming that it had "[a]nnually taken over 50 million pounds

out of production from facilities which could have easily been purchased and remained in production." By reducing the amount of the land and facilities available to produce mushrooms in the United States, EMMC and its members were able to maintain artificial price increases for mushrooms of at least 8%.

14.     The agreements among the EMMC members to restrict, forestall, and exclude competition from nonmember farmers was an unreasonable restraint of trade in violation of Section 1 of the Sherman Act. As a result of the EMMC's violations, the acreage and facilities available to produce mushrooms for American consumers was artificially reduced, and consumers were deprived of the benefits of competition.

## II.     JURISDICTION AND VENUE

15.     Plaintiffs bring this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, to recover treble damages, equitable relief, costs of suit and reasonable attorneys' fees for the Defendants' violations of Sections I and 2 of the Sherman Act, 15 U.S.C. §§ I and 2 and Section 7 of the Clayton Act, 15 U.S.C. § 18. Subject matter jurisdiction is proper pursuant to Section 4(a) of the Clayton Act, 15 U.S.C. § 15(a), and 28 U.S.C. §§ 1331, 1337, and 1345.

16.     The Defendants are involved in the production, processing, and/or sale of fresh market mushrooms in interstate commerce. The Defendants' activities in the production, processing, and/or sale of mushrooms substantially affect interstate commerce. The Defendants grow, process, and/or sell mushrooms in both the Eastern and Western parts of the United States and ship mushrooms between states.

17.     Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391 (b) and (c) because during the Conspiracy Period

many of the Defendants resided, transacted business, were found, or had agents in this district, and because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, and a substantial portion of the affected interstate trade and commerce described below has been carried out in this district.

## III. THE PARTIES

18. Plaintiff Winn-Dixie Stores, Inc., is a corporation organized under the laws of the State of Florida. Its principal place of business is *5050* Edgewood Court, Jacksonville, Florida 32254. During the Conspiracy Period defined below, Plaintiff purchased Agaricus mushrooms directly from one or more Defendants.

19. Bi-Lo Holdings LLC is a limited liability company organized under the laws of the State of Delaware. Its principal place of business is 5050 Edgewood Court, Jacksonville, Florida 32254. During the Conspiracy Period defined below, Plaintiff purchased Agaricus mushrooms directly from one or more Defendants.

20. Defendant Eastern Mushroom Marketing Cooperative began operations in January 2001, and purports to be the largest mushroom cooperative in the United States. EMMC is incorporated in the Commonwealth of Pennsylvania and is headquartered in Kennett Square, Pennsylvania. EMMC is made up of entities that grow, buy, package, and/or ship mushrooms to retail and food service outlets across the United States. EMMC concealed the identity of its members by refusing to publish or make publicly available a list of its members.

21. EMMC was not formed to process, prepare for market, handle, or market the mushrooms of its members. Rather, EMMC was formed as a pretext for naked price-fixing by its members. Each EMMC member, acting collectively with each and every other EMMC member, agreed to create the EMMC and join it as a member, for the express purpose of

stabilizing and increasing mushroom prices, controlling the supply of mushrooms and restraining or eliminating competition from other mushroom growers. EMMC and each EMMC member, acting collectively with each and every other EMMC member, discussed mushroom prices with its competitors, and agreed to set the minimum prices at which its members and nonmembers sold their mushrooms to customers in various geographic regions throughout the United States. At least two members of EMMC did not grow any mushrooms. Furthermore, several members of EMMC were large, vertically-integrated agri-businesses that have extensive processing, distribution and sales operations. During the 2001-2002 growing season, EMMC had approximately 19 members with control of more than 500 million pounds of mushrooms valued in excess of $425 million. During the Conspiracy Period, EMMC members controlled over 60 percent of all Agaricus mushrooms grown in the United States and approximately 90 percent of all Agaricus mushrooms grown in the eastern United States.

22. Defendant Robert A. Ferranto, Jr. is an individual trading as Bella Mushroom Farms ("Bella Mushroom"). The principal office of Bella Mushroom is located in Landenberg, Pennsylvania. Bella Mushroom was an EMMC member during the Conspiracy Period and participated in the alleged antitrust conspiracy in several ways: (1) agreeing to form and join the EMMC, including signing a Membership Agreement, in which Bella Mushroom agreed to be bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members, and in which Bella Mushroom agreed that the EMMC's Executive Committee could carry out the business and actions of the EMMC; (2) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing mushroom prices with its competitors and agreeing with its competitors to set minimum prices for mushrooms, at which Bella Mushroom and its competitors were required to sell their mushrooms and at which Bella Mushroom and its

competitors required packers and distributors to sell mushrooms to their customers; (3) charging the minimum prices or higher prices than minimum prices to packers, distributors and customers, and complying with the EMMC Pricing Policy; (4) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing controlling the supply of mushrooms (or "supply management," a term actually used in the meetings) with its competitors and agreeing with its competitors to create and implement a "Supply Control" campaign, with full knowledge and approval of the details of the campaign, including without limitation, knowledge and approval of each real estate transaction, and by voting to approve each transaction; and (5) agreeing to charge each EMMC member an Assessment to fund the Supply Control campaign, including each of the real estate transactions detailed herein, agreeing to pay and paying such Assessment, and agreeing to enforce the requirement that each EMMC member pay the Assessment. Bella Mushroom's participation alleged above will be set forth in more detail below.

23. Defendant Brownstone Mushroom Farms ("Brownstone") has its principal office in Avondale, Pennsylvania. Brownstone was an EMMC member during the Conspiracy Period and participated in the alleged antitrust conspiracy in several ways: (1) agreeing to form and join the EMMC, including signing a Membership Agreement, in which Brownstone agreed to be bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members, and in which Brownstone agreed that the EMMC's Executive Committee could carry out the business and actions of the EMMC; (2) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing mushroom prices with its competitors and agreeing with its competitors to set minimum prices for mushrooms, at which Brownstone and its competitors were required to sell their mushrooms and at which Brownstone and its

competitors required packers and distributors to sell mushrooms to their customers; (3) charging the minimum prices or higher prices than minimum prices to packers, distributors and customers, and complying with the EMMC Pricing Policy; (4) charging the minimum prices or higher prices than minimum prices to packers, distributors and customers, and complying with the EMMC Pricing Policy; (5) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing controlling the supply of mushrooms (or "supply management," a term actually used in the meetings) with its competitors and agreeing with its competitors to create and implement a "Supply Control" campaign, with full knowledge and approval of the details of the campaign, including without limitation, knowledge and approval of each real estate transaction, and by voting to approve each transaction; and (6) agreeing to charge each EMMC member an Assessment to fund the Supply Control campaign, including each of the real estate transactions detailed herein, agreeing to pay and paying such Assessment, and agreeing to enforce the requirement that each EMMC member pay the Assessment. Brownstone's participation alleged above will be set forth in more detail below.

24. Defendant Cardile Mushrooms, Inc. ("Cardile Mushrooms") has its principal office in Avondale, Pennsylvania. Cardile Mushrooms was an EMMC member during the Conspiracy Period and participated in the alleged antitrust conspiracy in several ways: (1) agreeing to form and join the EMMC, including signing a Membership Agreement, in which Cardile Mushrooms agreed to be bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members, and in which Cardile Mushrooms agreed that the EMMC's Executive Committee could carry out the business and actions of the EMMC; (2) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing mushroom prices with its competitors and agreeing with its competitors to set minimum prices

for mushrooms, at which Cardile Mushrooms and its competitors were required to sell their mushrooms and at which Cardile Mushrooms and its competitors required packers and distributors to sell mushrooms to their customers; (3) charging the minimum prices or higher prices than minimum prices to packers, distributors and customers, and complying with the EMMC Pricing Policy; (4) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing controlling the supply of mushrooms (or "supply management", a term actually used in the meetings) with its competitors and agreeing with its competitors to create and implement a "Supply Control" campaign, with full knowledge and approval of the details of the campaign, including without limitation, knowledge and approval of each real estate transaction, and by voting to approve each transaction; and (5) agreeing to charge each EMMC member an Assessment to fund the Supply Control campaign, including each of the real estate transactions detailed herein, agreeing to pay and paying such Assessment, and agreeing to enforce the requirement that each EMMC member pay the Assessment. Cardile Mushrooms' participation alleged above will be set forth in more detail below.

25. Defendant Country Fresh Mushroom Co. ("County Fresh") has its principal office in Avondale, Pennsylvania. Country Fresh is a packing and distribution company owned in its entirety by its directors and officers, Edward A. Leo, Mickey Brosius, and Peter Alonzo. County Fresh was an EMMC member during the Conspiracy Period and participated in the alleged antitrust conspiracy in several ways: (1) agreeing to form and join the EMMC, including signing a Membership Agreement, in which County Fresh agreed to be bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members, and in which County Fresh agreed that the EMMC's Executive Committee could carry out the business and actions of the EMMC; (2) attending and participating in EMMC meetings with its competitors and, at those

meetings, discussing mushroom prices with its competitors and agreeing with its competitors to set minimum prices for mushrooms, at which County Fresh and its competitors were required to sell their mushrooms and at which County Fresh and its competitors required packers and distributors to sell mushrooms to their customers; (3) charging the minimum prices or higher prices than minimum prices to packers, distributors and customers, and complying with the EMMC Pricing Policy; (4) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing controlling the supply of mushrooms (or "supply management," a term actually used in the meetings) with its competitors and agreeing with its competitors to create and implement a "Supply Control" campaign, with full knowledge and approval of the details of the campaign, including without limitation, knowledge and approval of each real estate transaction, and by voting to approve each transaction; and (5) agreeing to charge each EMMC member an Assessment to fund the Supply Control campaign, including each of the real estate transactions detailed herein, agreeing to pay and paying such Assessment, and agreeing to enforce the requirement that each EMMC member pay the Assessment. County Fresh's participation alleged above will be set forth in more detail below.

26. Defendant Forest Mushrooms Inc. ("Forest Mushrooms") is a vertically-integrated mushroom producer with its principal offices in Saint Joseph, Minnesota. Forest engages in the research, cultivation, and distribution of mushrooms, has its own packaging facility, and delivers its mushrooms directly to consumers by refrigerator truck. Forest Mushrooms was an EMMC member during the Conspiracy Period and participated in the alleged antitrust conspiracy in several ways: (1) agreeing to form and join the EMMC, including signing a Membership Agreement, in which Forest Mushrooms agreed to be bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members, and in which Forest

Mushrooms agreed that the EMMC's Executive Committee could carry out the business and actions of the EMMC; (2) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing mushroom prices with its competitors and agreeing with its competitors to set minimum prices for mushrooms, at which Forest Mushrooms and its competitors were required to sell their mushrooms and at which Forest Mushrooms and its competitors required packers and distributors to sell mushrooms to their customers; (3) charging the minimum prices or higher prices than minimum prices to packers, distributors and customers, and complying with the EMMC Pricing Policy; (4) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing controlling the supply of mushrooms (or "supply management," a term actually used in the meetings) with its competitors and agreeing with its competitors to create and implement a "Supply Control" campaign, with full knowledge and approval of the details of the campaign, including without limitation, knowledge and approval of each real estate transaction, and by voting to approve each transaction; and (5) agreeing to charge each EMMC member an Assessment to fund the Supply Control campaign, including each of the real estate transactions detailed herein, agreeing to pay and paying such Assessment, and agreeing to enforce the requirement that each EMMC member pay the Assessment. Forest Mushrooms' participation alleged above will be set forth in more detail below.

27.    Defendant Franklin Farms, Inc. ("Franklin Farms") is a vertically-integrated mushroom producer with its principal offices in North Franklin, Connecticut, has over 500 employees, and is the nation's largest grower and harvester of certified organic mushrooms, and one of the largest agricultural businesses in New England. It processes and distributes its products throughout the eastern United States. Franklin Farms was an EMMC member during

the Conspiracy Period and participated in the alleged antitrust conspiracy in several ways: (1) agreeing to form and join the EMMC, including signing a Membership Agreement, in which Franklin Farms agreed to be bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members, and in which Franklin Farms agreed that the EMMC's Executive Committee could carry out the business and actions of the EMMC; (2) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing mushroom prices with its competitors and agreeing with its competitors to set minimum prices for mushrooms, at which Franklin Farms and its competitors were required to sell their mushrooms and at which Franklin Farms and its competitors required packers and distributors to sell mushrooms to their customers; (3) charging the minimum prices or higher prices than minimum prices to packers, distributors and customers, and complying with the EMMC Pricing Policy; (4) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing controlling the supply of mushrooms (or "supply management," a term actually used in the meetings) with its competitors and agreeing with its competitors to create and implement a "Supply Control" campaign, with full knowledge and approval of the details of the campaign, including without limitation, knowledge and approval of each real estate transaction, and by voting to approve each transaction; and (5) agreeing to charge each EMMC member an Assessment to fund the Supply Control campaign, including each of the real estate transactions detailed herein, agreeing to pay and paying such Assessment, and agreeing to enforce the requirement that each EMMC member pay the Assessment. Franklin Farm's participation alleged above will be set forth in more detail below.

28. Defendant Gino Gaspari & Sons, Inc. ("Gino Gaspari") has its principal office in Temple, Pennsylvania. Gino Gaspari was an EMMC member during the Conspiracy Period and

participated in the alleged antitrust conspiracy in several ways: (1) agreeing to form and join the EMMC, including signing a Membership Agreement, in which Gino Gaspari agreed to be bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members, and in which Gino Gaspari agreed that the EMMC's Executive Committee could carry out the business and actions of the EMMC; (2) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing mushroom prices with its competitors and agreeing with its competitors to set minimum prices for mushrooms, at which Gino Gaspari and its competitors were required to sell their mushrooms and at which Gino Gaspari and its competitors required packers and distributors to sell mushrooms to their customers; (3) charging the minimum prices or higher prices than minimum prices to packers, distributors and customers, and complying with the EMMC Pricing Policy; (4) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing controlling the supply of mushrooms (or "supply management," a term actually used in the meetings) with its competitors and agreeing with its competitors to create and implement a "Supply Control" campaign, with full knowledge and approval of the details of the campaign, including without limitation, knowledge and approval of each real estate transaction, and by voting to approve each transaction; and (5) agreeing to charge each EMMC member an Assessment to fund the Supply Control campaign, including each of the real estate transactions detailed herein, agreeing to pay and paying such Assessment, and agreeing to enforce the requirement that each EMMC member pay the Assessment. Gino Gaspari's participation alleged above will be set forth in more detail below.

29.     Defendant Gaspari Bros., Inc. ("Gaspari Bros.") has its principal office in Temple, Pennsylvania. Gaspari Bros. Inc. does not grow mushrooms. Gaspari Bros. was an EMMC

member during the Conspiracy Period and participated in the alleged antitrust conspiracy in several ways: (1) agreeing to form and join the EMMC, including signing a Membership Agreement, in which Gaspari Bros. agreed to be bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members, and in which Gaspari Bros. agreed that the EMMC's Executive Committee could carry out the business and actions of the EMMC; (2) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing mushroom prices with its competitors and agreeing with its competitors to set minimum prices for mushrooms, at which Gaspari Bros. and its competitors were required to sell their mushrooms and at which Gaspari Bros. and its competitors required packers and distributors to sell mushrooms to their customers; (3) charging the minimum prices or higher prices than minimum prices to packers, distributors and customers, and complying with the EMMC Pricing Policy; (4) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing controlling the supply of mushrooms (or "supply management," a term actually used in the meetings) with its competitors and agreeing with its competitors to create and implement a "Supply Control" campaign, with full knowledge and approval of the details of the campaign, including without limitation, knowledge and approval of each real estate transaction, and by voting to approve each transaction; and (5) agreeing to charge each EMMC member an Assessment to fund the Supply Control campaign, including each of the real estate transactions detailed herein, agreeing to pay and paying such Assessment, and agreeing to enforce the requirement that each EMMC member pay the Assessment. Plead in the alternative to the forgoing, Gaspari Bros.'s was alternatively not a member of the EMMC but, nonetheless participated in the conspiracy as set forth below in the alternative. Gaspari Bros.'s participation alleged above will be set forth in more detail below.

30.     Defendant Giorgi Mushroom Company ("Giorgi Mushroom") has its principal

office in Temple, Pennsylvania.  Giorgi Mushroom Company was an EMMC member during

the Conspiracy Period. The company's website advertises that it is "a fully integrated grower,

processor, and distributor of the finest fresh, frozen, canned, jarred, and value-added mushroom

products." Giorgi Mushroom was an EMMC member during the Conspiracy Period and

participated in the alleged antitrust conspiracy in several ways: (1) agreeing to form and join the

EMMC, including signing a Membership Agreement, in which Giorgi Mushroom agreed to be

bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members,

and in which Giorgi Mushroom agreed that the EMMC's Executive Committee could carry out

the business and actions of the EMMC; (2) attending and participating in EMMC meetings with

its competitors and, at those meetings, discussing mushroom prices with its competitors and

agreeing with its competitors to set minimum prices for mushrooms, at which Giorgi Mushroom

and its competitors were required to sell their mushrooms and at which Giorgi Mushroom and its

competitors required packers and distributors to sell mushrooms to their customers; (3) charging

the minimum prices or higher prices than minimum prices to packers, distributors and customers,

and complying with the EMMC Pricing Policy; (4) attending and participating in EMMC

meetings with its competitors and, at those meetings, discussing controlling the supply of

mushrooms (or "supply management," a term actually used in the meetings) with its competitors

and agreeing with its competitors to create and implement a "Supply Control" campaign, with

full knowledge and approval of the details of the campaign, including without limitation,

knowledge and approval of each real estate transaction, and by voting to approve each

transaction; and (5) agreeing to charge each EMMC member an Assessment to fund the Supply

Control campaign, including each of the real estate transactions detailed herein, agreeing to pay

and paying such Assessment, and agreeing to enforce the requirement that each EMMC member pay the Assessment. Giorgi Mushroom's participation alleged above will be set forth in more detail below.

31.     Kaolin Mushroom Farms, Inc. joined the EMMC on January 9, 2001 and was an EMMC member during the Conspiracy Period and participated in the alleged antitrust conspiracy in several ways: (1) agreeing to form and join the EMMC, including signing a Membership Agreement, in which Kaolin Mushroom agreed to be bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members, and in which Kaolin Mushroom agreed that the EMMC's Executive Committee could carry out the business and actions of the EMMC; (2) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing mushroom prices with its competitors and agreeing with its competitors to set minimum prices for mushrooms, at which Kaolin Mushroom and its competitors were required to sell their mushrooms and at which Kaolin Mushroom and its competitors required packers and distributors to sell mushrooms to their customers; (3) charging the minimum prices or higher prices than minimum prices to packers, distributors and customers, and complying with the EMMC Pricing Policy; (4) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing controlling the supply of mushrooms (or "supply management," a term actually used in the meetings) with its competitors and agreeing with its competitors to create and implement a "Supply Control" campaign, with full knowledge and approval of the details of the campaign, including without limitation, knowledge and approval of each real estate transaction, and by voting to approve each transaction; and (5) agreeing to charge each EMMC member an Assessment to fund the Supply Control campaign, including each of the real estate transactions detailed herein, agreeing to pay

and paying such Assessment, and agreeing to enforce the requirement that each EMMC member pay the Assessment. Kaolin Mushroom's participation alleged above will be set forth in more detail below.

32.     Defendant Kaolin Mushroom Farms, Inc. ("Kaolin Mushroom") is a vertically-integrated mushroom producer organized and existing under the laws of the Commonwealth of Pennsylvania whose principal office is located in Kennett Square, Pennsylvania. Kaolin operates one of the largest mushroom farms in Pennsylvania, claiming to employ over 400 employees. During the Conspiracy Period, Kaolin sold mushrooms to retail, wholesale, food service, and commercial processors, under Defendant South Mill's label.

33.     Both Kaolin Mushroom and Defendant South Mill are jointly owned and operated by Defendants John and Michael Pia, each of whom have a 50% interest in each company. John and Michael Pia, through 100% ownership in two companies, Pennsylvania Mushroom Distribution, Inc. and Mushroom Substrate Technologies, Inc., held a 50% ownership interest in four companies that operated mushroom distribution centers in Dallas, Houston, New Orleans and Atlanta. The remaining 50% ownership interest in the distribution centers was held by Stuart Thomas through his ownership of Thomas Mushroom Distribution Inc. and Dallas South Mill Inc. The Kaolin/South Mill distribution centers were not EMMC members, did not grow mushrooms but sold mushrooms grown by defendant Kaolin. The Kaolin/South Mill distribution centers adhered to EMMC minimums in their mushroom sales.

34.     Defendant Leone Pizzini & Son, Inc. ("Leone Pizzini") has its principal office in Landenberg, Pennsylvania. On information and belief it is entirely owned by its officers, Leone Pizzini Sr. and Linda Pizzini-Johnson. Leone Pizzini is a wholesaler of fruit and vegetables and is not a grower of mushrooms. Leone Pizzini was an EMMC member during the Conspiracy

Period and participated in the alleged antitrust conspiracy in several ways: (1) agreeing to form and join the EMMC, including signing a Membership Agreement, in which Leone Pizzini agreed to be bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members, and in which Leone Pizzini agreed that the EMMC's Executive Committee could carry out the business and actions of the EMMC; (2) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing mushroom prices with its competitors and agreeing with its competitors to set minimum prices for mushrooms, at which Leone Pizzini and its competitors were required to sell their mushrooms and at which Leone Pizzini and its competitors required packers and distributors to sell mushrooms to their customers; (3) charging the minimum prices or higher prices than minimum prices to packers, distributors and customers, and complying with the EMMC Pricing Policy; (4) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing controlling the supply of mushrooms (or "supply management," a term actually used in the meetings) with its competitors and agreeing with its competitors to create and implement a "Supply Control" campaign, with full knowledge and approval of the details of the campaign, including without limitation, knowledge and approval of each real estate transaction, and by voting to approve each transaction; and (5) agreeing to charge each EMMC member an Assessment to fund the Supply Control campaign, including each of the real estate transactions detailed herein, agreeing to pay and paying such Assessment, and agreeing to enforce the requirement that each EMMC member pay the Assessment. Leone Pizzini's participation alleged above will be set forth in more detail below.

