IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WINN-DIXIE STORES, INC., *et al.*, | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| EASTERN MUSHROOM MARKETING | : | |
| COOPERATIVE, *et al.*, | : | No. 15-6480 |
| Defendants. | : | |

## MEMORANDUM

**Schiller, J.**                                                                                           **February 5, 2021**

      The Eastern Mushroom Marketing Cooperative (EMMC) and its members and affiliates—including Defendant M. Cutone Mushroom Co., Inc.—are accused of unlawfully colluding to inflate the price of fresh agaricus mushrooms. Before the Court is Defendant Cutone's Motion for Partial Summary Judgment, which argues that its liability for participation in the alleged antitrust conspiracy is limited because it withdrew from the EMMC during the conspiracy period. For the following reasons, the Court will grant the motion and limit Cutone's potential liability to damages attributable to the conspiracy's conduct before September 1, 2002.

**I.**     **FACTUAL BACKGROUND**

      This case involves alleged price-fixing and supply control in the market for fresh agaricus mushrooms. Plaintiffs seek damages from all Defendants, including Cutone, for their payment of artificially inflated prices for mushrooms as a result of a conspiracy among the EMMC and its members. Defendants allegedly agreed to inflate the price of mushrooms by setting minimum prices and decommissioning various mushroom farms in order to reduce mushroom supply. (*See* First Am. Compl. ¶¶ 1-3.) Plaintiffs assert that Cutone was an EMMC member during the conspiracy period, January 1, 2001 through December 31, 2008. (*Id.* ¶ 41; *see* Court's Mem. of

April 8, 2019 at 13, Doc. No. 121.) Plaintiffs allege that Cutone specifically participated in the alleged conspiracy by: (1) agreeing to form and join the EMMC; (2) attending numerous EMMC meetings to discuss mushroom prices and agreeing to set minimum prices; (3) complying with EMMC's minimum pricing policy; (4) attending an EMMC meeting to discuss controlling the supply of mushrooms; and (5) agreeing to pay an assessment and to charge each EMMC member an assessment in furtherance of supply control. (First Am. Compl. ¶¶ 41, 129, 194-96, 259, 289.)

Cutone does not dispute that it joined the EMMC by signing a membership agreement in January 2001. (Def.'s Statement of Undisputed Material Facts (SUMF) ¶ 8.) However, Cutone argues that it communicated its resignation from the EMMC effective September 1, 2002, thereby withdrawing from the alleged anti-competitive conspiracy.

Mario Cutone, Jr., President of Cutone Mushroom, sent Cutone's first letter of resignation to the EMMC on March 4, 2002. (Def.'s SUMF ¶ 9; Def.'s Ex. C.) In addition to informing the EMMC of Cutone's termination of membership, the letter stated: "Due to current circumstances we can no longer be bound to the rules and regulations of the cooperative. Although we will not be members, we fully intend to adhere to the pricing structure unless we are forced to alter it by other growers." (Def.'s Ex. C.) This letter also sought return of Cutone's $5,000 escrow and $100,000 balance of the capital assessment. (*Id.*)

Mario Cutone, Jr. submitted a second letter of resignation to the EMMC on May 20, 2002. (Def.'s SUMF ¶ 10; Def.'s Ex. D.) The second letter of resignation stated that Cutone was terminating its membership with EMMC, and again included the statement: "Due to current circumstances we can no longer be bound to the rules and regulations of the cooperative." (Def.'s Ex. D.) The May 20 letter did not include any reference to an intent to adhere to the minimum pricing structure or request any return of funds. (*Id.*)

Mario Cutone, Jr. submitted a third letter of resignation to EMMC on June 19, 2002. (Def.'s SUMF ¶ 11; Def.'s Ex. E.) The third letter of resignation included identical language to the second letter, except that it also requested that EMMC, "send an acknowledgment for the termination of our membership." (Def.'s Ex. E.)