35.     Defendant LRP-M Mushrooms LLC has its principal office in Landenberg, Pennsylvania. LRP-M Mushrooms LLC joined the EMMC on January 9, 2001 and was an

EMMC member during the Conspiracy Period and participated in the alleged antitrust conspiracy in several ways: (1) agreeing to form and join the EMMC, including signing a Membership Agreement, in which LRP-M Mushrooms LLC agreed to be bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members, and in which LRP-M Mushrooms LLC agreed that the EMMC's Executive Committee could carry out the business and actions of the EMMC; (2) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing mushroom prices with its competitors and agreeing with its competitors to set minimum prices for mushrooms, at which LRP-M Mushrooms LLC and its competitors were required to sell their mushrooms and at which LRP-M Mushrooms LLC and its competitors required packers and distributors to sell mushrooms to their customers; (3) charging the minimum prices or higher prices than minimum prices to packers, distributors and customers, and complying with the EMMC Pricing Policy; (4) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing controlling the supply of mushrooms (or "supply management," a term actually used in the meetings) with its competitors and agreeing with its competitors to create and implement a "Supply Control" campaign, with full knowledge and approval of the details of the campaign, including without limitation, knowledge and approval of each real estate transaction, and by voting to approve each transaction; and (5) agreeing to charge each EMMC member an Assessment to fund the Supply Control campaign, including each of the real estate transactions detailed herein, agreeing to pay and paying such Assessment, and agreeing to enforce the requirement that each EMMC member pay the Assessment. LRP-M Mushrooms LLC's participation alleged above will be set forth in more detail below. The Articles of Incorporation for LRP-M Mushrooms LLC were filed in January 2001. Dominic Manfredini and his nephew

Lucio Pizzini each have a 50% ownership interest in LRP-M Mushrooms LLC. Lucio Pizzini also owns LRP Mushrooms, Inc.. LRP Mushrooms, Inc. grows mushrooms on land leased to him by Dominic Manfredini. Both Defendant LRPM Mushrooms LLC and Defendant LRP Mushrooms, Inc. sell 100% of their mushrooms to Manfredini Enterprises, Inc., which buys, packages and markets produce including mushrooms. Manfredini Enterprises is owned by the wife of Dominic Manfredini and Dominic Manfredini serves as its president and operator. Manfredini Enterprises does not grow mushrooms. The mushrooms that Manfredini Enterprises acquired from LRP-M Mushrooms LLC account for 20-25% of the mushrooms that Manfredini Enterprises resold to its customers. EMMC minimum pricing applied to sales by Manfredini Enterprises. Dominic Manfredini testified that LRP-M "work[s] in conjunction with LRP . . . . That's why they're tied together." (D. Manfredini Dep. 21:19-22:2).

36. Defendant Modern Mushroom Farms, Inc. ("Modern Mushroom") has its principal office in Toughkenamon, Pennsylvania. Modern Mushroom is a vertically-integrated mushroom producer. In addition to growing and processing mushrooms, Modern Mushroom manufactures canned vegetables, fruits, and jellies. Modern Mushroom sells its products to food brokers, pizza chains, and supermarkets throughout the eastern half of the United States. Modern Mushroom was an EMMC member during the Conspiracy Period and participated in the alleged antitrust conspiracy in several ways: (1) agreeing to form and join the EMMC, including signing a Membership Agreement, in which Modern Mushroom agreed to be bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members, and in which Modern Mushroom agreed that the EMMC's Executive Committee could carry out the business and actions of the EMMC; (2) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing mushroom prices with its competitors and

agreeing with its competitors to set minimum prices for mushrooms, at which Modern Mushroom and its competitors were required to sell their mushrooms and at which Modern Mushroom and its competitors required packers and distributors to sell mushrooms to their customers; (3) charging the minimum prices or higher prices than minimum prices to packers, distributors and customers, and complying with the EMMC Pricing Policy; (4) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing controlling the supply of mushrooms (or "supply management," a term actually used in the meetings) with its competitors and agreeing with its competitors to create and implement a "Supply Control" campaign, with full knowledge and approval of the details of the campaign, including without limitation, knowledge and approval of each real estate transaction, and by voting to approve each transaction; and (5) agreeing to charge each EMMC member an Assessment to fund the Supply Control campaign, including each of the real estate transactions detailed herein, agreeing to pay and paying such Assessment, and agreeing to enforce the requirement that each EMMC member pay the Assessment. Modern Mushroom's participation alleged above will be set forth in more detail below.

37.      Defendant Oakshire Mushroom Farm, Inc. ("Oakshire Mushroom") has its principal office in Kennett Square, Pennsylvania. Oakshire is a mushroom grower and nationwide marketer and distributor, operating growing, packing, cooling, office, and warehouse facilities. Oakshire Mushroom was an EMMC member during the Conspiracy Period and participated in the alleged antitrust conspiracy in several ways: (1) agreeing to form and join the EMMC, including signing a Membership Agreement, in which Oakshire Mushroom agreed to be bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members, and in which Oakshire Mushroom agreed that the EMMC's Executive

Committee could carry out the business and actions of the EMMC; (2) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing mushroom prices with its competitors and agreeing with its competitors to set minimum prices for mushrooms, at which Oakshire Mushroom and its competitors were required to sell their mushrooms and at which Oakshire Mushroom and its competitors required packers and distributors to sell mushrooms to their customers; (3) charging the minimum prices or higher prices than minimum prices to packers, distributors and customers, and complying with the EMMC Pricing Policy; (4) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing controlling the supply of mushrooms (or "supply management," a term actually used in the meetings) with its competitors and agreeing with its competitors to create and implement a "Supply Control" campaign, with full knowledge and approval of the details of the campaign, including without limitation, knowledge and approval of each real estate transaction, and by voting to approve each transaction; and (5) agreeing to charge each EMMC member an Assessment to fund the Supply Control campaign, including each of the real estate transactions detailed herein, agreeing to pay and paying such Assessment, and agreeing to enforce the requirement that each EMMC member pay the Assessment. Oakshire Mushroom's participation alleged above will be set forth in more detail below.

38. Defendant Phillips Mushroom Farms, Inc. ("Phillips Mushroom") is a vertically-integrated mushroom producer with its principal office in Kennett Square, Pennsylvania. As of December 2002, Phillips Mushroom was the largest supplier of specialty mushrooms in the United States, selling 35 million pounds of mushrooms annually. Phillips Mushroom distributes mushrooms throughout the eastern United States. Phillips Mushroom was an EMMC member during the Conspiracy Period and participated in the alleged antitrust

conspiracy in several ways: (1) agreeing to form and join the EMMC, including signing a Membership Agreement, in which Phillips Mushroom agreed to be bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members, and in which Phillips Mushroom agreed that the EMMC's Executive Committee could carry out the business and actions of the EMMC; (2) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing mushroom prices with its competitors and agreeing with its competitors to set minimum prices for mushrooms, at which Phillips Mushroom and its competitors were required to sell their mushrooms and at which Phillips Mushroom and its competitors required packers and distributors to sell mushrooms to their customers; (3) charging the minimum prices or higher prices than minimum prices to packers, distributors and customers, and complying with the EMMC Pricing Policy; (4) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing controlling the supply of mushrooms (or "supply management, a term actually used in the meetings") with its competitors and agreeing with its competitors to create and implement a "Supply Control" campaign, with full knowledge and approval of the details of the campaign, including without limitation, knowledge and approval of each real estate transaction, and by voting to approve each transaction; and (5) agreeing to charge each EMMC member an Assessment to fund the Supply Control campaign, including each of the real estate transactions detailed herein, agreeing to pay and paying such Assessment, and agreeing to enforce the requirement that each EMMC member pay the Assessment.  Phillips Mushroom's participation alleged above will be set forth in more detail below.

      39.    Defendant Harvest Fresh Farms, Inc. ("Harvest Fresh") has its principal office in Shoemakersville, Pennsylvania. Harvest Fresh was an EMMC member during the Conspiracy

Period and participated in the alleged antitrust conspiracy in several ways: (1) agreeing to form and join the EMMC, including signing a Membership Agreement, in which Harvest Fresh agreed to be bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members, and in which Harvest Fresh agreed that the EMMC's Executive Committee could carry out the business and actions of the EMMC; (2) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing mushroom prices with its competitors and agreeing with its competitors to set minimum prices for mushrooms, at which Harvest Fresh and its competitors were required to sell their mushrooms and at which Harvest Fresh and its competitors required packers and distributors to sell mushrooms to their customers; (3) charging the minimum prices or higher prices than minimum prices to packers, distributors and customers, and complying with the EMMC Pricing Policy; (4) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing controlling the supply of mushrooms (or "supply management," a term actually used in the meetings) with its competitors and agreeing with its competitors to create and implement a "Supply Control" campaign, with full knowledge and approval of the details of the campaign, including without limitation, knowledge and approval of each real estate transaction, and by voting to approve each transaction; and (5) agreeing to charge each EMMC member an Assessment to fund the Supply Control campaign, including each of the real estate transactions detailed herein, agreeing to pay and paying such Assessment, and agreeing to enforce the requirement that each EMMC member pay the Assessment. Harvest Fresh's participation alleged above will be set forth in more detail below.

40.     Defendant Louis M. Marson, Inc. ("Louis M. Marson") has its principal office in Kennett Square, Pennsylvania. Louis M. Marson was an EMMC member during the Conspiracy

Period and participated in the alleged antitrust conspiracy in several ways: (1) agreeing to form and join the EMMC, including signing a Membership Agreement, in which Louis M. Marson agreed to be bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members, and in which Louis M. Marson agreed that the EMMC's Executive Committee could carry out the business and actions of the EMMC; (2) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing mushroom prices with its competitors and agreeing with its competitors to set minimum prices for mushrooms, at which Louis M. Marson and its competitors were required to sell their mushrooms and at which Louis M. Marson and its competitors required packers and distributors to sell mushrooms to their customers; (3) charging the minimum prices or higher prices than minimum prices to packers, distributors and customers, and complying with the EMMC Pricing Policy; (4) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing controlling the supply of mushrooms (or "supply management," a term actually used in the meetings) with its competitors and agreeing with its competitors to create and implement a "Supply Control" campaign, with full knowledge and approval of the details of the campaign, including without limitation, knowledge and approval of each real estate transaction, and by voting to approve each transaction; and (5) agreeing to charge each EMMC member an Assessment to fund the Supply Control campaign, including each of the real estate transactions detailed herein, agreeing to pay and paying such Assessment, and agreeing to enforce the requirement that each EMMC member pay the Assessment. Louis M. Marson's participation alleged above will be set forth in more detail below.

41.    Defendant Mario Cutone Mushroom Co. Inc. ("Mario Cutone Mushroom") has its principal office in Avondale, Pennsylvania. Mario Cutone was not a mushroom grower and

was a distributor for grower and non-EMMC member and non-defendant M&V Enterprises. Mario Cutone Mushroom was an EMMC member during the Conspiracy Period and participated in the alleged antitrust conspiracy in several ways: (1) agreeing to form and join the EMMC, including signing a Membership Agreement, in which Mario Cutone agreed to be bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members, and in which Mario Cutone Mushroom agreed that the EMMC's Executive Committee could carry out the business and actions of the EMMC; (2) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing mushroom prices with its competitors and agreeing with its competitors to set minimum prices for mushrooms, at which Mario Cutone Mushroom and its competitors were required to sell their mushrooms and at which Mario Cutone Mushroom and its competitors required packers and distributors to sell mushrooms to their customers; (3) charging the minimum prices or higher prices than minimum prices to packers, distributors and customers, and complying with the EMMC Pricing Policy; (4) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing controlling the supply of mushrooms (or "supply management," a term actually used in the meetings) with its competitors and agreeing with its competitors to create and implement a "Supply Control" campaign, with full knowledge and approval of the details of the campaign, including without limitation, knowledge and approval of each real estate transaction, and by voting to approve each transaction; and (5) agreeing to charge each EMMC member an Assessment to fund the Supply Control campaign, including each of the real estate transactions detailed herein, agreeing to pay and paying such Assessment, and agreeing to enforce the requirement that each EMMC member pay the Assessment.   Mario Cutone Mushroom's participation alleged above will be set forth in more detail below.

42.     Defendant M.D. Basciani & Sons, Inc. ("M.D. Basciani") has its principal office in Avondale, Pennsylvania. M.D. Basciani was an EMMC member during the Conspiracy Period and participated in the alleged antitrust conspiracy in several ways: (1) agreeing to form and join the EMMC, including signing a Membership Agreement, in which M.D. Basciani agreed to be bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members, and in which M.D. Basciani agreed that the EMMC's Executive Committee could carry out the business and actions of the EMMC; (2) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing mushroom prices with its competitors and agreeing with its competitors to set minimum prices for mushrooms, at which M.D. Basciani and its competitors were required to sell their mushrooms and at which M.D. Basciani and its competitors required packers and distributors to sell mushrooms to their customers; (3) charging the minimum prices or higher prices than minimum prices to packers, distributors and customers, and complying with the EMMC Pricing Policy; (4) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing controlling the supply of mushrooms (or "supply management," a term actually used in the meetings) with its competitors and agreeing with its competitors to create and implement a "Supply Control" campaign, with full knowledge and approval of the details of the campaign, including without limitation, knowledge and approval of each real estate transaction, and by voting to approve each transaction; and (5) agreeing to charge each EMMC member an Assessment to fund the Supply Control campaign, including each of the real estate transactions detailed herein, agreeing to pay and paying such Assessment, and agreeing to enforce the requirement that each EMMC member pay the Assessment. M.D. Basciani's participation alleged above will be set forth in more detail below.

43.     Defendant Monterey Mushrooms, Inc. ("Monterey Mushrooms") has its principal office in Watsonville, California.  Monterey is a grower, processor, and shipper of mushrooms with a full line of fresh domestic and specialty mushrooms which it sells to supermarkets, foodservices, and ingredient manufacturing operations. Monterey is the largest grower/shipper and marketer of fresh mushrooms in the United States. Monterey boasts a workforce of approximately 3,000 employees and does nearly $300 million in annual sales. Monterey has farms in Florida, Illinois, California, Texas, Tennessee, and Pennsylvania. In addition, Monterey also sells processed mushrooms that are canned, frozen and glass-jarred, which it processes at facilities and plants in Missouri, California, Pennsylvania, and Texas.   Monterey Mushrooms was an EMMC member during the Conspiracy Period and participated in the alleged antitrust conspiracy in several ways: (1) agreeing to form and join the EMMC, including signing a Membership Agreement, in which Monterey Mushrooms agreed to be bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members, and in which Monterey Mushrooms agreed that the EMMC's Executive Committee could carry out the business and actions of the EMMC; (2) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing mushroom prices with its competitors and agreeing with its competitors to set minimum prices for mushrooms, at which Monterey Mushrooms and its competitors were required to sell their mushrooms and at which Monterey Mushrooms and its competitors required packers and distributors to sell mushrooms to their customers; (3) charging the minimum prices or higher prices than minimum prices to packers, distributors and customers, and complying with the EMMC Pricing Policy; (4) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing controlling the supply of mushrooms (or "supply management," a term actually used in the meetings) with its competitors

and agreeing with its competitors to create and implement a "Supply Control" campaign, with full knowledge and approval of the details of the campaign, including without limitation, knowledge and approval of each real estate transaction, and by voting to approve each transaction; and (5) agreeing to charge each EMMC member an Assessment to fund the Supply Control campaign, including each of the real estate transactions detailed herein, agreeing to pay and paying such Assessment, and agreeing to enforce the requirement that each EMMC member pay the Assessment. Monterey Mushrooms' participation alleged above will be set forth in more detail below.

44.     Defendant Masha & Toto, Inc. ("Masha & Toto") is a corporation trading as M & T Mushrooms with its principal office in Avondale, Pennsylvania. Masha & Toto was an EMMC member during the Conspiracy Period and participated in the alleged antitrust conspiracy in several ways: (1) agreeing to form and join the EMMC, including signing a Membership Agreement, in which Masha & Toto agreed to be bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members, and in which Masha & Toto agreed that the EMMC's Executive Committee could carry out the business and actions of the EMMC; (2) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing mushroom prices with its competitors and agreeing with its competitors to set minimum prices for mushrooms, at which Masha & Toto and its competitors were required to sell their mushrooms and at which Masha & Toto and its competitors required packers and distributors to sell mushrooms to their customers; (3) charging the minimum prices or higher prices than minimum prices to packers, distributors and customers, and complying with the EMMC Pricing Policy; (4) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing controlling the supply of mushrooms (or "supply management,

a term actually used in the meetings") with its competitors and agreeing with its competitors to create and implement a "Supply Control" campaign, with full knowledge and approval of the details of the campaign, including without limitation, knowledge and approval of each real estate transaction, and by voting to approve each transaction; and (5) agreeing to charge each EMMC member an Assessment to fund the Supply Control campaign, including each of the real estate transactions detailed herein, agreeing to pay and paying such Assessment, and agreeing to enforce the requirement that each EMMC member pay the Assessment. Masha & Toto's participation alleged above will be set forth in more detail below.

45. Defendant W&P Mushroom, Inc. ("W&P Mushroom") has its principal office in Oxford, Pennsylvania. W&P Mushroom was an EMMC member during the Conspiracy Period and participated in the alleged antitrust conspiracy in several ways: (1) agreeing to form and join the EMMC, including signing a Membership Agreement, in which W&P Mushroom agreed to be bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members, and in which W&P Mushroom agreed that the EMMC's Executive Committee could carry out the business and actions of the EMMC; (2) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing mushroom prices with its competitors and agreeing with its competitors to set minimum prices for mushrooms, at which W&P Mushroom and its competitors were required to sell their mushrooms and at which W&P Mushroom and its competitors required packers and distributors to sell mushrooms to their customers; (3) charging the minimum prices or higher prices than minimum prices to packers, distributors and customers, and complying with the EMMC Pricing Policy; (4) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing controlling the supply of mushrooms (or "supply management," a term actually used in the meetings) with its competitors

and agreeing with its competitors to create and implement a "Supply Control" campaign, with full knowledge and approval of the details of the campaign, including without limitation, knowledge and approval of each real estate transaction, and by voting to approve each transaction; and (5) agreeing to charge each EMMC member an Assessment to fund the Supply Control campaign, including each of the real estate transactions detailed herein, agreeing to pay and paying such Assessment, and agreeing to enforce the requirement that each EMMC member pay the Assessment. W&P Mushroom's participation alleged above will be set forth in more detail below.

46.     Defendant Mushroom Alliance, Inc. ("Mushroom Alliance") is an agricultural cooperative incorporated in Washington. Its designated registered agent is CT Corporation System, 520 Pike St., Seattle, WA 98101. Mushroom Alliance was an EMMC member during the Conspiracy Period and participated in the alleged antitrust conspiracy in several ways: (1) agreeing to form and join the EMMC, including signing a Membership Agreement, in which Mushroom Alliance agreed to be bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members, and in which Mushroom Alliance agreed that the EMMC's Executive Committee could carry out the business and actions of the EMMC; (2) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing mushroom prices with its competitors and agreeing with its competitors to set minimum prices for mushrooms, at which Mushroom Alliance and its competitors were required to sell their mushrooms and at which Mushroom Alliance and its competitors required packers and distributors to sell mushrooms to their customers; (3) charging the minimum prices or higher prices than minimum prices to packers, distributors and customers, and complying with the EMMC Pricing Policy; (4) attending and participating in EMMC meetings with its competitors

and, at those meetings, discussing controlling the supply of mushrooms (or "supply management," a term actually used in the meetings) with its competitors and agreeing with its competitors to create and implement a "Supply Control" campaign, with full knowledge and approval of the details of the campaign, including without limitation, knowledge and approval of each real estate transaction, and by voting to approve each transaction; and (5) agreeing to charge each EMMC member an Assessment to fund the Supply Control campaign, including each of the real estate transactions detailed herein, agreeing to pay and paying such Assessment, and agreeing to enforce the requirement that each EMMC member pay the Assessment. Mushroom Alliance's participation alleged above will be set forth in more detail below.

47. While the Mushroom Alliance was no longer an EMMC member as of September 1, 2002, it never withdrew from the conspiracy, and indeed, many of its members were or became members of the EMMC. The Mushroom Alliance never took affirmative steps, inconsistent with the objectives of the conspiracy, to disavow or defeat those objectives. In addition, the Mushroom Alliance never took affirmative steps to communicate any such steps and to disclose the conspiracy to law enforcement authorities. Finally, it did not take affirmative steps to reverse the effects of the EMMC's minimum prices or price policy and the Supply Control Program.