On the same date Cutone sent its third letter of resignation, counsel for EMMC sent a letter to Mario Cutone acknowledging Defendant Cutone's "notice, given prior to June 15, 2002, of your desire to withdraw as a member of the EMMC." (Def.'s SUMF ¶¶ 12-13; Def.'s Ex. F.) The EMMC letter stated that Cutone's termination of membership in the EMMC was effective September 1, 2002, pursuant to the terms of EMMC Membership Agreement. (Def.'s Ex. F.) The EMMC letter further stated that Cutone's membership in the EMMC remained valid until September 1, 2002, and that it remained "responsible as a member as per all terms of the Membership Agreement and Bylaws and all policies adopted thereunder." (*Id.*)

After its resignation from the EMMC, Cutone did not consider itself bound by the EMMC minimum pricing requirements, nor did the EMMC or its members ask Cutone to continue to adhere to the EMMC's minimum pricing policy. (Def.'s SUMF ¶¶ 14-15; Def.'s Ex. B, Michael Cutone Dep. 235:3-236:6.)[1] Cutone seeks partial summary judgment on the grounds that it withdrew from the EMMC as of September 1, 2002, and therefore, cannot be liable to Plaintiffs for any damages incurred as a result of purchases after that date.

In opposition, Plaintiffs argue that Cutone's withdrawal was ineffective because Cutone

---

[1] Plaintiffs object to reliance on this testimony, arguing that it would be inadmissible at trial because it was in response to leading questions. *See* Fed. R. Civ. P. 56(c)(2). Objections to the form of the questions were not stated on the record at the deposition, and are therefore waived. *See Oberlin v. Marlin Am. Corp.*, 596 F.2d 1322, 1328 (7th Cir. 1979) (citing Fed. R. Civ. P. 32(d)(3)(B)). Regardless, the Court disagrees that this objection would render the testimony inadmissible under Fed. R. Evid. 611.

3

intended to continue complying with the EMMC's minimum pricing policy after it resigned from the EMMC. (Pl.'s Resp. in Opp'n to Def.'s Mot. at 5-7, 9-11.) Plaintiffs cite to the March 4, 2002 resignation letter as evidence of this intent, as well as the class action deposition testimony of Michael Cutone, who acted as the Rule 30(b)(6) witness for Defendant Cutone. (Pl.'s Ex. 4, Michael Cutone Dep.) When asked about the resignation letters' reference to EMMC "rules and regulations," Michael Cutone testified that his brother, Mario Cutone, "didn't attend a lot of meetings, so I don't know what he meant by that. I don't know the rules or regulations, you know. I don't know what he meant by that." (*Id.* at 170:23-171:3.) When asked why the sentence concerning minimum pricing in the March 4, 2002 resignation letter does not appear in the May 20, 2002 resignation letter, Michael Cutone testified, "my brother, these are written at different times. He probably just wrote the letter at different times, didn't look at his other letter. I don't know." (*Id.* at 233:20-24.) As to whether Cutone continued to follow the EMMC pricing structure after its resignation from EMMC, Michael Cutone testified, "I don't know. I don't know whether I could—It probably would show on the invoices what we sold...." (*Id.* at 172:2-4.) In response to the question whether Cutone attempted to adhere to minimum pricing after its resignation from EMMC to benefit the industry, Michael Cutone testified that, "We did what we had to do to stay in business, but there was [*sic*] accounts that I'm sure we had to go down on." (*Id.* at 174:25-175:7.)

      Cutone filed a Reply Memorandum which included the Affidavit of Mario Cutone, III in Support of the Motion for Partial Summary Judgment. According to Mario Cutone's affidavit, he and his father, Mario Cutone, Jr., who is now deceased, ran the business of Defendant Cutone, decided to join the EMMC, and set the price of the mushrooms that Cutone sold to retail and food service customers. (Ex. A to Def.'s Reply Mem., Aff. of Mario Cutone, III in Supp. of Mot. ¶¶ 3-

5.) Michael Cutone ran the family's mushroom growing operation, M&V Enterprises, Inc. (*Id.* ¶¶ 1-2.) Mario Cutone, III and his father "never had any intention to follow EMMC pricing policies following [Cutone's] resignation from EMMC." (*Id.* ¶ 10.) Before September 1, 2002, Mario Cutone, III and his father had received the EMMC minimum price list on a regular basis. (*Id.* ¶ 14.) After September 1, 2002, they no longer received the minimum price list from EMMC and did not learn about the EMMC minimum price list indirectly from any other source. (*Id.* ¶¶ 15-16.) As a result, Mario Cutone, III and his father "never followed EMMC prices after September 1, 2002," because they were "no longer under any obligation to attempt to do so," and they "did not know what those prices were." (*Id.* ¶ 17.) Mario Cutone, III and his father "had no further communication from EMMC after [September 1, 2002]." (*Id.* ¶ 19.)