48. Defendant Creekside Mushrooms, Ltd. ("Creekside Mushrooms") is a vertically-integrated mushroom producer and member of the Mushroom Alliance. Its principal place of business is in Worthington, Pennsylvania. Creekside Mushrooms grows, processes, and ships its own mushrooms to retailers and directly to consumers. Creekside Mushrooms was a member of the Mushroom Alliance when the Mushroom Alliance was an EMMC member during the Conspiracy Period and participated in the alleged antitrust conspiracy as a member of the

Mushroom Alliance in several ways: (1) agreeing to form and join the EMMC, including signing a Membership Agreement, in which Creekside Mushrooms agreed to be bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members, and in which Creekside Mushrooms agreed that the EMMC's Executive Committee could carry out the business and actions of the EMMC; (2) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing mushroom prices with its competitors and agreeing with its competitors to set minimum prices for mushrooms, at which Creekside Mushrooms and its competitors were required to sell their mushrooms and at which Creekside Mushrooms and its competitors required packers and distributors to sell mushrooms to their customers; (3) charging the minimum prices or higher prices than minimum prices to packers, distributors and customers, and complying with the EMMC Pricing Policy; (4) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing controlling the supply of mushrooms (or "supply management," a term actually used in the meetings) with its competitors and agreeing with its competitors to create and implement a "Supply Control" campaign, with full knowledge and approval of the details of the campaign, including without limitation, knowledge and approval of each real estate transaction, and by voting to approve each transaction; and (5) agreeing to charge each EMMC member an Assessment to fund the Supply Control campaign, including each of the real estate transactions detailed herein, agreeing to pay and paying such Assessment, and agreeing to enforce the requirement that each EMMC member pay the Assessment. Finally, as stated in Mushroom Alliance letter to its members dated September 10, 2001, by virtue of the Mushroom Alliance's being an EMMC member, each member of the Mushroom Alliance "participate in EMMC." Thus, the letter states in pertinent part:

As the Alliance we have agreed to become a member of EMMC, and with the final approval of our attorney and the EMMC attorney, we are now current and have everything in order as an official member with EMMC.

So what does this mean to our members? It was originally meant that the Alliance would be the member of EMMC not individual members.

The question to each of you as either EMMC member or Alliance members is: do you want to be represented by the Alliance and participate in EMMC or do you want to be represented individually as your own company.

Creekside Mushrooms' participation alleged above will be set forth in more detail below.

49. While the Mushroom Alliance was no longer an EMMC member as of September 1, 2002, it never withdrew from the conspiracy, and indeed, many of its members were or became members of the EMMC. The Mushroom Alliance never took affirmative steps, inconsistent with the objectives of the conspiracy, to disavow or defeat those objectives. In addition, the Mushroom Alliance never took affirmative steps to communicate any such steps and to disclose the conspiracy to law enforcement authorities. Finally, it did not take affirmative steps to reverse the effects of the EMMC's minimum prices or price policy and the Supply Control Program.

50. Furthermore, while Creekside stated that if the Mushroom Alliance joined the EMMC, either the Mushroom Alliance had to quit the EMMC or Creekside would quit the Mushroom Alliance, Creekside never quit the Mushroom Alliance. In making that statement, Creekside indicated that the Mushroom Alliance represented Creekside on its behalf in the EMMC, Creekside was bound by the Mushroom Alliance's actions as a member of the EMMC, and therefore, Creekside participated in the EMMC. In addition, the Mushroom Alliance joined the EMMC in January 2001 and did not quit being a member of the EMMC until September 1, 2002, after minimum pricing was discussed and agreed to at several EMMC meetings which the Mushroom Alliance attended and participated in, as well as the real estate transactions that were

part of the Supply Control Program.

51.     Creekside also admitted that there was a perception that Creekside was a member of EMMC by virtue of the Mushroom Alliance's membership in the EMMC, and that this perception was an "honest difference of opinion," meaning that there was some basis in fact for that perception.  Moreover, from January 2001 through at least September 1, 2002, Creekside knew that the EMMC had a policy that required members to sell mushrooms to non-members only at the minimum prices.  Finally, Creekside viewed it and the Mushroom Alliance as the same in terms of the Mushroom Alliance's membership in the EMMC.

52.     Defendant J-M Farms, Inc. ("J-M Farms") has its principal office in Miami, Oklahoma.  J-M Farms was a member of the Mushroom Alliance when the Mushroom Alliance was an EMMC member during the Conspiracy Period and participated in the alleged antitrust conspiracy as a member of the Mushroom Alliance in several ways: (1) agreeing to form and join the EMMC, including signing a Membership Agreement, in which J-M Farms agreed to be bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members, and in which J-M Farms agreed that the EMMC's Executive Committee could carry out the business and actions of the EMMC; (2) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing mushroom prices with its competitors and agreeing with its competitors to set minimum prices for mushrooms, at which J-M Farms and its competitors were required to sell their mushrooms and at which J-M Farms and its competitors required packers and distributors to sell mushrooms to their customers; (3) charging the minimum prices or higher prices than minimum prices to packers, distributors and customers, and complying with the EMMC Pricing Policy; (4) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing controlling the supply of

mushrooms (or "supply management," a term actually used in the meetings) with its competitors and agreeing with its competitors to create and implement a "Supply Control" campaign, with full knowledge and approval of the details of the campaign, including without limitation, knowledge and approval of each real estate transaction, and by voting to approve each transaction; and (5) agreeing to charge each EMMC member an Assessment to fund the Supply Control campaign, including each of the real estate transactions detailed herein, agreeing to pay and paying such Assessment, and agreeing to enforce the requirement that each EMMC member pay the Assessment. Finally, as stated in Mushroom Alliance letter to its members dated September 10, 2001, by virtue of the Mushroom Alliance's being an EMMC member, each member of the Mushroom Alliance "participate in EMMC." Thus, the letter states in pertinent part:

> As the Alliance we have agreed to become a member of EMMC, and with the final approval of our attorney and the EMMC attorney, we are now current and have everything in order as an official member with EMMC.
> So what does this mean to our members? It was originally meant that the Alliance would be member of EMMC not individual members.
> The question to each of you as either EMMC member or Alliance members is: do you want to be represented by the Alliance and participate in EMMC or do you want to be represented individually as your own company.

J-M Farms also paid membership dues and the Supply Reduction Assessment directly to the EMMC. .J-M Farms's participation alleged above will be set forth in more detail below.

53. While the Mushroom Alliance was no longer an EMMC member as of September 1, 2002, it never withdrew from the conspiracy, and indeed, many of its members were or became members of the EMMC. The Mushroom Alliance never took affirmative steps, inconsistent with the objectives of the conspiracy, to disavow or defeat those objectives. In addition, the Mushroom Alliance never took affirmative steps to communicate any such steps and to disclose the conspiracy to law enforcement authorities. Finally, it did not take affirmative

steps to reverse the effects of the EMMC's minimum prices or price policy and the Supply Control Program.

54. Defendant United Mushroom Farms Cooperative, Inc. ("United Mushroom") is a Pennsylvania agricultural cooperative with its principal office in Avondale, Pennsylvania. United Mushroom was an EMMC member during the Conspiracy Period and participated in the alleged antitrust conspiracy in several ways: (1) agreeing to form and join the EMMC, including signing a Membership Agreement, in which United Mushroom agreed to be bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members, and in which United Mushroom agreed that the EMMC's Executive Committee could carry out the business and actions of the EMMC; (2) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing mushroom prices with its competitors and agreeing with its competitors to set minimum prices for mushrooms, at which United Mushroom and its competitors were required to sell their mushrooms and at which United Mushroom and its competitors required packers and distributors to sell mushrooms to their customers; (3) charging the minimum prices or higher prices than minimum prices to packers, distributors and customers, and complying with the EMMC Pricing Policy; (4) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing controlling the supply of mushrooms (or "supply management, a term actually used in the meetings") with its competitors and agreeing with its competitors to create and implement a "Supply Control" campaign, with full knowledge and approval of the details of the campaign, including without limitation, knowledge and approval of each real estate transaction, and by voting to approve each transaction; and (5) agreeing to charge each EMMC member an Assessment to fund the Supply Control campaign, including each of the real estate transactions detailed herein, agreeing to pay

and paying such Assessment, and agreeing to enforce the requirement that each EMMC member pay the Assessment. United Mushroom's participation alleged above will be set forth in more detail below.

55.     Defendant To-Jo Mushrooms, Inc. ("To-Jo") is related to and controlled by Brownstone. To-Jo processes, packs, and ships mushrooms on behalf of Brownstone. To-Jo has a large fleet of refrigerator trucks that deliver mushrooms directly to retail outlets and consumers throughout New England. To-Jo was not an EMMC member but agreed to sell at prices set by the EMMC, reported sales to the EMMC for purposes of determining the membership fees of the EMMC member with which it was affiliated, and benefitted from EMMC's policies that were adopted to benefit distributors.

56.     Defendant Cardile Brothers Mushroom Packaging, Inc. ("Cardile Bros.") does not grow mushrooms and is not a member of EMMC. It is a packager, seller, and distributor with its principal offices in Avondale, Pennsylvania. Both Cardile Mushrooms, Inc. and Cardile Brothers Mushroom Packaging, Inc. are owned and operated by Michael P. Cardile Sr. and Charles Cardile. Cardile Bros. agreed to sell at prices set by the EMMC, reported sales to the EMMC for purposes of determining the membership fees of the EMMC member with which it was affiliated, and benefitted from EMMC's policies that were adopted to benefit distributors.

57.     Defendant Giorgio Foods, Inc. (Giorgio Foods") is located in Temple, Pennsylvania and does not grow mushrooms, operating instead as a cannery and supplier of frozen foods. Giorgio Foods, Inc. is not a member of EMMC. Giorgio Foods agreed to sell at prices set by the EMMC, reported sales to the EMMC for purposes of determining the membership fees of the EMMC member with which it was affiliated, and benefitted from EMMC's policies that were adopted to benefit distributors.

58.     Defendant LRP Mushrooms, Inc. has its principal office in Landenberg, Pennsylvania. LRP Mushrooms, Inc. was a mushroom grower and was not an EMMC member during the Conspiracy Period.   LRP Mushrooms, Inc. agreed to sell at prices set by the EMMC, reported sales to the EMMC for purposes of determining the membership fees of the EMMC member with which it was affiliated, and benefitted from EMMC's policies that were adopted to benefit distributors.

59.     Defendant South Mill Mushroom Sales, Inc. ("South Mill") is located in Kennett Square, Pennsylvania, and is related through common ownership to Kaolin. South Mill is a "vertically integrated company" engaged throughout the production, transportation, marketing, and distribution process. South Mill has satellite offices and distribution centers in Louisiana, Texas, and Georgia.  South Mill claims that "[a]s a result of vertical integration we maintain total control over supply and quality of our product." On information and belief, South Mill does not grow mushrooms and was not an EMMC member during the Conspiracy Period. South Mill agreed to sell at prices set by the EMMC, reported sales to the EMMC for purposes of determining the membership fees of the EMMC member with which it was affiliated, and benefitted from EMMC's policies that were adopted to benefit distributors.

60.     Both Kaolin Mushroom and Defendant South Mill are jointly owned and operated by Defendants John and Michael Pia, each of whom have a 50% interest in each company. John and Michael Pia, through 100% ownership in two companies, Pennsylvania Mushroom Distribution, Inc. and Mushroom Substrate Technologies, Inc., held a 50% ownership interest in four companies that operated mushroom distribution centers in Dallas, Houston, New Orleans and Atlanta. The remaining 50% ownership interest in the distribution centers was held by Stuart Thomas through his ownership of Thomas Mushroom Distribution Inc. and Dallas South Mill

Inc. The Kaolin/South Mill distribution centers were not EMMC members, did not grow mushrooms but sold mushrooms grown by defendant Kaolin. The Kaolin/South Mill distribution centers adhered to EMMC price minimums in their mushroom sales.

61. Defendant Sher-Rockee Mushroom Farm is located in Lincoln University, Pennsylvania, was not a member of EMMC during the Conspiracy Period, but is related through common ownership to Defendant Modern Mushroom Sher-Rockee Mushroom Farm agreed to sell at prices set by the EMMC, reported sales to the EMMC for purposes of determining the membership fees of the EMMC member with which it was affiliated, and benefitted from EMMC's policies that were adopted to benefit distributors.

62. Defendant C & C Carriage Mushroom Co. ("C & C") is located in Toughkenamon, Pennsylvania, was not a member of EMMC during the Conspiracy Period, but is related through common ownership to Defendant Modern Mushroom. C & C operates as a mushroom packager and broker. C & C Carriage Mushroom Co. agreed to sell at prices set by the EMMC, reported sales to the EMMC for purposes of determining the membership fees of the EMMC member with which it was affiliated, and benefitted from EMMC's policies that were adopted to benefit distributors..

63. Defendant John Pia was one of the founders, member of the executive committee and president of EMMC, and is the Chief Executive Officer of defendant Kaolin, one of EMMC's members. John Pia was also a 50% co-owner and secretary/treasurer of Kaolin Mushroom Farms, a mushroom grower and a member of the Eastern Mushroom Marketing Cooperative (EMMC). (Pia. Dep.) at 7:12-14, 7:22-24, 11:13-15; 33:18-34:8. Pia was also a 50% co-owner and president of South Mill Mushroom Sales, Inc., a mushroom distribution entity. *Id.* at 8:5-18. John Pia participated in the improper conduct alleged herein as set forth below.

Michael Pia was an officer of EMMC, and is the President of defendant Kaolin, one of EMMC's members. On information and belief, Michael Pia participated in the improper conduct alleged herein.

**NON-DEFENDANT CO-CONSPIRATORS**

64.     Kitchen Pride Mushrooms is a non-defendant co-conspirator ("Kitchen Pride") with its principal office in Gonzales, Texas. Kitchen Pride was a member of the Mushroom Alliance when the Mushroom Alliance was a member of EMMC during the Conspiracy Period. Kitchen Pride itself also was an EMMC member during the Conspiracy Period and participated in the alleged antitrust conspiracy as a member of the Mushroom Alliance and on its own right in several ways: (1) agreeing to form and join the EMMC, including signing a Membership Agreement, in which Kitchen Pride agreed to be bound by the collective action of the EMMC, which required a 2/3 vote of the EMMC members, and in which Kitchen Pride agreed that the EMMC's Executive Committee could carry out the business and actions of the EMMC; (2) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing mushroom prices with its competitors and agreeing with its competitors to set minimum prices for mushrooms, at which Kitchen Pride and its competitors were required to sell their mushrooms and at which Kitchen Pride and its competitors required packers and distributors to sell mushrooms to their customers; (3) charging the minimum prices or higher prices than minimum prices to packers, distributors and customers, and complying with the EMMC Pricing Policy; (4) attending and participating in EMMC meetings with its competitors and, at those meetings, discussing controlling the supply of mushrooms (or "supply management," a term actually used in the meetings) with its competitors and agreeing with its competitors to create and implement a "Supply Control" campaign, with full knowledge and

approval of the details of the campaign, including without limitation, knowledge and approval of each real estate transaction, and by voting to approve each transaction; and (5) agreeing to charge each EMMC member an Assessment to fund the Supply Control campaign, including each of the real estate transactions detailed herein, agreeing to pay and paying such Assessment, and agreeing to enforce the requirement that each EMMC member pay the Assessment. Finally, as stated in Mushroom Alliance letter to its members dated September 10, 2001, by virtue of the Mushroom Alliance's being an EMMC member, each member of the Mushroom Alliance "participate in EMMC." Thus, the letter states in pertinent part:

> As the Alliance we have agreed to become a member of EMMC, and with the final approval of our attorney and the EMMC attorney, we are now current and have everything in order as an official member with EMMC.
> So what does this mean to our members? It was originally meant that the Alliance would be the member of EMMC not individual members.
> The question to each of you as either EMMC member or Alliance members is: do you want to be represented by the Alliance and participate in EMMC or do you want to be represented individually as your own company.

65.     While the Mushroom Alliance was no longer an EMMC member as of September 1, 2002, it never withdrew from the conspiracy, and indeed, many of its members, including Kitchen Pride, were or became members of the EMMC. The Mushroom Alliance never took affirmative steps, inconsistent with the objectives of the conspiracy, to disavow or defeat those objectives. In addition, the Mushroom Alliance never took affirmative steps to communicate any such steps and to disclose the conspiracy to law enforcement authorities. Finally, it did not take affirmative steps to reverse the effects of the EMMC's minimum prices or price policy and the Supply Control Program.

66.     As detailed herein above and below, each EMMC member and nonmember third-parties identified herein actively participated in the unlawful conduct alleged herein.

# IV.   TRADE AND COMMERCE

67.    In 2002, domestic sales of all mushrooms were over $800 million, with the vast majority being the common table mushroom, called the Agaricus or "white button" mushroom (agaricus bisporus). According to the United States Department of Agriculture ("USDA"), from 2001-2005, Agaricus mushrooms accounted for 98% of all mushrooms grown in the U.S., and are sold to fresh market retailers such as grocery store chains and food distributors, and also to canneries. The Agaricus mushrooms grown by EMMC members and nonmembers were sold to both the fresh market retailers and canneries in various states, and were shipped by members and nonmembers between states.

68.    The relevant antitrust product market is fresh Agaricus mushrooms, and the relevant geographic market is the United States, or alternatively, the eastern United States.

# V.    DEFENDANTS' ANTICOMPETITIVE CONDUCT

69.    From January 2001 to the present, the following Defendants were EMMC members: Bella Mushroom, Brownstone, Cardile Mushrooms, Country Fresh, Forest Mushrooms, Franklin Farms, Gino Gaspari, Gaspari Bros., Giorgi Mushroom, Kaolin Mushroom, Leone Pizzini, LRP-M Mushrooms LLC, Modern Mushroom, Oakshire Mushroom, Phillips Mushroom, Harvest Fresh, Louis M. Marson, Mario Cutone Mushroom, M.D. Basciani, Monterey Mushrooms, Masha & Toto, W&P Mushroom, Mushroom Alliance, (who included Creekside Mushrooms, Kitchen Pride, J-M Farms, as members) and United Mushroom, ("collectively "EMMC Member Defendants")

70.    As detailed below, each of the EMMC Member Defendants:

    a.   Joined the EMMC in January 2001 and some remained as members to this day (AMC-EMMC-0001);[1]

---

[1] Plaintiffs have not had the benefit of discovery and lack access to most of documents cited herein but learned of their existence and/or portions of their content to the extent they were contained or referenced in pleadings in the

b. Created and agreed to minimum prices for mushrooms with their competitor fellow EMMC members;

c. Agreed in their membership agreements to comply with the EMMC's minimum price lists. (Executed Membership for Bella Mushroom Farms), EMMC-DOJ-01107 at 1111 (Members agreed to "sell mushrooms to all customers only on the terms authorized by the Cooperative");

d. Agreed to create and implement a Supply Control Program, and to charge each EMMC member an Assessment to pay for the Supply Control Program, which Assessment each EMMC member paid; and

e. Had knowledge of agreed to and voted in favor of each real estate transaction that was part of the Supply Control Program (as detailed below).

71.     The Defendants also include the following distributors who were affiliated with members of the EMMC: To-Jo, Cardile Bros., Giorgio Foods, South Mill, Sher-Rockee Mushroom Farm, C&C, LRP Mushrooms, Inc. and Gaspari Bros. (plead in the alternative) (collectively "Non-Member Defendants"). These Non-Member Defendants also participated in and benefitted from the conspiracy as each:

a. Agreed to sell at prices set by the EMMC. *See e.g.* Pizzini Tr. at 187:19-197:16; Schroeder Tr. at 118:4-25; Reitnauer Tr. at 98:24-99:10; Ferranto Tr. at 76:21-25; Cutone Tr. at 81:16-83:3; Cardile Tr. at 146:6-146:21, 245:6-14; Beltran Tr. at 204:23-205:3; Pia Tr. at 251:11-20; T. D'Amico Tr. at 171:6-172:3; *See also* Stuart Thomas testimony at fn. 3 infra.

b. Reported sales to the EMMC for purposes of determining the membership fees of the EMMC member with which it was affiliated. *See* Answers, Objections and Responses by Defendant Eastern Mushroom Marketing Cooperative (Now Known as American Mushroom Cooperative) To Direct Purchaser Class Plaintiffs' First Set of Interrogatories, chart entitled "EMMC Assessment Base and pounds sold that were produced by each member;" and

---

related *In Re Mushroom Direct Purchaser Antitrust Litigation*, Master File No. 2:06-cv-00620-BMS (E.D. Pa.). In the event that this Court finds the allegations contained in this First Amended Complaint lacking, Plaintiffs request that they be given access to the discovery in the main case, as well as access to sealed documents, and after reviewing those materials, be given the right to replead again. Finally, Plaintiffs would appreciate guidance from the Court on how they should proceed to obtain the discovery in the main case and access to the sealed documents.

c. Benefitted from EMMC's policies that were adopted to benefit distributors.

## THE FORMATION OF THE EMMC

72.     The EMMC was formed under the laws of Commonwealth of Pennsylvania on or about December 21, 2000.

73.     The EMMC began operations in January 2001, and is the largest mushroom cooperative in the United States.

74.     Defendant John Pia of Kaolin Mushroom Farms with South Mill Mushroom and Shah Kazemi of Monterrey Mushrooms founded the Eastern Mushroom Marketing Cooperative, in late 2000.

75.     Pia was the president of the EMMC in 2000, when it came into being. Ex. A. (Pia Dep.) at 55:8-18.

76.     Pia and Kazemi approached other mushroom growers and distributors in late 2000 to invite them to join the EMMC.

77.     Pia and Kazemi told these growers and distributors that the purpose of the EMMC was to stabilize the marketplace and to stabilize mushroom prices.   A number of these growers and distributors agreed to join the EMMC in order to improve mushroom prices.  These growers and distributors included the first directors of the EMMC, including Michael Cardile.   This was at the November 28, 2000 organizational meeting.   In addition, at this meeting, each EMMC member Defendant attended, including the Mushroom Alliance on behalf and with the knowledge of its members Creekside, J-M, Kitchen Pride and others.

78.     Under the 2001 EMMC membership agreement, the purported "objective of the Cooperative" was:

                to improve conditions in the mushroom industry for the mutual benefit of

its members as producers by promoting, fostering and encouraging the intelligent and orderly marketing of mushrooms through cooperation; eliminating speculation, waste and fluctuating prices, making the distribution of agricultural byproducts between producers and consumers as direct as can be efficiently done, thereby eliminating any manipulation of the price by middlemen, stabilizing the marketing of agricultural products, encouraging efficiency and economy in marketing; preventing the demoralizing of markets resulting from dumping and predatory practices; mitigating the recognized evils of a marketing system under which prices are set for the entire industry by the weakest producer; and fostering the ability of the members of this Cooperative to obtain prices for their mushrooms in competitive markets, which are fair prices but not prices inflated beyond the reasonable value of such products by reason of artificially created scarcity of such products or other predatory trade practices which would injure the public interest.