**II.    STANDARD OF REVIEW**

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). "The party moving for summary judgment has the burden of showing that there is no genuine issue of material fact, and once the moving party has sustained this burden, the opposing party must introduce specific evidence showing that there is a genuine issue for trial." *Williams v. Borough of W. Chester, Pa.*, 891 F.2d 458, 464 (3d Cir. 1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). The court may not, however,

make credibility determinations or weigh the evidence in considering motions for summary judgment. *Anderson*, 477 U.S. at 255.

### III. DISCUSSION

The Court will grant Cutone's partial motion for summary judgment because Cutone severed ties from the EMMC effective September 1, 2002 and ceased to act in furtherance of the EMMC's goals after its resignation. However, the Court cannot determine on the record before it whether Cutone is liable for any damages for Plaintiffs' purchases after September 1, 2002. In order to determine the scope of Cutone's liability for damages, Plaintiff will bear the burden at trial of proving what damages are attributable to conduct of the conspiracy prior to Cutone's withdrawal.

#### A. Withdrawal as an Affirmative Defense to an Antitrust Conspiracy

Federal antitrust law follows the common law doctrine of joint and several liability for co-conspirators. *See Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 646 (1981). A defendant who participated in a conspiracy can be liable for antitrust damages "even if the plaintiff only purchased from the defendants' co-conspirators and not from the defendant itself." *In re Processed Egg Prod. Antitrust Litig.*, 392 F. Supp. 3d 498, 513 (E.D. Pa. 2019); *see Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 448 (3d Cir. 1977). Thus, in a lawsuit for federal antitrust violations, "each member of a conspiracy is liable for all damages caused by the conspiracy's entire output." *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 632 (7th Cir. 2002).

Defendants accused of antitrust conspiracy in violation of the Sherman Act can raise withdrawal from the conspiracy as a defense. *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 464-65 (1978); *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 530 F.3d 204, 223 n.13 (3d Cir. 2008). Withdrawal from a conspiracy allows a conspirator to avoid continuing liability for the

entire conspiracy's conduct. *Smith v. United States*, 568 U.S. 106, 111 (2013). Withdrawal is an affirmative defense, and therefore, the burden of proof rests with the defendant. *Id*. at 113.

"Mere cessation of activity in furtherance of an illegal conspiracy does not necessarily constitute withdrawal." *United States v. Steele*, 685 F.2d 793, 803 (3d Cir. 1982). Rather, the defendant must present evidence of an affirmative act demonstrating withdrawal, "typically either a full confession to the authorities or communication to his co-conspirators that he has abandoned the enterprise and its goals." *Id.* at 803-04. "Affirmative acts inconsistent with the object of the conspiracy and communicated in a manner reasonably calculated to reach co-conspirators have generally been regarded as sufficient to establish withdrawal or abandonment." *U.S. Gypsum*, 438 U.S. at 464-65.

A defendant can establish a *prima facie* showing of withdrawal from a conspiracy if the defendant completely severs its relationship with the enterprise, gives notice to co-conspirators that it disavows the purpose of the conspiracy, or acts inconsistent with the object of the conspiracy. *United States v. Antar*, 53 F.3d 568, 583 (3d Cir. 1995), *abrogated on other grounds by Smith v. Berg*, 247 F.3d 532 (3d Cir. 2001). Once a defendant has made a *prima facie* showing of withdrawal, "the burden shifts to the plaintiff to rebut the defendant's *prima facie* showing, which it may do either by challenging the defendant's *prima facie* evidence or by presenting evidence that the defendant engaged in conduct in furtherance of the conspiracy subsequent to its alleged withdrawal." *In re NBR Antitrust Litig.*, Civ. A. No. 03-1898, 2005 WL 8179727, at *3 (W.D. Pa. July 18, 2005), report and recommendation adopted, Civ. A. No. 03-1898, 2005 WL 8179731 (W.D. Pa. Sept. 28, 2005) (citing *Antar*, 53 F.3d at 582 (3d Cir. 1995)). In the context of a business enterprise dedicated to illegal activity, "withdrawal as a matter of law from the conspiracy… may be demonstrated by the retirement of a coconspirator from the business,

severance of all ties to the business, and consequent deprivation to the remaining conspirator group of the services that constituted the retiree's contribution to the fraud." *United States v. Lowell*, 649 F.2d 950, 955 (3d Cir. 1981) (footnote omitted).