79.     It was under Defendant John Pia's leadership, guidance and oversight as a founder, member of the Executive Committee, and as the EMMC's first president that the EMMC, through the agreement of each of its members, acting collectively with each and every other EMMC member, agreed to and implemented the price-fixing agreements at issue here, including setting the prices to be charged and implementing the first price fix in February 2001.

80.     In addition, John Pia was personally involved in implementing the EMMC's supply reduction program starting in 2001, which was created and agreed to by each EMMC member, acting collectively with each and every other EMMC member.

81.     Under the EMMC membership agreement, each member agreed that it was "one of numerous producers engaged in the production and marketing of mushrooms." (Executed Membership Agreement for Bella Farms) at 1.

82.     Each member "expressly represent[ed] and warrant[ed] that it [was then] engaged in the production of mushrooms, that it [was] in a position to control the mushrooms subject to [the] Agreement and that it [would] be able to perform according to [the] Agreement." *Id.* at 7, ¶ 14.

83. Each member also agreed that it "competes with other members for the same customers." *Id.* at 4, ¶ 4.

84. EMMC members paid dues based on the number of pounds of mushrooms that were sold to the fresh market by their distributor operations and not the amount grown by the growing operations.

85. Each EMMC Member had voting rights in the EMMC to direct its actions, and each had knowledge of the EMMC's pricing policies (which they all agreed to) and the EMMC's supply reduction program that they voted on and funded.

86. The EMMC at all times acted for and on behalf of its members for their mutual benefit.

87. The EMMC issued Weekly Confidential Newsletters to its members.

88. The EMMC had an Executive Committee that was authorized by the EMMC members to carry out actions on their behalf and EMMC's behalf.

89. All EMMC members were required to maintain escrow accounts to ensure compliance with the EMMC's policies.

90. While the EMMC was ostensibly set up as an agriculture related cooperative, the EMMC and its members as explained below were not entitled to any of the limited antitrust protections afforded under the Capper-Volstead Act.

### THE EMMC MEMBERSHIP INCLUDED NON-GROWERS AND VERTICALY INTEGRATED GROWER, DISTRIBUTOR PROCESSORS

91. The EMMC membership included both non-growers and vertically  integrated grower, distributor processors.

92.  As was explained in a January 23, 2001 letter from then-EMMC counsel to John Pia, President of the EMMC:

50

Among the EMMC membership there are several different organizational structures used for the conduct of business. As we know, all EMMC members are "producers", i.e. mushroom growers and farmers. [10] However, because of internal operational/organizational choices or relationships with affiliates and/or wholly owned operational/organizational choices or relationships with affiliates and/or wholly owned subsidiaries, *almost all of the producer/member organizations also either process, package, market and or sell mushrooms.* Generally speaking, this is accomplished in the following ways:

a. by a single legal entity performing all related tasks;

b. by a parent, and a wholly owned-subsidiary which separate the growing and sales function into separate but related legal entities;

c. by related legal entities which share common or similar ownership and which are generally operated by a core family control group; and

d. in the case of the Mushroom Alliance, on a cooperative basis similar to, but smaller than, EMMC.

(Emphasis added.)

The letter further explained that:

EMMC is organized in a "non-traditional" sense in terms of the "classic" cooperative. Most, but not all, agricultural cooperatives differ from EMMC in that they tend to combine grower organizations for the collective purpose of consolidating and sharing the "getting-to-market" function for agricultural products, i.e., processing, handling, sales and marketing. These "classic" coops include organizations like Land O'Lakes, Sunmaid, Welch's, Sunkist and Ocean Spray. EMMC is not like those cooperatives given that EMMC members will continue to conduct independent businesses.

93.     The EMMC membership also included non-growers.

94.     For example, Mario Cutone Mushroom was a non-grower who became a member

of the EMMC at its inception in January of 2001.  Mario Cutone Mushroom was a distributor for

grower and non-EMMC member, non-defendant M & V Enterprises.

**NAKED PRICE FIXING AGREEMENT ON**

## 2001 MINIMUM PRICES AND OTHER ACTIONS

95.     One of the first acts of EMMC members after forming the cooperative was to agree to increase prices in each of the geographic regions where its members sell mushrooms. The agreed-upon price increases averaged about 8 percent nationwide.

96.     Shortly after its formation, on January 9, 2001, the EMMC held "a general membership meeting to discuss and sign the membership agreement." (EMMC January 9, 2001 Meeting Minutes).

97.     At this meeting "[p]ricing policies and minimum pricing for fresh mushroom products by region were discussed. Minimum price for individual products were discussed and agreed to by region." *Id.*

98.     Members of the EMMC agreed "not to sell or otherwise dispose of mushrooms except as provided under the terms of [the membership] Agreement and the Articles of Incorporation and Bylaws of the Cooperative." (Executed Membership Agreement for Bella Farms at 4, ¶ 6).

99.     Effective February 2001, the EMMC issued a minimum price list and pricing policy, agreed to by the EMMC members at the January 9, 2001 EMMC meeting.  That policy established minimum pricing for various types, grades, sizes and packaging modes of mushrooms. (EMMC Current Policies, Revision Date Feb. 13, 2001).

100.    Members agreed that they would "arrange or negotiate with buyers for the sale of mushrooms produced by or for [the member]." Id. at 4, ¶4.

101.    The agreement with respect to pricing applied to "sales to the retailers, wholesalers and to the non-members." A. David Carroll, Jr. Dep., at 130:5-18; see also Michael Basciani Dep. at 75:18-24 ("Q .... one of the policies that the EMMC adopted was to try to set

prices for - the downstream price that shippers got when they sold their product to wholesalers and retailers, correct? A. Yes, sir.").

102.    In other words, the EMMC set floor pricing for mushrooms that came out of packaging operations, not for mushrooms that came out of growing operations. *See* Michael P. Cardile Dep. at 145:9-147:4.

103.    Under the policy, each EMMC member agreed, acting collectively with each and every other EMMC member, *inter alia*, that "[t]he pricing listed for each product is the minimum price for that product delivered to a customer in a region." (EMMC Current Policies, Revision Date Feb. 13, 2001).

104.    The policy provided:

> FOB[2] pricing minimum for each product is equal to $.50 less than the delivered price for the region [in which] the farm is located.  For example, the minimum FOB price for a farm in the Mid Atlantic region is $.50 less than the delivered price for that product in the Mid Atlantic region.

*Id.*

105.    The policy provided that "[n]on-member mushroom farms are to be sold to at the same FOB price as customers.[…]" *Id.*

106.    Under the policy, "[n]o pricing is set for member-to-member (sideways sales within the cooperative. The members buying and selling will agree individually to the pricing for each sideway[s] sale." *Id.*

107.    The policy also provided that "[m]embers with off site Distribution Facilities" – "defined as off site distribution facilities owned (51 % or greater ownership by the member and whose sales pricing is controlled by the member)" – "must sell to other wholesalers at or above

---

[2] FOB or "free on board" means that goods are "delivered free of charge on the means of conveyance, such as air, rail, or sea." Free on board, Black's Law Dictionary (10th ed.2014). The term allocates "the rights and duties of the buyer and the seller of goods with respect to delivery, payment, and risk of loss, whereby the seller must clear the goods for export, and the buyer must arrange for transportation." *Id.*

the minimum pricing for that product." *Id.*

108.    When asked whether the EMMC adopted minimum pricing "[a]s part of the rules and regulations of the EMMC," Defendant John Pia testified that it "did adopt minimum pricing." (Pia Dep.) at 59:4-8.

109.    In his July 2, 2001 email to the EMMC Pia touted the unprecedented pricing levels for fresh mushrooms, Pia wrote:

> On the subject of market pricing: I think you have to go back to our fathers['] time, or before, to find a situation which allowed us to realize the levels of fresh market pricing that we now see, during a period of unprecedented low cannery prices. Of all the things that the EMMC has done, this has to stand out as . . . the most significant accomplishment. Yet, it doesn't happen by magic. It happens only because each of us as members, maintains our honor and commitment to those things we have agreed to do as a team.

(CREEK-RFP-0000349)

110.    Pia continued that "[i]ncreased pricing in the future should allow us to keep up with the 'cost of business[.]' No longer should we hope for the demise of an industry member to be able to realize pricing suitable to maintain our own existence." *Id.* at CREEK-RFP-0000350. Concluding his email, Pia asked, "[w]here would our fresh market pricing be today with cannery pricing at $.30 and $.20 . . . ?" (CREEK-RFP-0000349).

111.    EMMC members that had related non-grower packaging and distribution operations were required to force their non-grower operations to sell at minimum EMMC prices to the non-grower operations' customers.  Specifically for "members" that sold through a related non-EMMC distributor entity, the EMMC pricing applied to sales made by the non-EMMC distributor entity and not the member grower entity. Pizzini Tr. at 187:19-197. Schroeder Tr. at 118:4-25; Reitnauer Tr. at 98:24-99:10; Ferranto Tr. at 33:9-34:5; Manfredini Tr. at 50:25-51:10; Basciani Tr. at 76:21-25; Cutone Tr. at 81:16-83:3; Cardile Tr. at 145:6-146:21, 245:6-14;

Beltran Tr. at 204:23-205:3; Pia Tr. at 251:11-20; T. D'Amico Tr. at 171:6-172:3.[3]

112.    Bella Mushroom attended the January 9, 2001 EMMC meeting with its competitors and discussed mushroom prices and the pricing policy detailed in Paragraphs 95-111 above.  Bella Mushroom agreed to and voted in favor of setting those minimum prices and that pricing policy at that meeting. In addition, Bella Mushroom had knowledge of and acquiesced in the setting of those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

113.    Brownstone Mushroom Farms attended the January 9, 2001 EMMC meeting with its competitors and discussed mushroom prices and the pricing policy detailed in Paragraphs 95-111 above.  Brownstone Mushroom Farms agreed to and voted in favor of setting those minimum prices and that pricing policy at that meeting.  In addition, Brownstone Mushroom Farms had knowledge of and acquiesced in the setting of those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

114.    Cardile Mushrooms, Inc. attended the January 9, 2001 EMMC meeting with its competitors and discussed mushroom prices and the pricing policy detailed in Paragraphs 95-111 above.  Cardile Mushrooms, Inc. agreed to and voted in favor of setting those minimum prices and that pricing policy at that meeting.  In addition, Cardile Mushrooms, Inc. had knowledge of and acquiesced in the setting of those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the

---

[3] *See e.g.* Stuart Thomas Tr. indicating (it was John Pia who verbally communicated to him the prices at which the South Mill distribution entity – which was not an EMMC member – should resell mushrooms to the market. (Thomas Dep.) at 47:22-48:10 ("Q. . . . who communicated to you the prices at which you should sell? A. John Pia."); id. at 92:16-93:10 ("Q. . . . why are your prices set by the EMMC . . . ? . . . A. I was informed by John Pia that I had to follow the rules of the EMMC. . . . . Q. Who verbally communicated that pricing? A. John Pia.").

Executive Committee could carry out the actions of the EMMC.

115. Country Fresh Mushroom Co. attended the January 9, 2001 EMMC meeting with its competitors and discussed mushroom prices and the pricing policy detailed in Paragraphs 95-111 above. Country Fresh Mushroom Co. agreed to and voted in favor of setting those minimum prices and that pricing policy at that meeting. In addition, Country Fresh Mushroom Co. had knowledge of and acquiesced in the setting of those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

116. Forest Mushrooms Inc. attended the January 9, 2001 EMMC meeting with its competitors and discussed mushroom prices and the pricing policy detailed in Paragraphs 95-111 above. Forest Mushrooms Inc. agreed to and voted in favor of setting those minimum prices and that pricing policy at that meeting. In addition, Forest Mushrooms Inc. had knowledge of and acquiesced in the setting of those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

117. Franklin Farms, Inc. attended the January 9, 2001 EMMC meeting with its competitors and discussed mushroom prices and the pricing policy detailed in Paragraphs 95-111 above. Franklin Farms, Inc. agreed to and voted in favor of setting those minimum prices and that pricing policy at that meeting. In addition, Franklin Farms, Inc. had knowledge of and acquiesced in the setting of those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

118. Gino Gaspari & Sons, Inc. attended the January 9, 2001 EMMC meeting with its

competitors and discussed mushroom prices and the pricing policy detailed in Paragraphs 95-111 above. Gino Gaspari & Sons, Inc. agreed to and voted in favor of setting those minimum prices and that pricing policy at that meeting. In addition, Gino Gaspari & Sons, Inc. had knowledge of and acquiesced in the setting of those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

119. Gaspari Bros., Inc. attended the January 9, 2001 EMMC meeting with its competitors and discussed mushroom prices and the pricing policy detailed in Paragraphs 95-111 above. Gaspari Bros., Inc. agreed to and voted in favor of setting those minimum prices and that pricing policy at that meeting. In addition, Gaspari Bros., Inc. had knowledge of and acquiesced in the setting of those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

120. Giorgi Mushroom Company attended the January 9, 2001 EMMC meeting with its competitors and discussed mushroom prices and the pricing policy detailed in Paragraphs 95-111 above. Giorgi Mushroom Company agreed to and voted in favor of setting those minimum prices and that pricing policy at that meeting. In addition, Giorgi Mushroom Company had knowledge of and acquiesced in the setting of those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

121. Kaolin Mushroom Farms, Inc. attended the January 9, 2001 EMMC meeting with its competitors and discussed mushroom prices and the pricing policy detailed in Paragraphs 95-111 above. Kaolin Mushroom Farms, Inc. agreed to and voted in favor of setting those

minimum prices and that pricing policy at that meeting.  In addition, Kaolin Mushroom Farms, Inc. had knowledge of and acquiesced in the setting of those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

122.    Leone Pizzini & Son, Inc. attended the January 9, 2001 EMMC meeting with its competitors and discussed mushroom prices and the pricing policy detailed in Paragraphs 95-111 above.  Leone Pizzini & Son, Inc. agreed to and voted in favor of setting those minimum prices and that pricing policy at that meeting.  In addition, Leone Pizzini & Son, Inc. had knowledge of and acquiesced in the setting of those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

123.    LRP-M Mushrooms LLC attended the January 9, 2001 EMMC meeting with its competitors and discussed mushroom prices and the pricing policy detailed in Paragraphs 95-111 above.  LRP-M Mushrooms LLC agreed to and voted in favor of setting those minimum prices and that pricing policy at that meeting.  In addition, LRP-M Mushrooms LLC had knowledge of and acquiesced in the setting of those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

124.    Modern Mushroom Farms, Inc. attended the January 9, 2001 EMMC meeting with its competitors and discussed mushroom prices and the pricing policy detailed in Paragraphs 95-111 above.  Modern Mushroom Farms, Inc. agreed to and voted in favor of setting those minimum prices and that pricing policy at that meeting.  In addition, Modern Mushroom Farms, Inc. had knowledge of and acquiesced in the setting of those minimum prices and that

pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

125.    Oakshire Mushroom Farm, Inc. attended the January 9, 2001 EMMC meeting with its competitors and discussed mushroom prices and the pricing policy detailed in Paragraphs 95-111 above.  Oakshire Mushroom Farm, Inc. agreed to and voted in favor of setting those minimum prices and that pricing policy at that meeting.  In addition, Oakshire Mushroom Farm, Inc. had knowledge of and acquiesced in the setting of those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

126.    Phillips Mushroom Farms, Inc. attended the January 9, 2001 EMMC meeting with its competitors and discussed mushroom prices and the pricing policy detailed in Paragraphs 95-111 above.  Phillips Mushroom Farms, Inc. agreed to and voted in favor of setting those minimum prices and that pricing policy at that meeting.  In addition, Phillips Mushroom Farms, Inc. had knowledge of and acquiesced in the setting of those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

127.    Harvest Fresh Farms attended the January 9, 2001 EMMC meeting with its competitors and discussed mushroom prices and the pricing policy detailed in Paragraphs 95-111 above.  Harvest Fresh Farms agreed to and voted in favor of setting those minimum prices and that pricing policy at that meeting.  In addition, Harvest Fresh Farms had knowledge of and acquiesced in the setting of those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the

Executive Committee could carry out the actions of the EMMC.

128.     Louis M. Marson, Inc. attended the January 9, 2001 EMMC meeting with its competitors and discussed mushroom prices and the pricing policy detailed in Paragraphs 95-111 above.  Louis M. Marson, Inc. agreed to and voted in favor of setting those minimum prices and that pricing policy at that meeting.  In addition, Louis M. Marson, Inc. had knowledge of and acquiesced in the setting of those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

129.     Mario Cutone Mushroom Co. Inc. attended the January 9, 2001 EMMC meeting with its competitors and discussed mushroom prices and the pricing policy detailed in Paragraphs 95-111 above.  Mario Cutone Mushroom Co. Inc. agreed to and voted in favor of setting those minimum prices and that pricing policy at that meeting.  In addition, Mario Cutone Mushroom Co. Inc. had knowledge of and acquiesced in the setting of those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

130.     M.D. Basciani & Sons, Inc. attended the January 9, 2001 EMMC meeting with its competitors and discussed mushroom prices and the pricing policy detailed in Paragraphs 95-111 above.  M.D. Basciani & Sons, Inc. agreed to and voted in favor of setting those minimum prices and that pricing policy at that meeting.  In addition, M.D. Basciani & Sons, Inc. had knowledge of and acquiesced in the setting of those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

131.     Monterey Mushrooms, Inc. attended the January 9, 2001 EMMC meeting with its competitors and discussed mushroom prices and the pricing policy detailed in Paragraphs 95-111 above.  Monterey Mushrooms, Inc. agreed to and voted in favor of setting those minimum prices and that pricing policy at that meeting.  In addition, Monterey Mushrooms, Inc. had knowledge of and acquiesced in the setting of those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

132.     Masha & Toto, Inc. attended the January 9, 2001 EMMC meeting with its competitors and discussed mushroom prices and the pricing policy detailed in Paragraphs 95-111 above.  Masha & Toto, Inc. agreed to and voted in favor of setting those minimum prices and that pricing policy at that meeting.  In addition, Masha & Toto, Inc. had knowledge of and acquiesced in the setting of those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

133.     W&P Mushroom, Inc. attended the January 9, 2001 EMMC meeting with its competitors and discussed mushroom prices and the pricing policy detailed in Paragraphs 95-111 above.  W&P Mushroom, Inc. agreed to and voted in favor of setting those minimum prices and that pricing policy at that meeting.  In addition, W&P Mushroom, Inc. had knowledge of and acquiesced in the setting of those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

134.     Mushroom Alliance, Inc. attended the January 9, 2001 EMMC meeting with its competitors and discussed mushroom prices and the pricing policy detailed in Paragraphs 95-111

above. Mushroom Alliance, Inc. agreed to and voted in favor of setting those minimum prices and that pricing policy at that meeting. In addition, Mushroom Alliance, Inc. had knowledge of and acquiesced in the setting of those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

135.  Creekside Mushrooms, Ltd. attended the January 9, 2001 EMMC meeting with its competitors and discussed mushroom prices and the pricing policy detailed in Paragraphs 95-111 above. Creekside Mushrooms, Ltd. also agreed to and voted in favor of setting those minimum prices and that pricing policy at that meeting. In addition, Creekside Mushrooms, Ltd. had knowledge of and acquiesced in the setting of those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

136.  Kitchen Pride Mushrooms attended the January 9, 2001 EMMC meeting with its competitors and discussed mushroom prices and the pricing policy detailed in Paragraphs 95-111 above. Kitchen Pride Mushrooms also agreed to and voted in favor of setting those minimum prices and that pricing policy at that meeting. In addition, Kitchen Pride Mushrooms had knowledge of and acquiesced in the setting of those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

137.  J-M Farms, Inc. attended the January 9, 2001 EMMC meeting with its competitors and discussed mushroom prices and the pricing policy detailed in Paragraphs 95-111 above. J-M Farms, Inc. also agreed to and voted in favor of setting those minimum prices and that pricing policy at that meeting. In addition, J-M Farms, Inc. had knowledge of and

acquiesced in the setting of those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

138.    United Mushroom Farms Cooperative, Inc. attended the January 9, 2001 EMMC meeting with its competitors and discussed mushroom prices and the pricing policy detailed in Paragraphs 95-111 above.  United Mushroom Farms Cooperative, Inc. voted in favor of that pricing policy at that meeting.  In addition, United Mushroom Farms Cooperative, Inc. had knowledge of and acquiesced in the setting of those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

**AGREEMENT ON 2002 MINIMUM PRICES AND OTHER ACTIONS**

139.    When the EMMC met on March 12, 2002, "[a] pricing list for every product sold was distributed." EMMC Meeting Minutes March 12, 2002, at 2. Each EMMC member, acting collectively with each and every other EMMC member, agreed to the new minimum prices for mushrooms discussed at this meeting, and voted to approve the new minimum prices.

140.    In order to monitor and police compliance with their anticompetitive pricing agreements, at the March meeting the EMMC members discussed a Budget Audit Committee which was "to do mandatory individual audits on members. They will take the minimum pricing list and match it to members' books." *Id.* at 1.

141.    The EMMC met again on April 9, 2002, where the EMMC members discussed mushroom prices with each other as competitors, and each EMMC member, acting collectively with each and every other EMMC member, agreed to and voted to approve a mushroom price increase.  *See* April 9, 2002 Meeting Minutes, EMMC-DOJ-00232 at 234 (describing successful

motion to increase the price of retail washed, sliced mushrooms by $.20 per pound). Under the EMMC policy revised on April 24, 2002, and agreed to by the EMMC members, EMMC members were "never permitted to offer pricing below EMMC minimums to obtain the current business of a non-member in an new or shared account." EMMC Current Policies, Revision Date, Apr. 24, 2002, at 4.