In *Antar,* the defendant could not establish a withdrawal defense where he retained stock in the enterprise after resignation, and therefore, had not severed all ties with the conspiracy because he "continued to receive the fruits of the fraud." 53 F.3d at 583 (3d Cir. 1995). Likewise, in *Lowell*, although the defendant had resigned from the business enterprise, evidence of a phone call with conspirators after his retirement was an act in furtherance of the conspiracy sufficient to defeat a finding of withdrawal. 649 F.2d at 958 (3d Cir. 1981). On the other hand, in *United States v. Steele*, the Third Circuit found withdrawal as a matter of law where the defendant resigned from the corporate enterprise, and there was no evidence of any ongoing connection to the bribery conspiracy after his resignation. 685 F.2d at 804 (3d Cir. 1982).

In the context of a price-fixing conspiracy, the Third Circuit has approved a jury instruction that stated, "[a] defendant may also withdraw from a price fixing conspiracy by notifying his alleged co-conspirators of his intent to withdraw." *United States v. Cont'l Grp., Inc.*, 603 F.2d 444, 466 (3d Cir. 1979). Simply ending participation in price-fixing activity is not necessarily sufficient to show withdrawal. *See id.* (upholding district court's rejection of proposed jury instruction that resuming competitive activity would constitute withdrawal but stating that resumption of competitive activity could demonstrate withdrawal); *In re NBR Antitrust Litig.*, 2005 WL 8179727, at *4 (defendant "cannot be said to have withdrawn from the conspiracy simply because it no longer had the motivation or opportunity to fix prices."). The Eleventh Circuit has found withdrawal from a price-fixing conspiracy at the summary judgment stage where the defendant sold its business, thereby severing ties with the conspiracy, effectively communicated its

retirement to co-conspirators through the media, and "did nothing more to assist or participate in the price-fixing activities of other entities." *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 198 F.3d 823, 839 (11th Cir. 1999), *amended in part*, 211 F.3d 1224 (11th Cir. 2000).

### B. Cutone's Evidence of Withdrawal

Cutone has put forward unrefuted evidence that it resigned from membership in the EMMC, and thereby severed ties with the alleged conspiracy to fix prices and control the supply of mushroom sales, effective September 1, 2002. Cutone submitted three different letters of resignation to the EMMC. (Def.'s SUMF ¶¶ 9-11; Def.'s Exs. C-E.) Each of the resignation letters announced Cutone's resignation from the EMMC and stated that Cutone could "no longer be bound to the rules and regulations of the cooperative." (Def.'s Exs. C-E.) Counsel for the EMMC acknowledged receipt of these resignation letters and confirmed that Cutone's resignation from the EMMC was effective September 1, 2002. (Def.'s SUMF ¶¶ 12-13; Def.'s Ex. F.) Cutone's resignation letters are affirmative notice to the alleged co-conspirators, communicated in a manner reasonably calculated to reach the EMMC members, that Cutone was acting inconsistent with the objective of the conspiracy.

Cutone also presents Mario Cutone, III's affidavit to prove that it did not continue to act in furtherance of the conspiracy after its resignation from the EMMC. Mario Cutone avers that he no longer received the minimum price list from EMMC and did not learn about the EMMC price list indirectly from any other source after September 1, 2002. (Ex. A to Def.'s Reply Mem. ¶¶ 15-16.) As a result, Cutone never followed EMMC prices after September 1, 2002. (*Id.* ¶ 17.) Cutone also had no further communication from EMMC after its resignation. (*Id.* ¶ 19.) Taken together, Cutone's resignation letters and the affidavit of Mario Cutone, III are sufficient to meet Defendant Cutone's *prima facie* burden to prove that it withdrew from the alleged conspiracy effective

September 1, 2002 by severing all ties with the EMMC.

Plaintiffs present no evidence in opposition that raises a genuine dispute of material fact as to Cutone's withdrawal. Plaintiff does not point to any facts in the record to show that Cutone undertook acts in furtherance of the conspiracy, or continued to receive benefits from the conspiracy's operations, after it resigned from the EMMC.

Plaintiffs rely upon the March 4, 2002 resignation letter to argue that there is a genuine dispute of fact whether Cutone's resignation from EMMC was an effective withdrawal from the conspiracy. (Pl.'s Resp. in Opp'n to Def.'s Mot. at 5, 9-11.) Specifically, Plaintiffs point to the statement: "Although we will not be members, we fully intend to adhere to the pricing structure unless we are forced to alter it by other growers." (Def.'s Ex. C.) The Court does not find this sentence alone sufficient to raise a genuine dispute of fact, for two reasons. First, the sentence is equivocal about Cutone's intentions; it states that Cutone intends to adhere "unless it is forced to alter" that intention, but it does not specify what behavior by other growers would cause it to alter its intention. Second, this sentence was not repeated in Cutone's two subsequent resignation letters dated May 20 and June 19, 2002. (Def.'s Ex. D-E.)