142. Members were "never permitted to offer prices below the EMMC minimums to counter a purported offer from an EMMC member." *Id.*

143. Bella Mushroom attended the March 12, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and the pricing policy detailed in Paragraphs 139-140 above. Bella Mushroom agreed to and voted in favor of those minimum prices and that pricing policy at that meeting. In addition, Bella Mushroom had knowledge of and acquiesced in those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

144. Bella Mushroom attended the April 9, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and detailed in Paragraph 141 above. Bella Mushroom agreed to and voted in favor of those minimum prices at that meeting. In addition, Bella Mushroom had knowledge of and acquiesced in that minimum pricing, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

145. Bella Mushroom agreed to and voted in favor of the April 24, 2002 EMMC Policy Revision described in Paragraphs 141-142 above. In addition, Bella Mushroom had knowledge of and acquiesced in that Policy Revision, including without limitation, agreeing to

be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

146.     Brownstone Mushroom Farms attended the March 12, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and the pricing policy detailed in Paragraphs 139-140 above.  Brownstone Mushroom Farms agreed to and voted in favor of those minimum prices and that pricing policy at that meeting.  In addition, Brownstone Mushroom Farms had knowledge of and acquiesced in those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

147.     Brownstone Mushroom Farms. attended the April 9, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and detailed in Paragraph 141  above.  Brownstone Mushroom Farms agreed to and voted in favor of those minimum prices at that meeting.   In addition, Brownstone Mushroom Farms had knowledge of and acquiesced in that minimum pricing, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

148.     Brownstone Mushroom Farms agreed to and voted in favor of the April 24, 2002 EMMC Policy Revision described in Paragraphs 141-142 above.   In addition, Brownstone Mushroom Farms had knowledge of and acquiesced in that Policy Revision, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

149.     Cardile Mushrooms, Inc. attended the March 12, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and the pricing policy detailed

in Paragraphs 139-140 above. Cardile Mushrooms, Inc. agreed to and voted in favor of those minimum prices and that pricing policy at that meeting. In addition, Cardile Mushrooms, Inc. had knowledge of and acquiesced in those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

150. Cardile Mushrooms, Inc. attended the April 9, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and detailed in Paragraph 141 above. Cardile Mushrooms, Inc. agreed to and voted in favor of those minimum prices at that meeting. In addition, Cardile Mushrooms, Inc. had knowledge of and acquiesced in that minimum pricing, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

151. Cardile Mushrooms, Inc. agreed to and voted in favor of the April 24, 2002 EMMC Policy Revision described in Paragraphs 141-142 above. In addition, Cardile Mushrooms, Inc. had knowledge of and acquiesced in that Policy Revision, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

152. Country Fresh Mushroom Co. attended the March 12, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and the pricing policy detailed in Paragraphs 139-140 above. Country Fresh Mushroom Co. agreed to and voted in favor of those minimum prices and that pricing policy at that meeting. In addition, Country Fresh Mushroom Co. had knowledge of and acquiesced in those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

153.     Country Fresh Mushroom Co. attended the April 9, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and detailed in Paragraph 141 above.  Country Fresh Mushroom Co. agreed to and voted in favor of those minimum prices at that meeting.  In addition, Country Fresh Mushroom Co. had knowledge of and acquiesced in that minimum pricing, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

154.     Country Fresh Mushroom Co. agreed to and voted in favor of the April 24, 2002 EMMC Policy Revision described in Paragraphs 141-142 above.  In addition, Country Fresh Mushroom Co. had knowledge of and acquiesced in that Policy Revision, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

155.     Forest Mushrooms Inc. attended the March 12, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and the pricing policy detailed in Paragraphs 139-140 above.  Forest Mushrooms Inc. agreed to and voted in favor of those minimum prices and that pricing policy at that meeting.  In addition, Forest Mushrooms Inc. had knowledge of and acquiesced in those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

156.     Forest Mushrooms Inc. attended the April 9, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and detailed in Paragraph 141 above.  Forest Mushrooms Inc. agreed to and voted in favor of those minimum prices at that meeting.  In addition, Forest Mushrooms Inc. had knowledge of and acquiesced in that minimum

pricing, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

157.     Forest Mushrooms Inc. agreed to and voted in favor of the April 24, 2002 EMMC Policy Revision described in Paragraphs 141-142 above.  In addition, Forest Mushrooms Inc. had knowledge of and acquiesced in that Policy Revision, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

158.     Franklin Farms, Inc. attended the March 12, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and the pricing policy detailed in Paragraphs 139-140 above.  Franklin Farms, Inc. agreed to and voted in favor of those minimum prices and that pricing policy at that meeting.  In addition, Franklin Farms, Inc. had knowledge of and acquiesced in those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

159.     Franklin Farms, Inc. attended the April 9, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and detailed in Paragraph 141 above.  Franklin Farms, Inc. agreed to and voted in favor of those minimum prices at that meeting.  In addition, Franklin Farms, Inc. had knowledge of and acquiesced in that minimum pricing, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

160.     Franklin Farms, Inc. agreed to and voted in favor of the April 24, 2002 EMMC Policy Revision described in Paragraphs 141-142 above.  In addition, Franklin Farms, Inc. had knowledge of and acquiesced in that Policy Revision, including without limitation, agreeing to

be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

161.    Gino Gaspari & Sons, Inc. attended the March 12, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and the pricing policy detailed in Paragraphs 139-140 above.  Gino Gaspari & Sons, Inc. agreed to and voted in favor of those minimum prices and that pricing policy at that meeting.  In addition, Gino Gaspari & Sons, Inc. had knowledge of and acquiesced in those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

162.    Gino Gaspari & Sons, Inc. attended the April 9, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and detailed in Paragraph 141 above.  Gino Gaspari & Sons, Inc. agreed to and voted in favor of those minimum prices at that meeting.  In addition, Gino Gaspari & Sons, Inc. had knowledge of and acquiesced in that minimum pricing, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

163.    Gino Gaspari & Sons, Inc. agreed to and voted in favor of the April 24, 2002 EMMC Policy Revision described in Paragraphs 141-142 above.  In addition, Gino Gaspari & Sons, Inc. had knowledge of and acquiesced in that Policy Revision, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

164.    Gaspari Bros., Inc. attended the March 12, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and the pricing policy detailed in Paragraphs 139-140 above.   Gaspari Bros., Inc. agreed to and voted in favor of those

minimum prices and that pricing policy at that meeting. In addition, Gaspari Bros., Inc. had knowledge of and acquiesced in those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

165. Gaspari Bros., Inc. attended the April 9, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and detailed in Paragraph 141 above. Gaspari Bros., Inc. agreed to and voted in favor of those minimum prices at that meeting. In addition, Gaspari Bros., Inc. had knowledge of and acquiesced in that minimum pricing, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

166. Gaspari Bros., Inc. agreed to and voted in favor of the April 24, 2002 EMMC Policy Revision described in Paragraphs 141-142 above. In addition, Gaspari Bros., Inc. had knowledge of and acquiesced in that Policy Revision, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

167. Giorgi Mushroom Company attended the March 12, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and the pricing policy detailed in Paragraphs 139-140 above. Giorgi Mushroom Company agreed to and voted in favor of those minimum prices and that pricing policy at that meeting. In addition, Giorgi Mushroom Company had knowledge of and acquiesced in those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

168. Giorgi Mushroom Company attended the April 9, 2002 EMMC meeting with its

competitors and discussed mushroom prices and minimum pricing and detailed in Paragraph 141 above. Giorgi Mushroom Company agreed to and voted in favor of those minimum prices at that meeting. In addition, Giorgi Mushroom Company had knowledge of and acquiesced in that minimum pricing, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

169. Giorgi Mushroom Company agreed to and voted in favor of the April 24, 2002 EMMC Policy Revision described in Paragraphs 141-142 above. In addition, Giorgi Mushroom Company had knowledge of and acquiesced in that Policy Revision, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

170. Kaolin Mushroom Farms, Inc. attended the March 12, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and the pricing policy detailed in Paragraphs 139-140 above. Kaolin Mushroom Farms, Inc. agreed to and voted in favor of those minimum prices and that pricing policy at that meeting. In addition, Kaolin Mushroom Farms, Inc. had knowledge of and acquiesced in those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

171. Kaolin Mushroom Farms attended the April 9, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and detailed in Paragraph 141 above. Kaolin Mushroom Farms agreed to and voted in favor of those minimum prices at that meeting. In addition, Kaolin Mushroom Farms had knowledge of and acquiesced in that minimum pricing, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

172. Kaolin Mushroom Farms agreed to and voted in favor of the April 24, 2002 EMMC Policy Revision described in Paragraphs 141-142 above. In addition, Kaolin Mushroom Farms had knowledge of and acquiesced in that Policy Revision, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

173. Leone Pizzini & Son, Inc. attended the March 12, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and the pricing policy detailed in Paragraphs 139-140 above. Leone Pizzini & Son, Inc. agreed to and voted in favor of those minimum prices and that pricing policy at that meeting. In addition, Leone Pizzini & Son, Inc. had knowledge of and acquiesced in those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

174. Leone Pizzini & Son, Inc. attended the April 9, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and detailed in Paragraph 141 above. Leone Pizzini & Son, Inc. agreed to and voted in favor of those minimum prices at that meeting. In addition, Leone Pizzini & Son, Inc. had knowledge of and acquiesced in that minimum pricing, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

175. Leone Pizzini & Son, Inc. agreed to and voted in favor of the April 24, 2002 EMMC Policy Revision described in Paragraphs 141-142 above. In addition, Leone Pizzini & Son, Inc. had knowledge of and acquiesced in that Policy Revision, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

176.     LRP-M Mushrooms LLC attended the March 12, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and the pricing policy detailed in Paragraphs 139-140 above.  LRP-M Mushrooms LLC agreed to and voted in favor of those minimum prices and that pricing policy at that meeting.  In addition, LRP-M Mushrooms LLC had knowledge of and acquiesced in those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

177.     LRP-M Mushrooms, LLC attended the April 9, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and detailed in Paragraph 141 above.  LRP-M Mushrooms, LLC agreed to and voted in favor of those minimum prices at that meeting.  In addition, LRP-M Mushrooms, LLC had knowledge of and acquiesced in that minimum pricing, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

178.     LRP-M Mushrooms, LLC agreed to and voted in favor of the April 24, 2002 EMMC Policy Revision described in Paragraphs 141-142 above.   In addition, LRP-M Mushrooms, LLC had knowledge of and acquiesced in that Policy Revision, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

179.     Modern Mushroom Farms, Inc. attended the March 12, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and the pricing policy detailed in Paragraphs 139-140 above.  Modern Mushroom Farms, Inc. agreed to and voted in favor of those minimum prices and that pricing policy at that meeting.  In addition, Modern Mushroom Farms, Inc. had knowledge of and acquiesced in those minimum prices and that

pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

180.    Modern Mushroom Farms, Inc. attended the April 9, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and detailed in Paragraph 141 above.  Modern Mushroom Farms, Inc. agreed to and voted in favor of those minimum prices at that meeting.  In addition, Modern Mushroom Farms, Inc. had knowledge of and acquiesced in that minimum pricing, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

181.    Modern Mushroom Farms, Inc. agreed to and voted in favor of the April 24, 2002 EMMC Policy Revision described in Paragraphs 141-142 above.   In addition, Modern Mushroom Farms, Inc. had knowledge of and acquiesced in that Policy Revision, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

182.    Oakshire Mushroom Farm, Inc. attended the March 12, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and the pricing policy detailed in Paragraphs 139-140 above.  Oakshire Mushroom Farm, Inc. agreed to and voted in favor of those minimum prices and that pricing policy at that meeting.  In addition, Oakshire Mushroom Farm, Inc. had knowledge of and acquiesced in those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

183.    Oakshire Mushroom Farm, Inc. attended the April 9, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and detailed in Paragraph

141 above. Oakshire Mushroom Farm, Inc. agreed to and voted in favor of those minimum prices at that meeting. In addition, Oakshire Mushroom Farm, Inc. had knowledge of and acquiesced in that minimum pricing, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

184. Oakshire Mushroom Farm, Inc. agreed to and voted in favor of the April 24, 2002 EMMC Policy Revision described in Paragraphs 141-142 above. In addition, Oakshire Mushroom Farm, Inc. had knowledge of and acquiesced in that Policy Revision, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

185. Phillips Mushroom Farms, Inc. attended the March 12, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and the pricing policy detailed in Paragraphs 139-140 above. Phillips Mushroom Farms, Inc. agreed to and voted in favor of those minimum prices and that pricing policy at that meeting. In addition, Phillips Mushroom Farms, Inc. had knowledge of and acquiesced in those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

186. Phillips Mushroom Farms, Inc. attended the April 9, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and detailed in Paragraph 141 above. Phillips Mushroom Farms, Inc. agreed to and voted in favor of those minimum prices at that meeting. In addition, Phillips Mushroom Farms, Inc. had knowledge of and acquiesced in that minimum pricing, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the

actions of the EMMC.

187.     Phillips Mushroom Farms, Inc. agreed to and voted in favor of the April 24, 2002 EMMC Policy Revision described in Paragraphs 141-142 above.  In addition, Phillips Mushroom Farms, Inc. had knowledge of and acquiesced in that Policy Revision, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

188.     Harvest Fresh Farms, Inc. attended the March 12, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and the pricing policy detailed in Paragraphs 139-140 above.  Harvest Fresh Farms, Inc. agreed to and voted in favor of those minimum prices and that pricing policy at that meeting.  In addition, Harvest Fresh Farms, Inc. had knowledge of and acquiesced in those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

189.     Harvest Fresh Farms, Inc. attended the April 9, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and detailed in Paragraph 141 above.  Harvest Fresh Farms, Inc. agreed to and voted in favor of those minimum prices at that meeting.  In addition, Harvest Fresh Farms, Inc. had knowledge of and acquiesced in that minimum pricing, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

190.     Harvest Fresh Farms, Inc. agreed to and voted in favor of the April 24, 2002 EMMC Policy Revision described in Paragraphs 141-142 above.  In addition, Harvest Fresh Farms, Inc. had knowledge of and acquiesced in that Policy Revision, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the

Executive Committee could carry out the actions of the EMMC.

191.    Louis M. Marson, Inc. attended the March 12, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and the pricing policy detailed in Paragraphs 139-140 above.  Louis M. Marson, Inc. agreed to and voted in favor of those minimum prices and that pricing policy at that meeting.  In addition, Louis M. Marson, Inc. had knowledge of and acquiesced in those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

192.    Louis M. Marson, Inc. attended the April 9, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and detailed in Paragraph 141 above.  Louis M. Marson, Inc. agreed to and voted in favor of those minimum prices at that meeting.  In addition, Louis M. Marson, Inc. had knowledge of and acquiesced in that minimum pricing, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

193.    Louis M. Marson, Inc. agreed to and voted in favor of the April 24, 2002 EMMC Policy Revision described in Paragraphs 141-142 above.  In addition, Louis M. Marson, Inc. had knowledge of and acquiesced in that Policy Revision, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

194.    Mario Cutone Mushroom Co., Inc. attended the March 12, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and the pricing policy detailed in Paragraphs 139-140 above.  Mario Cutone Mushroom Co., Inc. agreed to and voted in favor of those minimum prices and that pricing policy at that meeting.  In addition, Mario Cutone

Mushroom Co., Inc. had knowledge of and acquiesced in those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

195.    Mario Cutone Mushroom Co., Inc. attended the April 9, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and detailed in Paragraph 141 above.  Mario Cutone Mushroom Co., Inc. agreed to and voted in favor of those minimum prices at that meeting.  In addition, Mario Cutone Mushroom Co., Inc. had knowledge of and acquiesced in that minimum pricing, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

196.    Mario Cutone Mushroom Co., Inc. agreed to and voted in favor of the April 24, 2002 EMMC Policy Revision described in Paragraphs 141-142 above.   In addition, Mario Cutone Mushroom Co., Inc. had knowledge of and acquiesced in that Policy Revision, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

197.    M.D. Basciani & Sons, Inc. attended the March 12, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and the pricing policy detailed in Paragraphs 139-140 above.  M.D. Basciani & Sons, Inc. agreed to and voted in favor of those minimum prices and that pricing policy at that meeting.  In addition, M.D. Basciani & Sons, Inc. had knowledge of and acquiesced in those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

198.    M.D. Basciani & Sons, Inc. attended the April 9, 2002 EMMC meeting with its

competitors and discussed mushroom prices and minimum pricing and detailed in Paragraph 141 above. M.D. Basciani & Sons, Inc. agreed to and voted in favor of those minimum prices at that meeting. In addition, M.D. Basciani & Sons, Inc. had knowledge of and acquiesced in that minimum pricing, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

199.     M.D. Basciani & Sons, Inc. agreed to and voted in favor of the April 24, 2002 EMMC Policy Revision described in Paragraphs 141-142 above. In addition, M.D. Basciani & Sons, Inc. had knowledge of and acquiesced in that Policy Revision, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

200.     Monterey Mushrooms, Inc. attended the March 12, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and the pricing policy detailed in Paragraphs 139-140 above. Monterey Mushrooms, Inc. agreed to and voted in favor of those minimum prices and that pricing policy at that meeting. In addition, Monterey Mushrooms, Inc. had knowledge of and acquiesced in those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

201.     Monterey Mushrooms, Inc. attended the April 9, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and detailed in Paragraph 141 above. Monterey Mushrooms, Inc. agreed to and voted in favor of those minimum prices at that meeting. In addition, Monterey Mushrooms, Inc. had knowledge of and acquiesced in that minimum pricing, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

202.     Monterey Mushrooms, Inc. agreed to and voted in favor of the April 24, 2002 EMMC Policy Revision described in Paragraphs 141-142 above.  In addition, Monterey Mushrooms, Inc. had knowledge of and acquiesced in that Policy Revision, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

203.     Masha & Toto, Inc. attended the March 12, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and the pricing policy detailed in Paragraphs 139-140 above.  Masha & Toto, Inc. agreed to and voted in favor of those minimum prices and that pricing policy at that meeting.  In addition, Masha & Toto, Inc. had knowledge of and acquiesced in those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

204.     Masha & Toto, Inc. attended the April 9, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and detailed in Paragraph 141 above.  Masha & Toto, Inc. agreed to and voted in favor of those minimum prices at that meeting.  In addition, Masha & Toto, Inc. had knowledge of and acquiesced in that minimum pricing, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

205.     Masha & Toto, Inc. agreed to and voted in favor of the April 24, 2002 EMMC Policy Revision described in Paragraphs 141-142 above.  In addition, Masha & Toto, Inc. had knowledge of and acquiesced in that Policy Revision, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

206.     W&P Mushroom, Inc. attended the March 12, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and the pricing policy detailed in Paragraphs 139-140 above.   W&P Mushroom, Inc. agreed to and voted in favor of those minimum prices and that pricing policy at that meeting.  In addition, W&P Mushroom, Inc. had knowledge of and acquiesced in those minimum prices  and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

207.     W&P Mushroom, Inc. attended the April 9, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and detailed in Paragraph 141 above.   W&P Mushroom, Inc. agreed to and voted in favor of those minimum prices at that meeting.  In addition, W&P Mushroom, Inc. had knowledge of and acquiesced in that minimum pricing, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

208.     W&P Mushroom, Inc. agreed to and voted in favor of the April 24, 2002 EMMC Policy Revision described in Paragraphs141-142 above.  In addition, W&P Mushroom, Inc. had knowledge of and acquiesced in that Policy Revision, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

209.     Mushroom Alliance, Inc. attended the March 12, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and the pricing policy detailed in Paragraphs 139-140 above.  Mushroom Alliance, Inc. agreed to and voted in favor of those minimum prices and that pricing policy at that meeting.  In addition, Mushroom Alliance, Inc. had knowledge of and acquiesced in those minimum prices and that pricing policy, including

without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

210.    Mushroom Alliance, Inc. attended the April 9, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and detailed in Paragraph 141 above.  Mushroom Alliance, Inc. agreed to and voted in favor of those minimum prices at that meeting.    In addition, Mushroom Alliance, Inc. had knowledge of and acquiesced in that minimum pricing, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

211.    Mushroom Alliance, Inc. agreed to and voted in favor of the April 24, 2002 EMMC Policy Revision described in Paragraphs 141-142 above.    In addition, Mushroom Alliance, Inc. had knowledge of and acquiesced in that Policy Revision, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

212.    Creekside Mushrooms, Ltd. attended the March 12, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and the pricing policy detailed in Paragraphs 139-140 above.  Creekside Mushrooms, Ltd. agreed to and voted in favor of those minimum prices and that pricing policy at that meeting.  In addition, Creekside Mushrooms, Ltd. had knowledge of and acquiesced in those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

213.    Creekside Mushroom, Ltd.  attended the April 9, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and detailed in Paragraph 141 above.  Creekside Mushroom, Ltd.  agreed to and voted in favor of those minimum prices at that

meeting. In addition, Creekside Mushroom, Ltd. had knowledge of and acquiesced in that minimum pricing, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

214. Creekside Mushroom, Ltd. agreed to and voted in favor of the April 24, 2002 EMMC Policy Revision described in Paragraphs 141-142 above. In addition, Creekside Mushroom, Ltd. had knowledge of and acquiesced in that Policy Revision, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

215. Kitchen Pride Mushrooms attended the March 12, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and the pricing policy detailed in Paragraphs 139-140above. Kitchen Pride Mushrooms agreed to and voted in favor of those minimum prices and that pricing policy at that meeting. In addition, Kitchen Pride Mushrooms had knowledge of and acquiesced in those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