If Cutone had continued to adhere to the EMMC minimum pricing structure after its resignation, this could be an act in furtherance of the goals of the conspiracy, which would prevent Cutone from proving its withdrawal as a matter of law. But Cutone has presented the affidavit of Mario Cutone, III affirming that it did not continue to follow the EMMC pricing policy after its resignation. (Ex. A to Def.'s Reply Mem. ¶ 17.) Plaintiffs, meanwhile, have failed to put forward any admissible evidence that tends to dispute Cutone's assertion.

Plaintiff also relies upon the deposition testimony of Michael Cutone. But Michael Cutone's testimony regarding Cutone's resignation letters is not supported by any actual

knowledge and therefore, would not be admissible evidence at trial. Michael Cutone did not author the resignation letters. The letters are signed by Mario Cutone. (Def.'s Exs. C-E.) Michael Cutone also testified that he did not have any knowledge about the EMMC resignation letters or its pricing after resignation. When asked about Defendant Cutone's resignation from the EMMC, Michael Cutone testified that he did not know: (1) what was meant by the statement in the resignation letters about rules and regulations; (2) why the content of the May 20 letter differed from the March 4 letter; and (3) whether Cutone adhered to the EMMC minimum pricing policy after its resignation. (Pl.'s Ex. 4, Michael Cutone Dep. 170:20-171:6; 171:21-172:13; 233:14-24.) Plaintiffs also rely on Michael Cutone's testimony concerning EMMC minimum pricing after Cutone's resignation that the company, "did what we had to do to stay in business, but there was [*sic*] accounts that I'm sure we had to go down on." (*Id.* at 174:25-175:7.) Plaintiffs argue that a fair inference from this testimony is that Cutone continued to adhere to the EMMC pricing policy after its resignation. The Court disagrees. This testimony does not create a genuine dispute of material fact as to whether Cutone continued to act in furtherance of the conspiracy after its resignation from the EMMC.

Cutone has shown that it resigned from EMMC effective September 1, 2002, communicated its resignation to its co-conspirators, and severed all ties with the conspiracy through that resignation. Plaintiffs have presented no admissible evidence in opposition that raises a genuine dispute of material fact concerning Cutone's withdrawal. Thus, the Court finds that Cutone withdrew from the alleged conspiracy, effective September 1, 2002, as a matter of law.

### C.  Impact on Damages

Having concluded that Cutone withdrew from the conspiracy effective September 1, 2002, the remaining question for the Court is what impact this determination has on Cutone's potential liability for damages. Cutone asks this Court to limit damages against it to Plaintiffs' purchases

made before September 1, 2002. However, on the current record, the Court cannot determine whether any damages Plaintiffs incurred after September 1, 2002 were attributable to the conspiracy's conduct prior to that date.

A conspiracy "to maintain high and stable prices" is a continuing conspiracy, in that it requires continuous cooperation of the conspirators to keep up the result. *United States v. U.S. Gypsum Co.*, 600 F.2d 414, 417 (3d Cir. 1979) (citing *United States v. Kissel*, 218 U.S. 601, 607 (1910)). In the context of a continuing antitrust conspiracy, a new cause of action accrues "each time a plaintiff is injured by an act of the defendants…." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). Thus, in a price-fixing conspiracy that raises prices over a period of years, a cause of action accrues each time a customer purchases a product at the artificially inflated price. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 189 (1997) (quoting 2 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 338b, p. 145 (rev. ed. 1995)).

Damages caused by an antitrust conspiracy are not always suffered at the time of the conspirators' agreement. *See Zenith*, 401 U.S. at 339. "[I]f a plaintiff feels the adverse impact of an antitrust conspiracy on a particular date, a cause of action immediately accrues to him to recover all damages incurred by that date and all provable damages that will flow in the future from the acts of the conspirators on that date." *Id.* "A conspirator is liable for the damages caused by its unlawful conduct, even if they are sustained after the unlawful conduct ceases." *Law v. Nat'l Collegiate Athletic Ass'n*, 5 F. Supp. 2d 921, 934 (D. Kan. 1998).