216. Kitchen Pride Mushrooms attended the April 9, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and detailed in Paragraph 141 above. Kitchen Pride Mushrooms agreed to and voted in favor of those minimum prices at that meeting. In addition, Kitchen Pride Mushrooms had knowledge of and acquiesced in that minimum pricing, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

217. Kitchen Pride Mushrooms agreed to and voted in favor of the April 24, 2002 EMMC Policy Revision described in Paragraphs 141-142 above. In addition, Kitchen Pride

Mushrooms had knowledge of and acquiesced in that Policy Revision, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

218. J-M Farms, Inc. attended the March 12, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and the pricing policy detailed in Paragraphs 139-140 above. J-M Farms, Inc. agreed to and voted in favor of those minimum prices and that pricing policy at that meeting. In addition, J-M Farms, Inc. had knowledge of and acquiesced in those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

219. J-M Farms, Inc. attended the April 9, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and detailed in Paragraph 141 above. J-M Farms, Inc. agreed to and voted in favor of those minimum prices at that meeting. In addition, J-M Farms, Inc. had knowledge of and acquiesced in that minimum pricing, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

220. J-M Farms, Inc. agreed to and voted in favor of the April 24, 2002 EMMC Policy Revision described in Paragraphs 141-142 above. In addition, J-M Farms, Inc. had knowledge of and acquiesced in that Policy Revision, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

221. United Mushroom Farms Cooperative, Inc. attended the March 12, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and the

pricing policy detailed in Paragraphs 139-140 above. United Mushroom Farms Cooperative, Inc. agreed to and voted in favor of those minimum prices and that pricing policy at that meeting. In addition, United Mushroom Farms Cooperative, Inc. had knowledge of and acquiesced in those minimum prices and that pricing policy, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

222.    United Mushroom Farms Cooperative, Inc. attended the April 9, 2002 EMMC meeting with its competitors and discussed mushroom prices and minimum pricing and detailed in Paragraph 141 above. United Mushroom Farms Cooperative, Inc. ageed to and voted in favor of those minimum prices at that meeting. In addition, United Mushroom Farms Cooperative, Inc. had knowledge of and acquiesced in that minimum pricing, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

223.    United Mushroom Farms Cooperative, Inc. agreed to and voted in favor of the April 24, 2002 EMMC Policy Revision described in Paragraphs 141-142 above. In addition, United Mushroom Farms Cooperative, Inc. had knowledge of and acquiesced in that Policy Revision, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

**EACH EMMC MEMBER, ACTING COLLECTIVELY WITH EACH OTHER EMMC MEMBER, AGREED TO THE MINIMUM PRICES AND TO FOLLOW THEM**

224.    Each EMMC member, acting collectively with each and every other EMMC member, agreed to the EMMC minimum prices and pricing policies and to follow them. EMMC-DOG-0900 ("cooperative pricing" listed as EMMC accomplishment.); January 9, 2001

Meeting Minutes, EMMC-DOJ-02560 ("Minimum price for individual products were discussed and agreed to by region."); March 12, 2002 Meeting Minutes, EMMC-DOJ-00229 at 230 (noting that members were asked to review distributed price list for every product and contact committee with any changes; describing successful motion to increase prices in Southwest region by $.50 per pound); April 9, 2002 Meeting Minutes, EMMC-DOJ-00232 at 234 (describing successful motion to increase the price of retail washed, sliced mushrooms by $.20 per pound); Executive Board Meeting Minutes dated January 21, 2003, EMMCDOJ-00270 at 271 ("Changes to the EMMC Price Sheet as a result of Board action in Hershey were reviewed."); Reitnauer Tr. at 237:7- 238:15 (citing implementation of minimum pricing as an accomplishment); Schroeder Tr. at 113:18-22 (citing the EMMC minimum as an example of a policy adopted by the EMMC's members); Manfredini Tr. at 122:25-123:14 (EMMC members agreed to minimum pricing); Kazemi Tr. at 31:18-25, 39:3-22; Pizzini Tr. at 183:3; Carroll Tr. at 130:5-13.

### EMMC AND ITS MEMBERS IMPLEMENTED ENFORCEMENT MECHANISMS WITH RESPECT TO THE AGREED MINIMUM PRICES

225. To police compliance with the pricing policies, EMMC and its members created and agreed to mechanisms to monitor prices charged by members and their affiliated distributors and to punish members who failed to comply with minimum prices.

226. For example, when the EMMC met on March 12, 2002, EMMC members discussed a Budget Audit Committee, which was "to [conduct] mandatory individual audits on members. They will take the minimum pricing list and match it to members' books." (EMMC Meeting Minutes March 12, 2002).

227. EMMC members were also required to keep escrow accounts to ensure compliance with EMMC policies.

### THE SUPPLY REDUCTION PROGRAM

228.    In order to support and maintain the artificial price increases created by their price-fixing scheme, Defendant EMMC members began eliminating competing mushroom supply, which could otherwise force down the artificially-increased prices. Within three months of instituting the price increases, the EMMC and each of its members, acting collectively with each and every other EMMC member, agreed to create and implement a supply control program to buy or lease mushroom farms and deed restrict them to prevent them from being used in the future as mushroom farms. Schroeder Tr. at 202:8-206:11; EMMC-DOJ-02519 (4/17/01 *Executive Management Committee Report re: land purchases and leases to reduce supply and deed restrictions*). Zwicky Tr. at 17:17-21:15; Agreement of Sale between EMMC and David Zwicky, 12/10/2001; Brown Tr. at 118:23-119:9, 122:5-25; Limited Warranty Deed for Dublin, Georgia Property, 10/3/01.

229.    As detailed below, the EMMC and each EMMC member, acting collectively with each and every other EMMC member, agreed to do and did the following things, among others:

> a. collectively funded the Supply Control campaign through a separate Supply Control Assessment;
>
> b. sold four properties with permanent deed restrictions forbidding the conduct of any business related to the production of mushrooms;
>
> c. entered agreements with nonmembers to place deed restrictions on two properties for which the cooperative purchased lease options; and
>
> d. filed deed restrictions on the two lease-optioned properties prohibiting the conduct of any business related to the production of mushrooms for ten years.

230.    In an April 21, 2001 email to all EMMC members, Pia stated "The purpose of the EMMC is to minimize the number of times we face that problem. It is working. We have accomplished nothing short of a miracle." Pia continued in the email "[f]or months now, I have

worked my butt off at the expense of my own company to further this cause in which I so much believe." Discussing the possibility that two closed mushroom farms owned by non-EMMC member Money's – Dublin and Hillsboro – Pia warned the EMMC membership that these farms could be purchased by non-EMMC member Rakraha who "has an offer on two of the Money's farms that are presently closed; Dublin and Hillsboro" which if successful "could add [significant] pounds of new production." After alerting the ECCM members to the threat of Rakraha possibly acquiring these farms and returning them to production, Pia continued in his email that:

> [o]n Tuesday, the Executive Committee will begin to work on the supply side issue. Hopefully, if and when we can come up with what we think is a workable solution, we will address the membership with the hopes of being able to raise the money it takes to carry out the job. If you agree with the plan, and support us with the funding, we will make it happen.

231.    It is believed that Pia when asked the reason the EMMC wanted to deed restrict the properties was because the members were worried that "someone will come and through a third party might buy the farms and later on reopen them."

232.    The Supply Control Assessment was in addition to the regular EMMC dues and the escrow accounts that EMMC were required to provide in order to ensure compliance with EMMC's policies, and was discussed by EMMC members at the June 5, 2001 meeting. Members were advised to avoid talking to the press about the EMMC, at the June 5, 2001 EMMC general meeting.    Schroeder, representing Oakshire Mushrooms, was EMMC's Treasurer as of the June 5, 2001 meeting.

233.    Through membership dues and a so called "Supply Control Assessment," the EMMC collected approximately six million dollars from its members between 2001 and 2003.

234.    At an earlier April 13, 2001 meeting of the EMMC members, the Treasurer

reported to all of the members which members were current with their payment of the Supply Control Assessments. EMMC members not current with their Supply Control Assessments were required to execute promissory notes bearing 8% interest.

235. On May 23, 2001, John Pia, the President of EMMC, wrote to all EMMC members by email that, at the Money's auction, there had been "three other bidders" for the Money's farms including non-EMMC member mushroom grower, Rakraha and that "our challenge was to unseat the incumbent bid from Rakraha." He described the outcome as "a day of victory," because the EMMC was successful in making the winning bid for the properties (and for a dollar amount "well below the maximum bid authorized by the membership")(emphasis added).

236. In that email, Pia, the President of EMMC, also wrote that the real estate developer competing bidders had told Pia that they would interested in the EMMC flipping the farm to them. In addition, Pia raised for discussion by EMMC members what to do with the equipment that EMMC acquired when it bought the Dublin farm, and there ensued a discussion among EMMC members about selling the equipment.

**PURCHASE OF THE DUBLIN, GEORGIA FARM AND ACTIONS BY THE EMMC MEMBERS AND EXECUTIVE COMMITTEE REGARDING THE SUPPLY CONTROL PROGRAM**

237. In May 2001, the EMMC, with the agreement, knowledge and approval of its members, purchased the farm in Dublin, Georgia at a bankruptcy auction. The Dublin farm had an annual mushroom production capacity of approximately eight million pounds. At the auction, EMMC outbid a non-EMMC mushroom grower based in Colorado attempting to enter mushroom farming in the eastern United States in competition with EMMC.

238. The EMMC members agreed at the June 5, 2001 meeting on the parameters that

the realtor, who represented the EMMC in connection with purchasing or leasing mushroom farms under the Supply Control Program, was to follow. Members were also advised to avoid talking to the press about the EMMC, at the June 5, 2001 EMMC general meeting.

239. In a June 9, 2001 email, Pia wrote to the EMMC members that the duties of the EMMC's Executive Committee:

> have recently consisted of carrying out the responsibilities of organizing and fulfilling the needs required for the purchase of the previously failed attempt to purchase the operating Money's facilities, and lastly dealing with the project of renting mushroom growing doubles in Chester and Berks County, *for the purpose of creating order in the supply side of business.*

(CREEK000112-13) (emphasis added).

240. Three months later, EMMC entered into a land exchange with a land developer not connected to the mushroom industry, in which EMMC exchanged the Dublin farm for another mushroom farm consisting of two parcels in Evansville, Pennsylvania, plus cash. As part of the exchange, the developer agreed with EMMC to place a permanent deed restriction on the Dublin farm prohibiting the conduct of any business related to the growing of mushrooms. EMMC lost approximately $525,000 on the Dublin farm purchase and exchange transactions.

241. Within three months of the Dublin farm/Evansville land exchange, EMMC sold the largest parcel of the Evansville, Pennsylvania farm to a third-party who agreed with EMMC to place a permanent deed restriction on the property prohibiting the conduct of any business related to the growing of mushrooms. Less than a year later, EMMC sold the second parcel to a third-party who agreed to the same permanent deed restriction. The two parcels making up the Evansville, Pennsylvania farm, with an annual mushroom growing capacity of 15 million pounds, were sold at a collective loss of $137,000.

242. Bella Mushroom agreed to and voted in favor of the purchase of the Dublin, Georgia farm, the exchange of that farm for another mushroom farm in Evansville, Pennsylvania, and the sale of the two parcels of that farm as significant losses, all as described above. In addition, Bella Mushroom had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Bella Mushroom attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Bella Mushroom and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Bella Mushroom received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

243. Brownstone Mushroom Farms agreed to and voted in favor of the purchase of the Dublin, Georgia farm, the exchange of that farm for another mushroom farm in Evansville, Pennsylvania, and the sale of the two parcels of that farm as significant losses, all as described above. In addition, Brownstone Mushroom Farms had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Brownstone Mushroom Farms attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Brownstone Mushroom Farms and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the

transactions.  Finally, Brownstone Mushroom Farms received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

244.    Cardile Mushrooms, Inc. agreed to and voted in favor of the purchase of the Dublin, Georgia farm, the exchange of that farm for another mushroom farm in Evansville, Pennsylvania, and the sale of the two parcels of that farm as significant losses, all as described above.  In addition, Cardile Mushrooms, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.  In addition, Cardile Mushrooms, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Cardile Mushrooms, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions.  Finally, Cardile Mushrooms, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

245.    Country Fresh Mushroom Co. agreed to and voted in favor of the purchase of the Dublin, Georgia farm, the exchange of that farm for another mushroom farm in Evansville, Pennsylvania, and the sale of the two parcels of that farm as significant losses, all as described above.  In addition, Country Fresh Mushroom Co. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the

EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Country Fresh Mushroom Co. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Country Fresh Mushroom Co. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Country Fresh Mushroom Co. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

246.     Forest Mushrooms Inc. agreed to and voted in favor of the purchase of the Dublin, Georgia farm, the exchange of that farm for another mushroom farm in Evansville, Pennsylvania, and the sale of the two parcels of that farm as significant losses, all as described above. In addition, Forest Mushrooms Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Forest Mushrooms Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Forest Mushrooms Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Forest Mushrooms Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

247.     Franklin Farms, Inc. agreed to and voted in favor of the purchase of the Dublin, Georgia farm, the exchange of that farm for another mushroom farm in Evansville, Pennsylvania, and the sale of the two parcels of that farm as significant losses, all as described above.  In addition, Franklin Farms, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.  In addition, Franklin Farms, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Franklin Farms, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions.  Finally, Franklin Farms, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

248.     Gino Gaspari & Sons, Inc. agreed to and voted in favor of the purchase of the Dublin, Georgia farm, the exchange of that farm for another mushroom farm in Evansville, Pennsylvania, and the sale of the two parcels of that farm as significant losses, all as described above.  In addition, Gino Gaspari & Sons, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.  In addition, Gino Gaspari & Sons, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Gino Gaspari & Sons, Inc. and the other EMMC members discussed and agreed to

the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Gino Gaspari & Sons, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

249. Gaspari Bros., Inc. agreed to and voted in favor of the purchase of the Dublin, Georgia farm, the exchange of that farm for another mushroom farm in Evansville, Pennsylvania, and the sale of the two parcels of that farm as significant losses, all as described above. In addition, Gaspari Bros., Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Gaspari Bros., Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Gaspari Bros., Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Gaspari Bros., Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

250. Giorgi Mushroom Company agreed to and voted in favor of the purchase of the Dublin, Georgia farm, the exchange of that farm for another mushroom farm in Evansville, Pennsylvania, and the sale of the two parcels of that farm as significant losses, all as described above. In addition, Giorgi Mushroom Company had knowledge of and acquiesced in these real

estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Giorgi Mushroom Company attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Giorgi Mushroom Company and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Giorgi Mushroom Company received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

251. Kaolin Mushroom Farms, Inc. agreed to and voted in favor of the purchase of the Dublin, Georgia farm, the exchange of that farm for another mushroom farm in Evansville, Pennsylvania, and the sale of the two parcels of that farm as significant losses, all as described above. In addition, Kaolin Mushroom Farms, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Kaolin Mushroom Farms, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Kaolin Mushroom Farms, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Kaolin Mushroom Farms, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the

purpose of creating order in the supply side of the business.

252.     Leone Pizzini & Son, Inc. agreed to and voted in favor of the purchase of the Dublin, Georgia farm, the exchange of that farm for another mushroom farm in Evansville, Pennsylvania, and the sale of the two parcels of that farm as significant losses, all as described above.  In addition, Leone Pizzini & Son, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.  In addition, Leone Pizzini & Son, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Leone Pizzini & Son, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions.  Finally, Leone Pizzini & Son, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

253.     LRP-M Mushrooms LLC agreed to and voted in favor of the purchase of the Dublin, Georgia farm, the exchange of that farm for another mushroom farm in Evansville, Pennsylvania, and the sale of the two parcels of that farm as significant losses, all as described above.  In addition, LRP-M Mushrooms LLC had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.  In addition, LRP-M Mushrooms LLC attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members,

and at which LRP-M Mushrooms LLC and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, LRP-M Mushrooms LLC received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

254. Modern Mushroom Farms, Inc. agreed to and voted in favor of the purchase of the Dublin, Georgia farm, the exchange of that farm for another mushroom farm in Evansville, Pennsylvania, and the sale of the two parcels of that farm as significant losses, all as described above. In addition, Modern Mushroom Farms, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Modern Mushroom Farms, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Modern Mushroom Farms, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Modern Mushroom Farms, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

255. Oakshire Mushroom Farm, Inc. agreed to and voted in favor of the purchase of the Dublin, Georgia farm, the exchange of that farm for another mushroom farm in Evansville, Pennsylvania, and the sale of the two parcels of that farm as significant losses, all as described

above.  In addition, Oakshire Mushroom Farm, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.  In addition, Oakshire Mushroom Farm, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Oakshire Mushroom Farm, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions.  Finally, Oakshire Mushroom Farm, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

256.    Phillips Mushroom Farms, Inc. agreed to and voted in favor of the purchase of the Dublin, Georgia farm, the exchange of that farm for another mushroom farm in Evansville, Pennsylvania, and the sale of the two parcels of that farm as significant losses, all as described above.  In addition, Phillips Mushroom Farms, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.  In addition, Phillips Mushroom Farms, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Phillips Mushroom Farms, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions.  Finally, Phillips Mushroom Farms, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its

responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

257.    Harvest Fresh Farms, Inc. agreed to and voted in favor of the purchase of the Dublin, Georgia farm, the exchange of that farm for another mushroom farm in Evansville, Pennsylvania, and the sale of the two parcels of that farm as significant losses, all as described above.  In addition, Harvest Fresh Farms, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.  In addition, Harvest Fresh Farms, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Harvest Fresh Farms, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions.  Finally, Harvest Fresh Farms, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

258.    Louis M. Marson, Inc. agreed to and voted in favor of the purchase of the Dublin, Georgia farm, the exchange of that farm for another mushroom farm in Evansville, Pennsylvania, and the sale of the two parcels of that farm as significant losses, all as described above.  In addition, Louis M. Marson, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Louis M. Marson, Inc. attended the June 5, 2001 EMMC meeting at which the real

estate transactions were discussed and agreed to with the other EMMC members, and at which Louis M. Marson, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Louis M. Marson, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

259.    Mario Cutone Mushroom Co. Inc. agreed to and voted in favor of the purchase of the Dublin, Georgia farm, the exchange of that farm for another mushroom farm in Evansville, Pennsylvania, and the sale of the two parcels of that farm as significant losses, all as described above. In addition, Mario Cutone Mushroom Co. Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Mario Cutone Mushroom Co. Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Mario Cutone Mushroom Co. Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Mario Cutone Mushroom Co. Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

260.    M.D. Basciani & Sons, Inc. agreed to and voted in favor of the purchase of the Dublin, Georgia farm, the exchange of that farm for another mushroom farm in Evansville,

Pennsylvania, and the sale of the two parcels of that farm as significant losses, all as described above.  In addition, M.D. Basciani & Sons, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.  In addition, M.D. Basciani & Sons, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which M.D. Basciani & Sons, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions.  Finally, M.D. Basciani & Sons, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

261.    Monterey Mushrooms, Inc. agreed to and voted in favor of the purchase of the Dublin, Georgia farm, the exchange of that farm for another mushroom farm in Evansville, Pennsylvania, and the sale of the two parcels of that farm as significant losses, all as described above.  In addition, Monterey Mushrooms, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.  In addition, Monterey Mushrooms, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Monterey Mushrooms, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions.  Finally, Monterey Mushrooms, Inc. received the June 9, 2001 email from John Pia wherein he indicated

that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

262.    Masha & Toto, Inc. agreed to and voted in favor of the purchase of the Dublin, Georgia farm, the exchange of that farm for another mushroom farm in Evansville, Pennsylvania, and the sale of the two parcels of that farm as significant losses, all as described above.  In addition, Masha & Toto, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.  In addition, Masha & Toto, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Masha & Toto, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions.  Finally, Masha & Toto, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

263.    W&P Mushroom, Inc. agreed to and voted in favor of the purchase of the Dublin, Georgia farm, the exchange of that farm for another mushroom farm in Evansville, Pennsylvania, and the sale of the two parcels of that farm as significant losses, all as described above.  In addition, W&P Mushroom, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.

In addition, W&P Mushroom, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which W&P Mushroom, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, W&P Mushroom, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

264. Mushroom Alliance, Inc. agreed to and voted in favor of the purchase of the Dublin, Georgia farm, the exchange of that farm for another mushroom farm in Evansville, Pennsylvania, and the sale of the two parcels of that farm as significant losses, all as described above. In addition, Mushroom Alliance, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Mushroom Alliance, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Mushroom Alliance, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Mushroom Alliance, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

265. Creekside Mushrooms, Ltd. agreed to and voted in favor of the purchase of the

Dublin, Georgia farm, the exchange of that farm for another mushroom farm in Evansville, Pennsylvania, and the sale of the two parcels of that farm as significant losses, all as described above. In addition, Creekside Mushrooms, Ltd. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Creekside Mushrooms, Ltd. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Creekside Mushrooms, Ltd. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Creekside Mushrooms, Ltd. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

266. J-M Farms, Inc. agreed to and voted in favor of the purchase of the Dublin, Georgia farm, the exchange of that farm for another mushroom farm in Evansville, Pennsylvania, and the sale of the two parcels of that farm as significant losses, all as described above. In addition, J-M Farms, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, J-M Farms, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which J-M Farms, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, J-M Farms, Inc. received the June 9, 2001

email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

267. United Mushroom Farms Cooperative, Inc. agreed to and voted in favor of the purchase of the Dublin, Georgia farm, the exchange of that farm for another mushroom farm in Evansville, Pennsylvania, and the sale of the two parcels of that farm as significant losses, all as described above. In addition, United Mushroom Farms Cooperative, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, United Mushroom Farms Cooperative, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which United Mushroom Farms Cooperative, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, United Mushroom Farms Cooperative, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

**THE 2002 REAL ESTATE TRANSACTIONS**

268. In January 2002, with the agreement, knowledge and approval of its members, EMMC purchased Gallo's Mushroom Farm ("Gallo's"), in Berks County, Pennsylvania. Gallo's had an annual mushroom-growing capacity of two million pounds. Less than four months later, with the agreement, knowledge and approval of its members, EMMC sold Gallo's to a third-

party at a loss of $77,500. The third-party purchaser agreed with EMMC to a permanent deed restriction prohibiting the conduct of any business related to the growing of mushrooms.