"[E]ven upon withdrawal, a defendant remains liable for his previous agreement and for his own and his co-conspirators' previous acts in furtherance of the conspiracy…." *United States v. Kushner*, 305 F.3d 194, 198 (3d Cir. 2002); *accord Smith*, 568 U.S. at 111 ("Withdrawal terminates the defendant's liability for postwithdrawal acts of his co-conspirators, but he remains

guilty of conspiracy."); *Morton's Mkt.*, 198 F.3d at 837 ("The ex-conspirator remains liable, however, for his previous agreement and all damages inflicted by the acts he committed prior to his withdrawal.").

The Eleventh Circuit and the Seventh Circuit have stated that where a continuing conspiracy is alleged, a former conspirator could be held liable for the acts of co-conspirators even after withdrawal. *See Morton's Mkt.*, 198 F.3d at 837 n.22 ("Since a continuing conspiracy is alleged as one crime, a conspirator is still liable for the crimes of his co-conspirators even after his withdrawal, so long as he is sued during the limitations period."); *United States v. Read*, 658 F.2d 1225, 1233 n.4 (7th Cir. 1981) ("Dropping out during the limitations period does not absolve a defendant. He is still liable for the agreement and acts committed before he withdraws. Since a continuing conspiracy is alleged as one crime, he is also liable in effect for the crimes of his co-conspirators even after his withdrawal."). Neither of those opinions assessed the scope of the damages that could be incurred if a defendant effectively withdrew from a continuing conspiracy during the limitations period and new conspiratorial activity occurred after its withdrawal. Nevertheless, the Court finds that once a defendant has withdrawn from a continuing conspiracy its liability should only extend to damages caused by the conspiracy's conduct prior to withdrawal. Even in a continuing conspiracy, a defendant should not be liable for damages attributable only to new acts of the conspiracy, which were taken after that defendant's withdrawal. The Eleventh Circuit's amendment to its opinion in *Morton's Market* supports this interpretation. The amended opinion clarified that if the defendant's withdrawal from the price-fixing conspiracy was within the limitations period, the defendant "would be liable for any price-fixing activity prior to its withdrawal." *Morton's Mkt., Inc. v. Gustafson's Dairy, Inc.*, 211 F.3d 1224 (11th Cir. 2000).

Moreover, the purpose of the withdrawal defense is to mitigate harm by encouraging

conspirators to withdraw. *See Morton's Mkt.*, 198 F.3d at 839 n.26. If withdrawal could not limit the extent of a defendant's liability for its co-conspirators' future conduct, there would be little incentive for a conspirator to withdraw from an ongoing conspiracy. Requiring a former antitrust conspirator to remain liable for post-withdrawal acts of the continuing conspiracy would be antithetical to the purpose of the defense.

The Court concludes that Cutone Mushroom's potential liability is limited to damages caused by acts of the conspiracy that were taken prior to Cutone's withdrawal. The question of what damages flow from the alleged conspiracy's activity prior to September 1, 2002 remains. On this question, genuine issues of material fact are outstanding.

The Court can envision scenarios in which damages incurred through purchases after September 1, 2002 are attributable to the Defendants' conspiratorial actions taken before that date. For example, if Winn Dixie purchased mushrooms from a conspirator in October 2002 at a price that was negotiated pursuant to the EMMC minimum pricing standards set in April 2002, damages related to those October sales could arguably flow from actions of the conspiracy taken prior to Cutone's withdrawal. *See US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019) ("each supracompetitive price charged…was not an overt act of its own, but a manifestation of the prior overt act of entering into the 2006 contract."). On the other hand, if Winn Dixie negotiated its purchase price for mushrooms in October 2002 based upon higher minimum pricing standards, which were set by the EMMC on or after September 1, 2002, then damages related to those sales might not be properly attributable to Cutone. Such damages may have been caused by new acts of the conspiracy, of which Cutone was no longer a part. Thus, questions of material fact regarding causation and damages remain, which the Court cannot decide on this motion for summary judgment. At this stage, the Court holds only that Cutone's withdrawal from the alleged

conspiracy limits its potential liability to damages caused by the conspiracy's conduct before September 1, 2002. It will be Plaintiffs' burden to prove to the finder of fact what damages flow from acts of the alleged conspiracy taken prior to Cutone's withdrawal.

## IV. CONCLUSION

For the foregoing reasons, Defendant Cutone Mushroom's Motion for Partial Summary Judgment is granted. An Order consistent with this Memorandum will be docketed separately.