269.    In a February 8, 2002 email, John Pia wrote to representatives of EMMC members that they should "be prepared to discuss whether we want to buy [a] farm ou[t] from under Blue Mountain," noting "the importance of continuing on the plan of absorbing available plants/production." In February 2002, with the agreement, knowledge and approval of its members,  EMMC agreed to pay $1 million to the owners of Ohio Valley Mushroom Farms for, among other things, a non-compete agreement, a right of first refusal to lease the mushroom growing operations, a right of first refusal to purchase the properties, and the right to record a deed restriction prohibiting the conduct of any business related to mushroom growing on the property for ten years.  EMMC did not lease or purchase the property, but did file the deed restriction on the Ohio Valley Farm, which had operated as a mushroom-growing concern with annual capacity of nine million pounds.

270.    In March 2002, with the agreement, knowledge and approval of its members, EMMC purchased the La Conca D'Oro mushroom farm in Berks County, Pennsylvania, with an annual production capacity of approximately five million pounds. With the agreement, knowledge and approval of its members, EMMC sold the farm and the mushroom-growing equipment on the farm at a loss of $500,000. The third-party purchaser agreed to a deed restriction prohibiting anyone from conducting any business related to the growing of mushrooms on the property.

271.    In August 2002, with the agreement, knowledge and approval of its members, EMMC purchased a ten-year lease option, for $230,000 on the Amadio Farm in Berks County, Pennsylvania, which had an annual mushroom production capacity of

approximately five million pounds. The owner of the property agreed to a deed restriction on the property prohibiting anyone other than EMMC from conducting any business related to the growing of mushrooms for ten years. EMMC never entered into a lease on the property.

272. Bella Mushroom agreed to and voted in favor of (a) the purchase of Gallo's Mushroom Farm and sale of that farm at a loss, (b) the payment of $1 million to the owners of the Ohio Valley Mushroom Farms in exchange for a non-compete and right of first refusal and option that placed a deed restriction that the property not be used for growing mushrooms, (c) the purchase of the La Conca D'Oro mushroom farm and sale of that farm at a significant loss, and (d) the purchase of a 10-year option on the Amadio Farm, all as described above. In addition, Bella Mushroom had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Bella Mushroom attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Bella Mushroom and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Bella Mushroom received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

273. Brownstone Mushroom Farms agreed to and voted in favor of (a) the purchase of Gallo's Mushroom Farm and sale of that farm at a loss, (b) the payment of $1 million to the owners of the Ohio Valley Mushroom Farms in exchange for a non-compete and right of first

refusal and option that placed a deed restriction that the property not be used for growing mushrooms, (c) the purchase of the La Conca D'Oro mushroom farm and sale of that farm at a significant loss, and (d) the purchase of a 10-year option on the Amadio Farm, all as described above. In addition, Brownstone Mushroom Farms had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Brownstone Mushroom Farms attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Brownstone Mushroom Farms and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Brownstone Mushroom Farms received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

274. Cardile Mushrooms, Inc. agreed to and voted in favor of (a) the purchase of Gallo's Mushroom Farm and sale of that farm at a loss, (b) the payment of $1 million to the owners of the Ohio Valley Mushroom Farms in exchange for a non-compete and right of first refusal and option that placed a deed restriction that the property not be used for growing mushrooms, (c) the purchase of the La Conca D'Oro mushroom farm and sale of that farm at a significant loss, and (d) the purchase of a 10-year option on the Amadio Farm, all as described above. In addition, Cardile Mushrooms, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the

EMMC. In addition, Cardile Mushrooms, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Cardile Mushrooms, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Cardile Mushrooms, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

275. Country Fresh Mushroom Co. agreed to and voted in favor of (a) the purchase of Gallo's Mushroom Farm and sale of that farm at a loss, (b) the payment of $1 million to the owners of the Ohio Valley Mushroom Farms in exchange for a non-compete and right of first refusal and option that placed a deed restriction that the property not be used for growing mushrooms, (c) the purchase of the La Conca D'Oro mushroom farm and sale of that farm at a significant loss, and (d) the purchase of a 10-year option on the Amadio Farm, all as described above. In addition, Country Fresh Mushroom Co. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Country Fresh Mushroom Co. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Country Fresh Mushroom Co. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Country Fresh Mushroom Co. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities,

granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

276.    Forest Mushrooms, Inc. agreed to and voted in favor of (a) the purchase of Gallo's Mushroom Farm and sale of that farm at a loss, (b) the payment of $1 million to the owners of the Ohio Valley Mushroom Farms in exchange for a non-compete and right of first refusal and option that placed a deed restriction that the property not be used for growing mushrooms, (c) the purchase of the La Conca D'Oro mushroom farm and sale of that farm at a significant loss, and (d) the purchase of a 10-year option on the Amadio Farm, all as described above.  In addition, Forest Mushrooms, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Forest Mushrooms, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Forest Mushrooms, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions.  Finally, Forest Mushrooms, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

277.    Franklin Farms, Inc. agreed to and voted in favor of (a) the purchase of Gallo's Mushroom Farm and sale of that farm at a loss, (b) the payment of $1 million to the owners of the Ohio Valley Mushroom Farms in exchange for a non-compete and right of first refusal and option that placed a deed restriction that the property not be used for growing mushrooms, (c) the

purchase of the La Conca D'Oro mushroom farm and sale of that farm at a significant loss, and (d) the purchase of a 10-year option on the Amadio Farm, all as described above. In addition, Franklin Farms, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Franklin Farms, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Franklin Farms, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Franklin Farms, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

278. Gino Gaspari & Sons, Inc. agreed to and voted in favor of (a) the purchase of Gallo's Mushroom Farm and sale of that farm at a loss, (b) the payment of $1 million to the owners of the Ohio Valley Mushroom Farms in exchange for a non-compete and right of first refusal and option that placed a deed restriction that the property not be used for growing mushrooms, (c) the purchase of the La Conca D'Oro mushroom farm and sale of that farm at a significant loss, and (d) the purchase of a 10-year option on the Amadio Farm, all as described above. In addition, Gino Gaspari & Sons, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Gino Gaspari & Sons, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members,

and at which Gino Gaspari & Sons, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Gino Gaspari & Sons, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

279. Gaspari Bros., Inc. agreed to and voted in favor of (a) the purchase of Gallo's Mushroom Farm and sale of that farm at a loss, (b) the payment of $1 million to the owners of the Ohio Valley Mushroom Farms in exchange for a non-compete and right of first refusal and option that placed a deed restriction that the property not be used for growing mushrooms, (c) the purchase of the La Conca D'Oro mushroom farm and sale of that farm at a significant loss, and (d) the purchase of a 10-year option on the Amadio Farm, all as described above. In addition, Gaspari Bros., Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Gaspari Bros., Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Gaspari Bros., Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Gaspari Bros., Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

280. Giorgi Mushroom Company agreed to and voted in favor of (a) the purchase of

Gallo's Mushroom Farm and sale of that farm at a loss, (b) the payment of $1 million to the owners of the Ohio Valley Mushroom Farms in exchange for a non-compete and right of first refusal and option that placed a deed restriction that the property not be used for growing mushrooms, (c) the purchase of the La Conca D'Oro mushroom farm and sale of that farm at a significant loss, and (d) the purchase of a 10-year option on the Amadio Farm, all as described above. In addition, Giorgi Mushroom Company had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Giorgi Mushroom Company attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Giorgi Mushroom Company and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Giorgi Mushroom Company received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

281. Kaolin Mushroom Farms, Inc. agreed to and voted in favor of (a) the purchase of Gallo's Mushroom Farm and sale of that farm at a loss, (b) the payment of $1 million to the owners of the Ohio Valley Mushroom Farms in exchange for a non-compete and right of first refusal and option that placed a deed restriction that the property not be used for growing mushrooms, (c) the purchase of the La Conca D'Oro mushroom farm and sale of that farm at a significant loss, and (d) the purchase of a 10-year option on the Amadio Farm, all as described above. In addition, Kaolin Mushroom Farms, Inc. had knowledge of and acquiesced in these

real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Kaolin Mushroom Farms, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Kaolin Mushroom Farms, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Kaolin Mushroom Farms, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

282. Leone Pizzini & Son, Inc. agreed to and voted in favor of (a) the purchase of Gallo's Mushroom Farm and sale of that farm at a loss, (b) the payment of $1 million to the owners of the Ohio Valley Mushroom Farms in exchange for a non-compete and right of first refusal and option that placed a deed restriction that the property not be used for growing mushrooms, (c) the purchase of the La Conca D'Oro mushroom farm and sale of that farm at a significant loss, and (d) the purchase of a 10-year option on the Amadio Farm, all as described above. In addition, Leone Pizzini & Son, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Leone Pizzini & Son, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Leone Pizzini & Son, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally,

Leone Pizzini & Son, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

283. LRP-M Mushrooms LLC agreed to and voted in favor of (a) the purchase of Gallo's Mushroom Farm and sale of that farm at a loss, (b) the payment of $1 million to the owners of the Ohio Valley Mushroom Farms in exchange for a non-compete and right of first refusal and option that placed a deed restriction that the property not be used for growing mushrooms, (c) the purchase of the La Conca D'Oro mushroom farm and sale of that farm at a significant loss, and (d) the purchase of a 10-year option on the Amadio Farm, all as described above. In addition, LRP-M Mushrooms LLC had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, LRP-M Mushrooms LLC attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which LRP-M Mushrooms LLC and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, LRP-M Mushrooms LLC received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

284. Modern Mushroom Farms, Inc. agreed to and voted in favor of (a) the purchase of Gallo's Mushroom Farm and sale of that farm at a loss, (b) the payment of $1 million to the

owners of the Ohio Valley Mushroom Farms in exchange for a non-compete and right of first refusal and option that placed a deed restriction that the property not be used for growing mushrooms, (c) the purchase of the La Conca D'Oro mushroom farm and sale of that farm at a significant loss, and (d) the purchase of a 10-year option on the Amadio Farm, all as described above. In addition, Modern Mushroom Farms, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Modern Mushroom Farms, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Modern Mushroom Farms, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Modern Mushroom Farms, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

285. Oakshire Mushroom Farm, Inc. agreed to and voted in favor of (a) the purchase of Gallo's Mushroom Farm and sale of that farm at a loss, (b) the payment of $1 million to the owners of the Ohio Valley Mushroom Farms in exchange for a non-compete and right of first refusal and option that placed a deed restriction that the property not be used for growing mushrooms, (c) the purchase of the La Conca D'Oro mushroom farm and sale of that farm at a significant loss, and (d) the purchase of a 10-year option on the Amadio Farm, all as described above. In addition, Oakshire Mushroom Farm, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the

EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Oakshire Mushroom Farm, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Oakshire Mushroom Farm, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Oakshire Mushroom Farm, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

286.     Phillips Mushroom Farms, Inc. agreed to and voted in favor of (a) the purchase of Gallo's Mushroom Farm and sale of that farm at a loss, (b) the payment of $1 million to the owners of the Ohio Valley Mushroom Farms in exchange for a non-compete and right of first refusal and option that placed a deed restriction that the property not be used for growing mushrooms, (c) the purchase of the La Conca D'Oro mushroom farm and sale of that farm at a significant loss, and (d) the purchase of a 10-year option on the Amadio Farm, all as described above. In addition, Phillips Mushroom Farms, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Phillips Mushroom Farms, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Phillips Mushroom Farms, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Phillips Mushroom Farms, Inc. received the June 9, 2001 email from John

Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

287.     Harvest Fresh Farms, Inc. agreed to and voted in favor of (a) the purchase of Gallo's Mushroom Farm and sale of that farm at a loss, (b) the payment of $1 million to the owners of the Ohio Valley Mushroom Farms in exchange for a non-compete and right of first refusal and option that placed a deed restriction that the property not be used for growing mushrooms, (c) the purchase of the La Conca D'Oro mushroom farm and sale of that farm at a significant loss, and (d) the purchase of a 10-year option on the Amadio Farm, all as described above.  In addition, Harvest Fresh Farms, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.  In addition, Harvest Fresh Farms, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Harvest Fresh Farms, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions.  Finally, Harvest Fresh Farms, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

288.     Louis M. Marson, Inc. agreed to and voted in favor of (a) the purchase of Gallo's Mushroom Farm and sale of that farm at a loss, (b) the payment of $1 million to the owners of the Ohio Valley Mushroom Farms in exchange for a non-compete and right of first refusal and

option that placed a deed restriction that the property not be used for growing mushrooms, (c) the purchase of the La Conca D'Oro mushroom farm and sale of that farm at a significant loss, and (d) the purchase of a 10-year option on the Amadio Farm, all as described above. In addition, Louis M. Marson, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Louis M. Marson, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Louis M. Marson, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Louis M. Marson, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

289. Mario Cutone Mushroom Co. agreed to and voted in favor of (a) the purchase of Gallo's Mushroom Farm and sale of that farm at a loss, (b) the payment of $1 million to the owners of the Ohio Valley Mushroom Farms in exchange for a non-compete and right of first refusal and option that placed a deed restriction that the property not be used for growing mushrooms, (c) the purchase of the La Conca D'Oro mushroom farm and sale of that farm at a significant loss, and (d) the purchase of a 10-year option on the Amadio Farm, all as described above. In addition, Harvest Fresh Farms, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the

EMMC. In addition, Mario Cutone Mushroom Co. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Mario Cutone Mushroom Co. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Mario Cutone Mushroom Co. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

290.     M. D. Basciani & Sons, Inc. agreed to and voted in favor of (a) the purchase of Gallo's Mushroom Farm and sale of that farm at a loss, (b) the payment of $1 million to the owners of the Ohio Valley Mushroom Farms in exchange for a non-compete and right of first refusal and option that placed a deed restriction that the property not be used for growing mushrooms, (c) the purchase of the La Conca D'Oro mushroom farm and sale of that farm at a significant loss, and (d) the purchase of a 10-year option on the Amadio Farm, all as described above. In addition, Basciani & Sons, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, M. D. Basciani & Sons, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which M. D. Basciani & Sons, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, M. D. Basciani & Sons, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by

the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

291. Monterey Mushrooms, Inc. agreed to and voted in favor of (a) the purchase of Gallo's Mushroom Farm and sale of that farm at a loss, (b) the payment of $1 million to the owners of the Ohio Valley Mushroom Farms in exchange for a non-compete and right of first refusal and option that placed a deed restriction that the property not be used for growing mushrooms, (c) the purchase of the La Conca D'Oro mushroom farm and sale of that farm at a significant loss, and (d) the purchase of a 10-year option on the Amadio Farm, all as described above. In addition, Monterey Mushrooms, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Monterey Mushrooms, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Monterey Mushrooms, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Monterey Mushrooms, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

292. Masha & Toto, Inc. agreed to and voted in favor of (a) the purchase of Gallo's Mushroom Farm and sale of that farm at a loss, (b) the payment of $1 million to the owners of the Ohio Valley Mushroom Farms in exchange for a non-compete and right of first refusal and option that placed a deed restriction that the property not be used for growing mushrooms, (c) the

purchase of the La Conca D'Oro mushroom farm and sale of that farm at a significant loss, and (d) the purchase of a 10-year option on the Amadio Farm, all as described above. In addition, Masha & Toto, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Masha & Toto, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Masha & Toto, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Masha & Toto, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

293. W&P Mushroom, Inc. agreed to and voted in favor of (a) the purchase of Gallo's Mushroom Farm and sale of that farm at a loss, (b) the payment of $1 million to the owners of the Ohio Valley Mushroom Farms in exchange for a non-compete and right of first refusal and option that placed a deed restriction that the property not be used for growing mushrooms, (c) the purchase of the La Conca D'Oro mushroom farm and sale of that farm at a significant loss, and (d) the purchase of a 10-year option on the Amadio Farm, all as described above. In addition, W&P Mushroom, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, W&P Mushroom, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which W&P

Mushroom, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, W&P Mushroom, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

294. Mushroom Alliance, Inc. agreed to and voted in favor of (a) the purchase of Gallo's Mushroom Farm and sale of that farm at a loss, (b) the payment of $1 million to the owners of the Ohio Valley Mushroom Farms in exchange for a non-compete and right of first refusal and option that placed a deed restriction that the property not be used for growing mushrooms, (c) the purchase of the La Conca D'Oro mushroom farm and sale of that farm at a significant loss, and (d) the purchase of a 10-year option on the Amadio Farm, all as described above. In addition, Mushroom Alliance, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Mushroom Alliance, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Mushroom Alliance, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Mushroom Alliance, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

295.     Creekside Mushrooms, Ltd. agreed to and voted in favor of (a) the purchase of Gallo's Mushroom Farm and sale of that farm at a loss, (b) the payment of $1 million to the owners of the Ohio Valley Mushroom Farms in exchange for a non-compete and right of first refusal and option that placed a deed restriction that the property not be used for growing mushrooms, (c) the purchase of the La Conca D'Oro mushroom farm and sale of that farm at a significant loss, and (d) the purchase of a 10-year option on the Amadio Farm, all as described above.  In addition, Creekside Mushrooms, Ltd. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC.  In addition, Creekside Mushrooms, Ltd. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Creekside Mushrooms, Ltd. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions.  Finally, Creekside Mushrooms, Ltd. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

296.     Kitchen Pride Mushrooms agreed to and voted in favor of (a) the purchase of Gallo's Mushroom Farm and sale of that farm at a loss, (b) the payment of $1 million to the owners of the Ohio Valley Mushroom Farms in exchange for a non-compete and right of first refusal and option that placed a deed restriction that the property not be used for growing mushrooms, (c) the purchase of the La Conca D'Oro mushroom farm and sale of that farm at a significant loss, and (d) the purchase of a 10-year option on the Amadio Farm, all as described

above. In addition, Kitchen Pride Mushrooms had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, Kitchen Pride Mushrooms attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which Kitchen Pride Mushrooms and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, Kitchen Pride Mushrooms received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

297. J-M Farms, Inc. agreed to and voted in favor of (a) the purchase of Gallo's Mushroom Farm and sale of that farm at a loss, (b) the payment of $1 million to the owners of the Ohio Valley Mushroom Farms in exchange for a non-compete and right of first refusal and option that placed a deed restriction that the property not be used for growing mushrooms, (c) the purchase of the La Conca D'Oro mushroom farm and sale of that farm at a significant loss, and (d) the purchase of a 10-year option on the Amadio Farm, all as described above. In addition, J-M Farms, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, J-M Farms, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which J-M Farms, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker

in carrying out the transactions. Finally, J-M Farms, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

298. United Mushroom Farms Cooperative, Inc. agreed to and voted in favor of (a) the purchase of Gallo's Mushroom Farm and sale of that farm at a loss, (b) the payment of $1 million to the owners of the Ohio Valley Mushroom Farms in exchange for a non-compete and right of first refusal and option that placed a deed restriction that the property not be used for growing mushrooms, (c) the purchase of the La Conca D'Oro mushroom farm and sale of that farm at a significant loss, and (d) the purchase of a 10-year option on the Amadio Farm, all as described above. In addition, United Mushroom Farms Cooperative, Inc. had knowledge of and acquiesced in these real estate transactions, including without limitation, agreeing to be bound by a 2/3 vote of the EMMC members, and agreeing that the Executive Committee could carry out the actions of the EMMC. In addition, United Mushroom Farms Cooperative, Inc. attended the June 5, 2001 EMMC meeting at which the real estate transactions were discussed and agreed to with the other EMMC members, and at which United Mushroom Farms Cooperative, Inc. and the other EMMC members discussed and agreed to the parameters to bind the EMMC's real estate broker in carrying out the transactions. Finally, United Mushroom Farms Cooperative, Inc. received the June 9, 2001 email from John Pia wherein he indicated that the EMMC Executive Committee had been carrying out its responsibilities, granted to it by the EMMC members, in connection with the real estate transactions that had the purpose of creating order in the supply side of the business.

299. As a result of the agreements between third-parties and EMMC, the deed

restrictions on these six mushroom farms in the eastern United States, permitted EMMC to remove more than 42 million pounds of annual growing capacity from that region, or approximately 8 percent of the total capacity in the eastern United States.

300.    In addition to the farms in Pennsylvania, Georgia, and Ohio, the Defendants also implemented the Supply Control campaign to buy mushroom farms to restrict mushroom production in other states. For example, with the agreement, knowledge and approval of its members, EMMC acquired a farm in Hillsborough, Texas, to reduce and forestall the threat of a competitor (Stuart Thomas) from producing mushrooms in Texas. As a result of EMMC's actions in various states, with the agreement, knowledge and approval of its members, EMMC eliminated at least 50 million pounds of mushroom supply, if not more. The EMMC boasted to its members that the campaign as a whole had "[a]nnually taken over 50 million pounds out of production from facilities which could have easily been purchased and remained in production."

301.    Stuart Thomas filed suit against Defendants South Mill Mushroom Sales, Mike Pia and John Pia and other employees of Defendant Kaolin, asserting claims of price discrimination and discriminatory allowances under § 2(d) of the Robinson-Patman Act, restraint of trade under § 1 of the Sherman Act, and anti-competitive dealing under § 3 of the Clayton Act. *See Dallas South Mill, Inc. v. Kaolin Mushroom Farms, Inc.*, No. 3:05-cv-1890 (N.D. Tex. Sept. 23, 2005) (Compl.).  In the complaint in that action, Thomas alleged that Kaolin/South Mill, operated and controlled by the Pias, exercised predatory pricing of mushrooms as the sole supplier to the distribution entities, leading to a "downward spiral" of the growth rate and the profits of entities.

302.    In another email to EMMC members, it is believed that John Pia wrote, "I think

everybody agrees that we've won a lot of battles in the last 9 months in the area of supply management. . . . [T]he farm closings have resulted in [millions of] pounds being taken off the market." *See* CREEK-RFP-0000502.

303. Likewise, EMMC Operational Meeting Notes dated October 22, 2001 estimates the "supply reduction" in mushrooms since January 2001.

304. The Defendants and non-EMMC third-parties' purpose in entering into the purchase and lease transactions was to reduce or eliminate the Agaricus mushroom growing capacity available to potential independent competitors in the United States. Eliminating or reducing growing capacity improved Defendants' ability to perpetuate its naked price-fixing scheme and maintain the artificially-inflated price increases to which they and nonmember distributors had agreed. Moreover, these land purchases and lease/option agreements did not, nor were they intended to, serve any legitimate or lawful purpose under the Capper-Volstead Act, such as the promotion of growing or marketing the Defendants' mushrooms.

305. Depending on the size and location, building a new mushroom growing and production facility costs millions of dollars and generally requires zoning approval, and takes much longer to generate any revenue than purchasing or leasing an existing growing operation. By eliminating the existing available production capacity, the Defendants substantially reduced and impeded competition and substantially forestalled and delayed the entry of new competitors and/or the expansion of existing competitors.

306. Through membership dues and a "Supply Control Assessment," EMMC members paid and the EMMC collected approximately $6 million from its members between 2001 and 2003. EMMC, with the knowledge, approval and agreement of each EMMC member detailed above, then spent approximately $4 million to purchase four

mushroom farms and to acquire lease options on two additional mushroom farms in the eastern United States for the purpose of reducing the mushroom production capacity available for nonmember non-conspirators to grow mushrooms in competition with the Defendants through deed restrictions.[4]

307.    The Supply Control campaign is not a joint activity protected by the exemption from the antitrust laws created by the Capper Volstead Act, 7 U.S.C. §291, *et seq.*

### Group Boycotts

308.    In addition to the property transactions and deed restrictions to restrain mushroom supply alleged above, EMMC members collectively interfered with any non-EMMC growers that sought to sell at prices that were below the artificially-inflated prices set by EMMC, and employed collective and conspiratorial acts to pressure independent growers to join EMMC and cooperate in the Defendants' anticompetitive scheme.

309.    Mushroom growers frequently sell fresh mushrooms to each other to fill daily needs. Because EMMC members and co-conspirators control over 60 percent of the national mushroom supply, and approximately 90 percent of the mushroom supply in the eastern United States, EMMC members were able to pressure non-EMMC members to force independent growers to join EMMC (and thus the anticompetitive scheme) or to refrain from selling mushrooms at lower prices that would undermine the agreed-upon anticompetitive prices. EMMC members applied such pressure and coercion by threatening and/or implementing a group boycott in which they would not sell mushrooms to other growers who needed them to meet short-term supply needs and/or

---

[4] By way of example, one of the deed restrictions reads:

> This property shall never be used for the cultivation, growing, marketing, sale or distribution of fresh mushrooms, canned and/or processed mushrooms or related endeavors.

selling mushrooms to such independent growers at inflated prices.

310. Through the collective boycotts and other collective efforts to penalize non-EMMC members that threatened to undermine the Defendants' anticompetitive scheme, the Defendants caused the artificial inflation of prices for not only the fresh Agaricus mushrooms that the Defendants sold, but also for the fresh Agaricus mushrooms sold by non-EMMC growers.

**311.** For example, at a January 2002 EMMC meeting in Hershey, Pennsylvania, one of the issues discussed by the members was how the EMMC could persuade non-members to join the EMMC. The EMMC members discussed how the EMMC and its members should essentially boycott non-members and not cooperate with non-members seeking to purchase Mushrooms due to shortages or otherwise. According to Jonathon Adler from Defendant Creekside, the EMMC members at this meeting supported the idea of a group boycott and the representative of M.D. Basciani even indicated that if necessary, the EMMC should "take a bat" to non-members. Adler Decl., p.2 ¶3.

312. Defendant Creekside knew that EMMC had a policy to sell to non-members at certain minimum prices.

313. In 2001 and 2002, Defendant Giorgi Mushroom would only sell to Creekside, who was a member of the Mushroom Alliance, at the higher EMMC member prices.

314. Defendant County Fresh likewise refused to sell mushrooms to Creekside after Mushroom Alliance left EMMC and Creekside declined to join the EMMC.

## DOJ ACTION

315. As a result of Defendants' illegal, anticompetitive conduct, on December 16, 2004, the United States Department of Justice filed a complaint against EMMC, styled

*United States of America v. Eastern Mushroom Marketing Cooperative, Inc.,* Civil Case No. 2: 04-CV-S 829 (the "DOJ Complaint") alleging that the Eastern Mushroom Marketing Cooperative, Inc. ("EMMC") had violated Section 1 of the Sherman Act, 15 U.S.C. § 1.

316.    With the DOJ Complaint, the United States and EMMC filed an agreed-upon proposed Final Judgment that required EMMC to eliminate the deed restrictions from all the properties it shut down. That Final Judgment was subsequently entered on September 9, 2005.

317.    According to the DOJ:

> The EMMC is made up of entities that grow, buy, package, and ship mushrooms to retail and food service outlets across the United States. EMMC began operations in January 2001 and presently has 15 members.

(*See* Competitive Impact Statement, p. 1).

318.    The DOJ further stated that:

a.    "One of the first acts of EMMC members after forming the cooperative was to agree to increase prices in each of the geographic regions where its members sell mushrooms. The agreed-upon price increases averaged about 8 percent nationwide." (*Id.* at p.3),

b.    "Through membership dues and a so called "Supply Control Assessment," the EMMC collected approximately six million dollars from its members between 2001 and 2003." (*Id.* ),

c.    that (The EMMC touted the success of the Supply Control campaign to its membership, claiming it had "[a]nnually taken over 50 million pounds out of production from facilities which could have easily been purchased and remained in production." (Compl, ¶ 6),

d.    The agreement among the EMMC members to restrict, forestall, and exclude competition from nonmember farmers is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act. (*Id.* ¶ 7)

e.    The members of the EMMC grow, sell, and ship mushrooms to retail and food service outlets across the United States. (*Id.* ¶ 11)

f. In January 2001, shortly after its formation, the EMMC and its members agreed to set increased minimum prices at which they would sell fresh mushrooms in six different geographic regions, covering the entire continental United States. (*Id.* ¶ 16)

g. To form and effectuate this conspiracy, EMMC and its members did the following things, among others:

> a. collectively funded the Supply Control campaign;
>
> b. sold four properties with permanent deed restrictions forbidding the conduct of any business related to the production of mushrooms;
>
> c. entered agreements with nonmembers to place deed restrictions on two properties for which the cooperative purchased lease options; and
>
> d. filed deed restrictions on the two lease-optioned properties prohibiting the conduct of any business related to the production of mushrooms for ten years.

(*Id.* ¶ 32)

h. "EMMC" means that Eastern Mushroom Marketing Cooperative, Inc., the Defendant in this case, a Pennsylvania corporation with its headquarters in Kenneth Square, Pennsylvania, its successors and assigns, and its subsidiaries, affiliates, members, divisions, groups, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees. (*See* Final Judgment, ¶ A.)

319. None of the documents filed by the DOJ in support of the Final Judgment identify any of the members of EMMC or consider whether they are growers. The only basis the DOJ appears to have considered for abrogating the immunity of EMMC was the predatory conduct of EMMC in buying nonmember farms and selling them to third parties who agreed to deed restrictions limiting the use of the properties for mushroom production. There is no evidence that the DOJ considered whether the members and the conduct of

EMMC would otherwise be entitled to immunity.  Pursuant to 15 U.S.C. § 16(a), entry of that Final Judgment does not in any way impair this action.

## VI.　FRAUDULENT CONCEALMENT AND TOLLING

### Fraudulent Concealment

320.　Throughout the relevant period, Defendants affirmatively concealed their unlawful conduct from Plaintiffs. Plaintiffs did not discover, and could not discover through the exercise of reasonable diligence, that Defendants were violating the antitrust laws as alleged herein until approximately December 2004, when the Justice Department announced that it had filed a civil complaint against EMMC and that EMMC had consented to entry of a final judgment against it.  Nor could Plaintiffs have discovered the violations earlier than that time because Defendants and their co-conspirators concealed the identity of EMMC's members, conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in furtherance thereof, and attempted to conceal from public scrutiny their activities through various other means and methods designed to avoid detection.

321.　Defendants and their co-conspirators affirmatively and fraudulently concealed the existence of the violations alleged through the following actions, among others:

> a.　Concealing the identity of EMMC members, some of whom are not mushroom growers, and avoiding references or discussion in public documents of the identities of EMMC's membership and the anticompetitive scheme and acts alleged herein;
>
> b.　Concealing the fact that EMMC was formed solely as a pretext for naked price-fixing and that it provided no market efficiencies or legitimate business value to its members or consumers;
>
> c.　Conducting non-public meetings and communications in which the Defendants agreed upon and implemented the scheme alleged herein;

d. Participating in non-public meetings and conversations to monitor and enforce adherence to the conspiracy; and

e. Falsely representing that EMMC members' prices were fair and competitive.

322. As a result of Defendants' concealment, any applicable statute of limitations affecting the rights of action of Plaintiffs was tolled. Plaintiffs exercised due diligence to learn of its legal rights, and, despite the exercise of due diligence, did not discover and could not have discovered the antitrust violations alleged above at the time they occurred.

323. As a result of Defendants' continuing violations of federal antitrust laws and the nature of the damages to Plaintiffs, Plaintiffs asserts the tolling of the applicable statute of limitations with respect to any claims and rights of action that Plaintiffs has as a result of the unlawful contract, combination, and conspiracy alleged in this Complaint.

## Tolling

324. The running of the statute of limitations as to each Defendant was tolled by 15 U.S.C. §16(i).

325. This Court found that as the claims made in the Class Action Complaint[5] bear a "substantial identity" to the claims made by the DOJ[6] tolling of the statute of limitations under 15 U.S.C. §16(i) is applicable here. *See* Dkt. 88 at 20.

326. While the Court used the amended class action complaint from the *In Re Mushroom Direct Purchaser Antitrust Litigation* to compare with the claims made by the DOJ, the court found that tolling applies to Plaintiffs claims here as each Defendant named in Plaintiffs' Complaint was named in the initial Class Action Complaint, and contains the same factual allegations and causes of action contained in the initial Class Action Complaint.

---

[5] *In Re Mushroom Direct Purchaser Antitrust Litigation*, Master File No. 2:06-cv-00620-BMS (E.D. Pa.).
[6] *U.S. vs. Eastern Mushroom Mkting. Coop.*, 2:04-CV-5829 (E.D. PA.).

327. As the claims here, arise out of the same supply scheme at issue in the DOJ case, any limitation periods here is tolled pursuant to 15 U.S.C. §16(i).

328. The running of the statute of limitations as to each Defendant is also tolled here under *American Pipe*, 414 U.S. 538, 553 (1974), because the Class Action filed on or about February 10, 2006 involved the same subject matter and parties as set for in Plaintiffs' Complaint (Dkt.No.1), and as each Defendant named in Plaintiffs' Complaint was named in the initial Class Action Complaint, and contains the same factual allegations and causes of action contained in the initial Class Action Complaint.

## VII. CAUSES OF ACTION

### COUNT I

### Violation of Sherman Act § I – Anticompetitive Conspiracy

329. Plaintiffs incorporate by reference all of the foregoing allegations as though fully set forth at length.

330. Defendants have used their illegal conspiracy and unlawfully-gained market power to suppress competition and harm Plaintiffs by enacting an overarching and illegal scheme to affect, fix, raise, maintain and/or stabilize at artificial and non-competitive levels, the prices of Agaricus mushrooms that were sold, distributed, or obtained in the United States.

331. Defendants engaged in naked-price fixing and conspired among themselves and in conjunction with nonmember distributors to set artificially-inflated prices. Defendants and their co-conspirators sought to exclude and penalize independent mushroom growers who failed to abide by the prices set and dictated by EMMC. Defendants' actions constitute a conspiracy in unreasonable restraint of trade in violation Section 1 of the Sherman Act, 15 U.S.C. § 1.

332. To form and effectuate this conspiracy, the Defendants performed multiple acts,

including but not limited to the following:

    a. meeting and agreeing to fix the price of Agaricus mushrooms;

    b. discussing and agreeing upon the Supply Control campaign and collectively funding it;

    c. buying multiple properties which were resold at a loss with permanent deed restrictions forbidding the conduct of any business related to the production of mushrooms;

    d. entering into agreements with nonmembers to place deed restrictions on properties for which the cooperative purchased lease options;

    e. filing deed restrictions on the lease-optioned properties prohibiting the conduct of any business related to the production of mushrooms for ten years; and

    f. supporting and reinforcing the price-fixing scheme by collectively interfering with, penalizing and retaliating against any non-EMMC growers that sought to sell at prices that were below the artificially-inflated prices set by EMMC, and collectively pressuring independent growers to join EMMC and the Defendants' anticompetitive scheme.

333. In addition, the Supply Control campaign adopted and implemented by EMMC in and of itself constitutes a conspiracy between and among EMMC members and nonmember co- conspirators in unreasonable restraint of trade to restrict competition from independent mushroom producers in violation of Section 1 of the Sherman Act, 15 U.S.C. § I.

334. EMMC was an agricultural cooperative in name only, and operated as a pretext for naked price-fixing by Defendants. EMMC never engaged in collectively processing, preparing for market, handling, or marketing products of its members as envisioned by the Capper-Volstead Act, 7 U.S.C. § 291, et seq. Consequently, Defendants are not entitled to immunity pursuant to the Capper-Volstead Act.

335.     In addition, under the Capper-Volstead Act, farm cooperatives lose immunity from antitrust liability when they engage in exclusionary practices, monopolize trade, or suppress competition in concert with nonmembers. EMMC and its members conspired with nonmember distributors to engage in naked price-fixing, conspired with nonmember third-parties to eliminate mushroom supply from non-EMMC members, and/or used collective efforts to exclude  and penalize non-EMMC members that charged lower prices. These actions did not, nor were they intended to, serve any legitimate or lawful purpose under the Capper-Volstead Act, such as the promotion of growing or marketing the Defendants' mushrooms. They were predatory actions for which no immunity is available under the Capper-Volstead Act.

336.     Furthermore, under the Capper-Volstead Act, farm cooperatives are not immune from antitrust liability when even one member of the cooperative is not a "farmer" within the meaning of the Capper-Volstead Act. At least two EMMC members are not "farmers," i.e. they do not grow mushrooms. Many others are vertically-integrated agri-businesses that do not qualify as "farmers" within the meaning of the Capper-Volstead Act.

337.     The above-described illegal practices of Defendants have resulted in continuing and accumulating harm to Plaintiffs by allowing Defendants to affect, fix, raise, maintain, and/or stabilize at artificial and non-competitive levels the prices at which Agaricus mushrooms were sold, distributed, or obtained in the United States.   The continuing and accumulating harm suffered by Plaintiffs specifically includes being overcharged for Agaricus mushrooms as a result of Defendants' conspiracy.

338.     As a direct and proximate result of the Defendants' illegal, overarching price-fixing scheme, Plaintiffs were injured in their business or property by the collusion and

conspiracy alleged above which substantially foreclosed and excluded competition in the relevant markets. Without limiting the generality of the foregoing, Plaintiffs have been forced to pay higher prices for Agaricus mushrooms in the relevant market than they would have paid in the absence of Defendants' unlawful conduct.

## COUNT II

### Violation of Sherman Act § 2 - Conspiracy to Monopolize, Monopolization, or Attempted Monopolization

339. Plaintiffs incorporate by reference all of the foregoing allegations as though fully set forth at length.

340. At all relevant times, Defendants conspired to possess, possessed, or attempted to acquire monopoly power in the relevant market -- i.e., the market for Agaricus mushrooms in the United States and/or the market for Agaricus mushrooms in the eastern United States.

341. During the relevant period, Defendants violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by willfully and unlawfully conspiring to acquire or maintain, acquiring or maintaining, and/or attempting to acquire or maintain monopoly power by, inter alia:

     a. setting artificially-inflated prices at which mushrooms could be sold by conspiring with nonmember distributors to enact their naked price-fixing scheme;

     b. seeking to punish and exclude independent mushroom producers who did not sell at the dictated price and/or otherwise cooperate in their anticompetitive scheme;

     c. conducting the Supply Control campaign;

     d. buying multiple properties and reselling them at a loss with permanent deed restrictions forbidding the conduct of any business related to the production of mushrooms;

     e. entering into agreements with nonmembers to place deed restrictions on properties for which the cooperative purchased lease options;

  f. filing deed restrictions on the lease-optioned properties prohibiting the conduct of any business related to the production of mushrooms; and

  g. supporting and reinforcing the scheme by collectively interfering with, penalizing, and retaliating against any non-EMMC growers that sought to sell at prices below the artificially-inflated prices set by EMMC, and collectively pressuring independent growers to join EMMC and the Defendants' anticompetitive scheme.

342. As set forth herein, Defendants have used their illegal monopoly power to suppress competition and harm Plaintiffs by enacting an overarching, illegal, and predatory scheme to affect, fix, raise, maintain, and/or stabilize at artificial and non-competitive levels, the prices of Agaricus mushrooms that were sold, distributed, or obtained in the United States. Alternatively, if it is determined that defendants have not yet secured monopoly power, their conduct constitutes attempted monopolization which has harmed Plaintiffs and poses a dangerous possibility of success. Through this illegal conduct, Defendants have violated Section 2 of the Sherman Act.

343. These illegal practices of Defendants have resulted in continuing and accumulating harm to Plaintiffs by allowing Defendants to affect, fix, raise, maintain, and/or stabilize at artificial and non-competitive levels the prices at which Agaricus mushrooms were sold, distributed, or obtained in the United States. The continuing and accumulating harm suffered by Plaintiffs specifically includes being overcharged for Agaricus mushrooms as a result of Defendants' monopoly or attempted monopoly.

344. Acts of monopolization or attempted monopolization such as those of Defendants are not activities protected by the limited exemption from the antitrust laws created by the Capper Volstead Act, 7 U.S.C. § 291, et seq. Further, as discussed in greater detail in Count I, EMMC has lost any claim to immunity by allowing membership by non-

grower entities, and engaging in exclusionary and anticompetitive practices with nonmember third-parties. EMMC served as a pretext for the illegal actions of the Defendants. There was no legitimate business justification for the willful conspiracy to acquire or maintain, acquisition or maintenance, and/or attempted acquisition or maintenance of monopoly power by Defendants. EMMC and its actions provided no market efficiencies or other legitimate business value to members or consumers.

345. As a direct and proximate result of the Defendants' willful conspiracy to acquire or maintain, acquisition or maintenance, and/or attempted acquisition or maintenance of monopoly power, Plaintiffs were injured in their business or property because competition in the relevant markets was substantially foreclosed. Without limiting the generality of the foregoing, Plaintiffs have been forced to pay higher prices for Agaricus mushrooms in the relevant market than they would have paid in the absence of Defendants' unlawful conduct.

## COUNT III

### Violation of Clayton Act § 7 - Unlawful Acquisition

346. Plaintiffs incorporate by reference all of the foregoing allegations as though fully set forth at length.

347. EMMC and its members acting through EMMC, unlawfully acquired the assets of their direct competitors, as detailed above, thereby substantially lessening competition in a relevant market -- i.e., the market for Agaricus mushrooms in the United States and/or the market for Agaricus mushrooms grown in the eastern United States. This acquisition violated Section 7 of the Clayton Act, 15 U.S.C. § 18.

348. By reason of the antitrust violations of Defendants alleged herein, the prices of the mushrooms purchased were higher than they would have been but for Defendants'

violation of antitrust laws.

349.  Defendants' acquisition and holding of competitor mushroom farms violated Section 7 of the Clayton Act.

350.  As a direct and proximate result of the Defendants' acquisition of their competitors, Plaintiffs were injured in its business or property by the substantial lessening of competition in the relevant markets. Without limiting the generality of the foregoing, Plaintiffs have been forced to pay higher prices for Agaricus mushrooms in the relevant market than it would have paid in the absence of Defendants' unlawful conduct.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

(i)  rule the acts alleged herein be adjudged and decreed unlawful acts in violation of Section I of the Sherman Act;

(ii)  rule that the acts alleged herein be adjudged and decreed unlawful acts in violation of Section 2 of the Sherman Act;

(iii)  rule the acts alleged herein be adjudged and decreed unlawful acts in violation of Section 7 of the Clayton Act;

(iv)  award Plaintiffs three-fold the damages determined to have been sustained by them, and enter judgment against Defendants in favor of Plaintiffs;

(v)  require Defendants to take affirmative steps to dissipate the continuing effects of their unlawful conduct; and

(vi)  award Plaintiffs their costs of suit, including reasonable attorney's fees and costs as provided by law.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.


Dated:  January 22, 2019


/s/ Patrick J. Ahern
Patrick J. Ahern
Theodore Bell
Ahern and Associates, P.C.
Willoughby Tower
8 South Michigan Avenue
Suite 3600
Chicago, Illinois 60603
Ph: (312) 404-3760
patrick.ahern@ahernandassociatespc.com
theo.bell@ahernandassociatespc.com

*Attorneys for Plaintiffs Winn-Dixie*
*Stores, Inc., and Bi-Lo Holding, LLC*
*Attorneys for Plaintiffs Winn-Dixie*
*Stores, Inc., and Bi-Lo Holding, LLC*