**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WINN-DIXIE STORES, INC.,** *et al.*, | : | |
| Plaintiffs, | : | **CIVIL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **EASTERN MUSHROOM MARKETING** | : | |
| **COOPERATIVE,** *et al.*, | : | **No. 15-6480** |
| Defendants. | : | |

## MEMORANDUM

**Schiller, J.**                                                              **May 12, 2021**

Winn-Dixie has accused the Eastern Mushroom Marketing Cooperative, its members, and various affiliates of unlawfully colluding to inflate the price of fresh agaricus mushrooms. The instant motion, however, does not deal with whether antitrust laws were violated. Instead, it asks whether Winn-Dixie can maintain an action for antitrust damages against Defendants based on its purchase of mushrooms from a non-party. Defendants[1] move for partial summary judgment arguing that Winn-Dixie was not a direct purchaser from Defendants for a portion of the claimed conspiracy period, and therefore, it lacks antitrust standing to pursue some of its claims for damages. For the following reasons, the Court will deny the motion.

---

[1]      The motion was filed by Eastern Mushroom Marketing Cooperative, Inc. (EMMC); Robert A. Feranto, Jr., t/a Bella Mushroom Farms; Brownstone Mushroom Farms, Inc.; To-Jo Fresh Mushrooms, Inc.; Country Fresh Mushroom Co.; Gino Gaspari & Sons, Inc.; Kaolin Mushroom Farms, Inc.; South Mill Mushroom Sales, Inc.; Modern Mushroom Farms, Inc.; Sher-rockee Mushroom Farm, LLC; C&C Carriage Mushroom Co.; Oakshire Mushroom Farm, Inc.; Phillips Mushroom Farms, Inc.; Louis M. Marson, Jr., Inc.; Monterey Mushrooms, Inc.; John Pia; and Forrest Mushrooms (collectively, "Certain Defendants"), Giorgi Mushroom Co.; Giorgio Foods, Inc.; and Franklin Organic Mushrooms, Inc. (f/k/a Franklin Farms, Inc.). While the motion was pending, claims against Franklin Organic Mushrooms, Inc. (f/k/a Franklin Farms, Inc.) were dismissed with prejudice.

1

# I. FACTUAL BACKGROUND

This case is one of a related series of actions dealing with alleged price fixing and collusion in the market for fresh agaricus mushrooms. In February 2006, WM Rosenstein & Sons Co. filed a class action complaint alleging that various players in the mushroom industry colluded to inflate the price of mushrooms by agreeing on minimum prices and by decommissioning various mushroom farms in order to reduce mushroom supply. That complaint was later consolidated with six similar class actions, and a consolidated class action complaint was filed on November 13, 2007. Winn-Dixie, along with co-plaintiff Bi-Lo, opted out of the class action and initiated this action in 2015. Plaintiffs' Complaint was similar in all meaningful respects to the class action complaint that preceded it. Plaintiffs' First Amended Complaint, filed in January 2019, asserts claims pursuant to the Sherman Act and Clayton Act and alleges that Winn-Dixie "purchased Agaricus mushrooms directly from one or more Defendants." (First Am. Compl. ¶ 18.)

Now before this Court is Defendants' motion for partial summary judgment against Winn-Dixie, which argues that Winn-Dixie cannot maintain an action for antitrust damages during a portion of the alleged conspiracy period because it did not purchase mushrooms directly from an alleged conspirator. Defendants argue that from late 2004 through 2010, Winn-Dixie purchased mushrooms from Oakshire Mushroom Sales, LLC (OMS), which is not a party to this action and was not a member of the alleged conspiracy, thereby rendering Winn-Dixie an indirect purchaser.

In support of this argument, Defendants present the Certification of Gary Schroeder, sole shareholder and President of both OMS and Defendant Oakshire Mushroom Farm, Inc. (OMF). (Ex. A to Defs.' Mot. for Summ. J. [Schroeder Cert.] ¶ 1.) Schroeder states that OMF was incorporated in 1985 for the purpose of growing, packaging, and selling specialty mushrooms. (*Id.* ¶ 3.) In 2001, OMF joined the EMMC, and Schroeder was also elected Treasurer of the EMMC.

(*Id.*) OMS was formed in 2002 to market and sell mushrooms under the brand name "Dole." (*Id.* ¶ 4.) OMS "kept separate books and records from OMF," but "the two companies shared some common employees and used a common ordering system." (*Id.* ¶ 10.)

OMS began selling mushrooms to Winn-Dixie in 2004. (*Id.* ¶ 6.) Schroeder states that OMS purchased all of the mushrooms that it resold to Winn-Dixie either from OMF "at prices that included the packaging and delivery costs[,]" or from South Mill Mushrooms and Country Fresh Mushrooms "at negotiated prices which included the packaging and delivery costs." (*Id.* ¶ 8.) Schroeder states the prices negotiated between OMS and Winn-Dixie "were not affected or influenced by any rule, regulation or program adopted by the EMMC." (*Id.* ¶ 7.) Schroeder states that OMS did not offer or attempt to join the EMMC, nor did Schroeder ever agree "that OMS would follow any of the rules[,] regulations or pricing policies adopted by the EMMC." (*Id.* ¶ 5.)

Defendants present two supply agreements between Winn-Dixie and OMS that were signed in 2005 and 2007. (*Id.* ¶ 6; Exs. A-B to Schroeder Cert.) Winn-Dixie does not dispute that it entered into a two-year supply agreement in 2005 and a three-year supply agreement in 2007 to purchase mushrooms "from the Oakshire companies, including OMS." (Pl.'s Resp. to Defs.' Statement of Undisputed Material Facts at 33, 35.) However, Plaintiff disputes that these agreements were solely between Winn-Dixie and OMS, because it states that OMS "was acting on behalf of its affiliated and commonly owned and controlled sister company, OMF." (*Id.*)

Plaintiff contends that genuine issues of material fact exist as to whether Winn-Dixie was an indirect purchaser and whether OMS was owned or controlled by OMF. In opposition to Defendants' motion for partial summary judgment, Plaintiff submits the class action deposition testimony of Gary Schroeder (Pl.'s Ex. 1 [Schroeder Tr.]), and Kirk Reichert, who was the controller for OMF. (*See* Pl.'s Statement of Undisputed Mat. Facts in Opp. to Defs.' Mot. [Pl.'s

SUMF] ¶ 4; Pl.'s Ex. 4 [Reichert Tr.].) In further support, Winn-Dixie presents the deposition testimony of representatives of several other EMMC members, as well as the EMMC Membership Agreement signed by Gary Schroeder, sales data from OMS, and analysis of its expert Dr. Keith Leffler. (*See* Pl.'s Ex. 5, 8, 11-14, 16-17.)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate when admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). Evidentiary matter in support of the motion must establish the absence of a genuine dispute of material fact; if it does not, the motion will be denied, even if no opposing evidentiary matter is presented, because "a response is not essential to defeat a motion that does not satisfy the movant's initial burden." *Maldonado v. Ramirez*, 757 F.2d 48, 50 (3d Cir. 1985) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160-61 (1970)). In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). A court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *Anderson*, 477 U.S. at 255.

## III.    DISCUSSION

The question raised by Defendants' motion for partial summary judgment is whether Winn-Dixie can bring an action for antitrust damages for its purchases of mushrooms from non-party

OMS. As a threshold matter, the Court will consider and deny Plaintiff's request to strike the Certification of Gary Schroeder. Defendants' motion relies entirely on the Schroeder Certification and its accompanying exhibits, so the Court must first determine whether it may consider this Certification before it can assess Defendants' motion. Then the Court will turn to the merits of Defendants' motion for partial summary judgment.

### A.     Plaintiff's Request to Strike the Schroeder Certification

Plaintiff makes two distinct arguments to exclude the Schroeder Certification offered in support of Defendants' motion. First, Plaintiff argues that the Certification does not meet the requirements of 28 U.S.C. § 1746 or Rule 56(c)(4). Second, because OMS and OMF are in bankruptcy, Plaintiff argues that the Schroeder Certification violated the automatic stay of the bankruptcy court. The Court rejects both of these arguments.

### 1.     Compliance with 28 U.S.C. § 1746 and Rule 56(c)(4)

An unsworn statement can support a motion for summary judgment to the same extent as a sworn affidavit as long as the statement is made under penalty of perjury. *United States ex rel. Doe v. Heart Sol., PC*, 923 F.3d 308, 315 (3d Cir. 2019); Fed. R. Civ. P. 56(c)(4) cmt. on 2010 amdts. (citing 28 U.S.C. § 1746).

The Schroeder Certification concludes with the statement:

"The foregoing statements made by me are true and correct to the best of my knowledge, information and belief. I am aware that if any statement made by me is intentionally false, I am subject to punishment under the perjury and false statement laws of the Commonwealth of Pennsylvania or the United States."

(Schroeder Cert.) Plaintiff argues the Certification should be excluded because it does not substantially comply with 28 U.S.C. § 1746, which requires that an unsworn certification is verified as true and correct under penalty of perjury. Plaintiff argues that Schroder's qualifiers that

the statement is true and correct "to the best of [his] knowledge, information and belief[,]" and that Schroeder is subject to perjury only if any statement is "intentionally false," render the Certification non-compliant. (Pl.'s Resp. in Opp. to Defs.' Motion [Pl.'s Resp.] at 46-48.)

The Court finds that Schroeder's Certification substantially complies with the requirements of 28 U.S.C. § 1746. A declarant is guilty of federal perjury when he "willfully subscribes as true any material matter which he does not believe to be true[.]" 18 U.S.C. § 1621(2). Schroeder's certification that his "intentionally false" statements are subject to punishment under perjury laws does not diminish the penalty of federal perjury, and therefore substantially complies with 28 U.S.C. § 1746.

Schroeder's statement that the entire Certification is true and correct "to the best of [his] knowledge, information and belief[,]" also does not require its exclusion. "[W]hen affidavits based on knowledge and belief are submitted to support or oppose a motion for summary judgment, the district court has discretion to determine whether it can differentiate between knowledge and belief for each averment in the affidavit." *Ondo v. City of Cleveland*, 795 F.3d 597, 605 (6th Cir. 2015). A party's inclusion of improper language in an affidavit's declaration of personal knowledge does not invalidate the entire contents of an affidavit. *Brown v. Nat'l Penn Ins. Servs. Grp., Inc.*, Civ. A. No. 13-1748, 2014 WL 4160421, at *4 (E.D. Pa. Aug. 22, 2014), *aff'd*, 614 F. App'x 96 (3d Cir. 2015). "Rather, the Court must only disregard statements that are clearly not based upon personal knowledge." *Id.* (citing *Keating v. Bucks Cty. Water & Sewer Auth.*, Civ. A. No. 99-1584, 2000 WL 1888770, at *4 (E.D. Pa. Dec. 29, 2000)). "Statements in affidavits made only on belief or on information and belief may not be considered in support of or in opposition to summary judgment." *United States v. Rocky Mountain Holdings, Inc.*, 782 F. Supp. 2d 106, 114 (E.D. Pa. 2011); *see also Tziatzios v. United States*, 164 F.R.D. 410, 411-12 (E.D. Pa. 1996) (statements in

an affidavit about the conduct of other persons, made to the best of the affiant's "knowledge, information and belief," were insufficient to create a genuine dispute of fact).

Upon review of the Schroeder Certification, nearly all of its contents are based upon Schroeder's personal knowledge. Schroeder is the sole shareholder and President of OMS and OMF. (Schroeder Cert. ¶ 1.) The Court concludes that Schroeder's statements throughout the affidavit concerning OMS's and OMF's formation and business operations are based on his personal knowledge. Therefore, the Court will not exclude those statements from consideration. Schroeder is also the OMS signatory on the two supply agreements with Winn-Dixie, and therefore has personal knowledge of those agreements. (Exs. A-B to Schroeder Cert.) Thus, the Court will not exclude those exhibits from consideration.

However, Exhibit C is a chart that appears to summarize Winn-Dixie's mushroom purchase data, by mushroom type, between 2004 and 2010. (Ex. C to Schroeder Cert.) Schroeder does not state how Exhibit C was created or whose data supported the calculations. (Schroeder Cert. ¶ 7.) In fact, Defendants' brief implies that the chart may have been prepared by Plaintiff's expert witness. (*See* Defs.' Mot. for Partial Summary J. [Defs.' Mot.] at 7 of 39.) Because Schroeder's Exhibit C does not appear to be based upon his personal knowledge, the Court will not consider Exhibit C or the conclusions Schroeder draws from it.

Plaintiff further argues that the Schroeder Certification does not satisfy Rule 56(c)(4) because it lacks support from the record and is conclusory or irrelevant. (Pl.'s Resp. at 41-45.) Declarations in support of a motion for summary judgment must be "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). Statements in an affidavit need not be supported from the record in order to be considered on a motion for summary judgment, so

long as they otherwise meet the requirements of Rule 56(c)(4). Even if an affidavit is self-serving, it may still be part of the record if it sets forth specific facts based on personal knowledge. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 506 (7th Cir. 2004) (finding the district court abused its discretion by refusing to consider part of an affidavit simply because it was self-serving, since it set forth a relevant specific fact based on personal knowledge). However, an affidavit that is "'essentially conclusory' and lacking in specific facts" is inadequate to satisfy the movant's burden on a motion for summary judgment. *Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir. 1985) (quoting *Drexel v. Union Prescription Centers, Inc.*, 582 F.2d 781, 789-90 (3d Cir. 1978)). The Court has already assessed the specific facts in the Schroeder Certification to ensure they are based upon his personal knowledge and would be admissible in evidence. Therefore, the Court will not exclude the entire Certification simply because not all statements therein are supported by extrinsic evidence or certain statements are conclusory or irrelevant.

Finally, although Plaintiff generally claims the Schroeder Certification is contradicted by his deposition, it does not point to any portions of Schroeder's deposition testimony that contradict provisions of the Certification. (Pl.'s Resp. at 41, 43.) Even if the Certification were contradicted by deposition testimony, this could raise an issue of credibility that would preclude summary judgment, but it would not require the Court to exclude the Certification. *See* 10B Wright & Miller, *Federal Practice & Procedure* § 2738 (4th ed.). For these reasons, the Court declines to strike the Schroeder Certification but will not consider Exhibit C to the Certification.

### 2.   *The Bankruptcy Automatic Stay*

Winn-Dixie next argues that the Schroeder Certification should be excluded because OMF and OMS are in bankruptcy. OMS and OMF each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on December 28, 2018. (Pl.'s Ex. 2 ¶ 1.) The petitions were

consolidated, and the bankruptcy case is still ongoing. *See In re: Oakshire Mushroom Farm, Inc.*, No. 18-18446 (Bankr. E.D. Pa.). On March 17, 2021, the bankruptcy court granted Winn-Dixie's Motion to lift the automatic stay of this action against OMF. (Document No. 343-1.)

Winn-Dixie argues that this Court's consideration of the Schroeder Certification would violate the automatic stay imposed by the bankruptcy court. (Pl.'s Resp. at 39-41.) When an entity files for bankruptcy, an automatic stay applies to the "commencement or continuation" of all suits "against the debtor . . . ." 11 U.S.C. § 362(a)(1). Thus, when OMF filed for bankruptcy, Winn-Dixie's claims against Defendant OMF were stayed. But the automatic stay of claims *against* OMF does not have any impact on OMF's voluntary actions. Even before the stay was lifted as to Plaintiffs' claims against OMF, nothing about the automatic stay would have precluded this Court from considering evidence voluntarily produced by OMF's President in support of Defendants' motion for partial summary judgment. The automatic stay did not prevent this matter from proceeding against the other Defendants. *See In re Gronczewski*, 444 B.R. 526, 530 (Bankr. E.D. Pa. 2011). Moreover, Defendants all face potential joint and several liability for damages premised on Winn-Dixie's purchases from OMS. *See In re Processed Egg Prod. Antitrust Litig.*, 392 F. Supp. 3d 498, 513 (E.D. Pa. 2019). It would unfairly prejudice Defendants not in bankruptcy for this Court to allow Plaintiffs to proceed in litigating their claims against Defendants, but prohibit Defendants from presenting any evidence from Gary Schroeder because of the automatic stay of Plaintiffs' claims against OMF.

Winn-Dixie's final argument for exclusion of the Schroeder Certification is based on its inability to collect evidence from OMF because of the bankruptcy automatic stay. (Pl.'s Resp. at 48-50.) First, the Court notes that Plaintiff has not offered an affidavit or declaration concerning its inability to take discovery from Defendant OMF or non-party OMS, pursuant to Fed. R. Civ.

P. 56(d). Even absent this procedural defect, the Court would not exclude the Schroeder Certification on these grounds, for two reasons.

First, Plaintiff argues that it was deprived of discovery relating to OMS, which was previously produced in the class action, because of the automatic stay. (Pl.'s Resp. at 48-49.) Plaintiff bases this argument on the class action deposition of Gary Schroeder, who testified that OMF produced documents in the class action pertaining to OMS. (*Id.*) From this testimony, Plaintiff concludes that Defendants withheld from it documents pertaining to OMS that were previously produced in the class action. The conclusion Plaintiff draws from Schroeder's testimony is not supported by the existing record. During discovery in this action, Plaintiff moved to compel Defendants to produce all documents that had been previously produced in the class action. The Court denied Plaintiff's motion to compel because Defendants represented that they had produced every document previously produced in the class action. (Document No. 262 at 2 n.3.) However, the Court denied this motion without prejudice to renew "[s]hould Winn-Dixie find additional evidence that Defendants' document production is incomplete[.]" (*Id.*) Plaintiff did not renew that motion. Months later, Plaintiff filed a motion to reopen discovery in this action, arguing—as it does here—that the class action deposition testimony of Gary Schroeder indicates Defendants did not produce materials in this action that were produced in the class action, which pertain to OMS. (Document No. 344-1 at 6 n.3.) In opposition to that motion, Defendants reiterated that they did not "refuse or withhold any materials" because of the bankruptcy stay. (Document No. 345 at 5.) In light of this representation, the class action deposition testimony of Gary Schroeder is not sufficient to convince the Court that Defendants withheld from discovery any documents previously produced in the class action.

Second, Plaintiff states that it was unfairly ambushed by new information in Schroeder's

Certification that Defendants Country Fresh and South Mill supplied mushrooms to OMS. (Pl.'s 49-50.) This argument is belied by Plaintiff's own exhibits, which indicate that OMS used Country Fresh and South Mill as suppliers to Winn-Dixie. (Pl.'s Ex. 5; *see* Schroeder Tr. 50:11-24.) In fact, in its briefing on discovery disputes, Plaintiff has previously informed the Court that OMS procured mushrooms from these entities. (Document No. 256 at 14 ("Schroeder testified that Oakshire Mushroom Sales, LLC purchased mushrooms from Defendants Country Fresh and South Mill, EMMC members.").) Although the automatic stay may have prevented Plaintiff from collecting discovery directly from OMF, Plaintiff could have propounded discovery requests to Country Fresh or South Mill concerning their supply of mushrooms to OMS, if it believed such discovery was necessary. Plaintiff also could have propounded third party discovery to OMS or sought to lift the automatic stay sooner to pursue discovery from OMF. (*See* Document No. 346.)

In sum, Plaintiff has not shown that the bankruptcy proceedings of OMF and OMS should prevent the Court from considering Gary Schroeder's Certification in support of Defendants' motion. Therefore, the Court will proceed to consider the merits of Defendants' motion, excluding Exhibit C of the Certification.

### B. Defendants' Motion for Partial Summary Judgment

Defendants argue that Winn-Dixie cannot pursue damages on the basis of its purchases from non-party OMS because antitrust damages claims can only be sustained by parties who directly purchase from members of the conspiracy. Defendants further argue that OMS is not owned or controlled by OMF, so the exception to the direct purchaser rule for entities that are owned or controlled by members of the conspiracy does not apply. Upon review of the record, the Court concludes that there is a genuine dispute of fact as to whether OMS is owned or controlled by OMF, and therefore, the motion will be denied.

The Court will consider first Plaintiff's argument that the direct purchaser rule does not apply to the facts of this case. Then, the Court will turn to the question of whether OMS is owned or controlled by OMF. Third, the Court will address the alleged pleading deficiencies in the First Amended Complaint. Finally, the Court will consider Defendants' arguments concerning the impact on damages of mushrooms OMS purchased from Defendants other than OMF.

### 1. The *Illinois Brick Bar to Antitrust Damages for Indirect Purchasers*

Defendants argue that Winn-Dixie's suit for damages for mushroom sales from OMS is barred by the direct purchaser rule set forth in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). Meanwhile, Plaintiff contends that the *Illinois Brick* framework does not apply because OMS sold mushrooms at prices fixed by the EMMC. The Court agrees with Defendants that *Illinois Brick* controls the analysis of Winn-Dixie's potential damages for purchases from OMS.

Section 4 of the Clayton Act provides that, "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor…and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a). In *Illinois Brick*, the Court concluded that an injured person under Section 4 of the Clayton Act did not encompass an indirect purchaser who had incurred damages passed-on by the direct purchaser from a participant in the conspiracy. 431 U.S. at 728-29. The *Illinois Brick* opinion relied on two main considerations.

First, in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), the Court held that an antitrust defendant could not employ a pass-on theory as a defense to damages, meaning that direct purchasers could recover all damages incurred from an antitrust violation regardless of whether they passed on those damages to their customers. As a result, in *Illinois Brick*, the Court concluded that allowing indirect purchasers to sue for damages would essentially

permit *offensive* pass-on theories of liability, even though pass-on was not a permissible defense, which could lead to inconsistent results and double recovery against antitrust violators. 431 U.S. at 730. The Court expressed concern that allowing an indirect purchaser to sue for damages "would create a serious risk of multiple liability" for antitrust violators in suits from both direct and indirect purchasers. *Id.*

Second, the Court described that requiring courts to "trace the complex economic adjustments to a change in the cost of a particular factor of production"—as would be required to determine the extent of an indirect-purchaser plaintiff's damages stemming from overcharge to the direct purchaser—"would greatly complicate and reduce the effectiveness of already protracted treble-damages proceedings . . . ." *Id*. at 732. As a result, the Court in *Illinois Brick* reaffirmed the judgment of *Hanover Shoe* that "the antitrust laws will be more effectively enforced by concentrating the full recovery for the overcharge in the direct purchasers rather than by allowing every plaintiff potentially affected by the overcharge to sue only for the amount it could show was absorbed by it." *Id.* at 735. In its analysis, the Court cautioned against litigation where "the overcharge would have to be apportioned among the relevant wholesalers, retailers, and other middlemen . . . ." *Id*. at 740.

The Supreme Court has twice reaffirmed *Illinois Brick*'s bar to actions for damages by indirect purchasers. In *Kansas v. UtiliCorp United, Inc.*, 497 U.S. 199 (1990), the Court held that the bar to damages recovery by indirect purchasers applied even if direct purchasers were required by law or regulation to pass on all overcharges to downstream purchasers. The Court reasoned that even if a direct purchaser passed on 100% of the overcharge to an indirect purchaser, the direct purchaser may still have suffered antitrust damages in situations where it could have raised its prices absent the overcharge, or where there was a delay between the increase in defendants' price

and the increase in the direct purchasers' sales price. *Id.* at 209-11. As a result, the damages from any overcharge would still have to be apportioned between direct and indirect purchasers—the calculation *Illinois Brick* was designed to preclude. *See id.* at 210-11. Thus, even if overcharges are passed on in their entirety, an indirect purchaser cannot sustain a claim for damages, unless a specific exception to *Illinois Brick* applies. *Id.* The Court in *Utilicorp* went on to conclude that "even assuming that any economic assumptions underlying the *Illinois Brick* rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions." *Id.* at 217. In *Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019), the Supreme Court again reaffirmed that *Illinois Brick* outlined a bright-line rule barring an indirect purchaser's recovery, even if the antitrust violator did not set the price of the product for the direct purchaser. The Court reiterated that, "the bright-line rule of *Illinois Brick* means that there is no reason to ask whether the rationales of *Illinois Brick* 'apply with equal force' in every individual case." *Id.* at 1524 (quoting *UtiliCorp*, 497 U.S. at 216). The combined effect of the major indirect-purchaser cases is a single bright-line rule: "if manufacturer A sells to retailer B, and retailer B sells to consumer C, then C may not sue A." *Id.* at 1521.

### a.  Illinois Brick*'s Application in Vertical Conspiracies*

Despite this bright-line rule, the *Illinois Brick* doctrine will not always bar a plaintiff's recovery from multiple levels of a production chain when the plaintiff alleges a vertical conspiracy. *See* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 346h (5th ed. 2020). For example, if a consumer plaintiff alleges that it has purchased from a retailer who has conspired with the manufacturer to fix the plaintiff's purchase price, the consumer plaintiff can seek damages from the manufacturer because there is no allegation of pass-on damages. *See Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1211-12

(9th Cir. 1984). This scenario has been referred to as the "co-conspirator exception" to *Illinois Brick*, although some courts have noted that, "the 'co-conspirator exception is not really an exception at all,' but rather describes a situation in which *Illinois Brick* is simply not applicable." *In re Nat'l Football League's Sunday Ticket Antitrust Litig*., 933 F.3d 1136, 1157 (9th Cir. 2019), *cert. denied sub nom. Nat'l Football League v. Ninth Inning, Inc*., 141 S. Ct. 56 (2020) (quoting *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 750 (9th Cir. 2012)). In such a scenario, even though the product has been sold through an intermediary, the plaintiff is a direct purchaser from an alleged member of the conspiracy. *Id*. ("[W]hen co-conspirators have jointly committed the antitrust violation, a plaintiff who is the immediate purchaser from any of the conspirators is directly injured by the violation.")

However, in order to invoke the co-conspirator exception and successfully sue an upstream seller or manufacturer for an overcharge, a plaintiff in the Third Circuit must name as a defendant the intermediary co-conspirator from which it purchased the product. *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842, 855 (3d Cir. 1996); *Link v. Mercedes–Benz*, 788 F.2d 918, 931-33 (3d Cir. 1986). The Third Circuit has "rejected attempts to invoke a co-conspirator exception to *Illinois Brick*'s bar on indirect purchaser standing when plaintiffs have not named the co-conspirators immediately upstream as defendants." *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc*., 424 F.3d 363, 370 (3d Cir. 2005) ("*Hess I*") (citing *McCarthy*, 80 F.3d at 854; *Link*, 788 F.2d at 933). If the retailer from which a plaintiff purchased the product is not named as a defendant, it will not be bound by the Court's judgment, and therefore, could potentially seek double recovery from the manufacturer. *See Link*, 788 F.2d at 932. This is precisely the type of scenario the *Illinois Brick* holding was designed to avoid. Even if these concerns of double recovery were not practically possible, the absence of *Illinois Brick* policy concerns in a particular case does not remove it as a

bar to indirect purchaser recovery. *Hess I*, 424 F.3d at 371 (citing *UtiliCorp*, 497 U.S. at 216). Thus, to revive the shorthand described in *Apple v. Pepper*, the bright-line rule for a vertical price-fixing conspiracy in the Third Circuit is: if manufacturer A sells to and conspires with retailer B, and retailer B sells to consumer C, consumer C may not sue A *unless it also sues B*.

Plaintiff argues that the *Illinois Brick* doctrine should not bar Winn-Dixie's recovery in this case because Defendants engaged in a conspiracy to fix the "retail" prices that Winn-Dixie paid for mushrooms. (Pl.'s Resp. 4-10, 19-28, 30-32.) Essentially, Winn-Dixie argues that it should be treated as a direct purchaser because OMS was a co-conspirator with OMF in a vertical conspiracy that fixed the prices Winn-Dixie paid to OMS. The glaring problem with this argument is that OMS is not a defendant in this action.

Winn-Dixie argues that an intermediary distributor need not be joined as a co-conspirator in a conspiracy to fix the "retail" price, relying on *Lowell v. Am. Cyanamid Co.*, 177 F.3d 1228, 1230 (11th Cir. 1999). (Pl.'s Resp. 31.) In *Lowell*, the plaintiff farmers' failure to join the intermediary dealers from which they purchased a price-fixed product did not bar their recovery. *Id.* at 1231. Thus, the Eleventh Circuit seemed to approve a co-conspirator exception to *Illinois Brick* when the direct sellers were not joined as defendants. But a closer reading of *Lowell* does not support its application to the facts here. *Lowell* specifically relied on what it deemed to be an exception to *Illinois Brick* for a "a single vertical conspiracy where the plaintiff has purchased directly from a conspiring party in the chain of distribution." *Id*. at 1232. The court's conclusion was premised on the fact that there was "no allegation of both a vertical conspiracy as well as a horizontal conspiracy one step removed from the plaintiffs." *Id.* The *Lowell* court specifically differentiated the narrowly confined facts of that case—which alleged a single vertical conspiracy with no allegations of pass-on—from the facts of *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148

16

(5th Cir. 1979), in which the plaintiff ranchers alleged a horizonal conspiracy among retail food chains and a vertically integrated conspiracy with the meat packer and slaughterhouse intermediaries. 177 F.3d at 1231-32. The *Lowell* court explained that "[n]ot every vertical conspiracy allegation will get around the *Illinois Brick* doctrine. An alleged vertical conspiracy on top of a horizontal conspiracy . . . does not…'save' the overall conspiracy claims. Instead, the *Illinois Brick* doctrine might apply even more strongly in a case like *In re Beef*." 177 F.3d at 1232. Thus, in allegations of a horizontal and vertical conspiracy, where the intermediary reseller is not joined as a defendant, the risks that *Illinois Brick* contemplated of multiple liability and damages-apportionment complexity would still be present.

In this case, Plaintiffs have alleged a horizontal conspiracy among EMMC members. Now facing Defendants' motion for partial summary judgment, Winn-Dixie argues that OMS followed EMMC minimum pricing policies, and in essence, was a vertically integrated co-conspirator that sold to Winn-Dixie at prices fixed by the conspiracy. But because OMS is not a defendant, the policy concerns *Illinois Brick* identified of double recovery from members of the EMMC, and pass-on damages apportionment among OMS and Winn-Dixie, could still arise. Plaintiff argues that the concerns of double recovery and apportionment of damages do not apply in this case because OMS never sued Defendants and any new claims would now be time-barred. (Pl.'s Resp. at 32.) Even if Plaintiff were correct, the Supreme Court has cautioned against assessing whether the policy rationales of *Illinois Brick* apply in a particular case because "allowing an exception, even in rather meritorious circumstances, would undermine the rule." *UtiliCorp*, 497 U.S. at 216. Regardless of whether OMS followed EMMC minimum pricing in its sales to Winn-Dixie, or whether there is any risk that OMS may still sue Defendants, the *Illinois Brick* doctrine bars an indirect purchaser from suing an upstream entity for damages, unless the intermediary is also

joined as a defendant or another exception applies. Winn-Dixie's argument that *Illinois Brick* does not apply fails because OMS is not a named defendant in this action.

> b.  *Determining the Seller, Direct Purchaser, and Indirect Purchaser*

Winn-Dixie also argues that it is a direct purchaser, and therefore *Illinois Brick* does not apply, because Defendants Country Fresh and South Mill were the "true sellers" to Winn-Dixie. (Pl.'s Resp. 29; Pl.'s SUMF ¶¶ 18-26, 58-63.) Plaintiff argues that because OMS was purely a sales entity that did not package or ship the mushrooms it sold to Winn-Dixie, "it is reasonable to infer that OMS did not take possession or title to the Dole mushrooms sold to Winn-Dixie, and that Country Fresh and South Mill, both EMMC members, were the true sellers of Dole mushrooms to Winn-Dixie." (Pl.'s SUMF ¶ 63.)

Winn-Dixie's argument is similar to an argument considered and rejected in *Hess I*, 424 F.3d 363, 372-73 (3d Cir. 2005). In that case, the plaintiffs, who purchased a price-fixed product through dealer intermediaries, argued they were direct purchasers from the manufacturer for certain transactions where the dealers "do not take physical possession" of the product. *Id.* at 373. The Third Circuit rejected this argument, reasoning that the shipping method "does not affect the economic substance of the transaction." *Id.*

Here, Schroeder testified that OMS was a sales entity that was distinct from the packaging operation, and OMS used other growers besides OMF, including Country Fresh and South Mill, to supply, package, and label its sales of Dole mushrooms. (*See* Schroeder Tr. 50:11-14; 51:4-52:4, 95:21-96:10.) OMS's data for sales to Winn-Dixie also describes the "Ship Method" as "Southmill", "Country Fresh", or "Quincy". (Pl.'s Ex. 5.) However, Defendants presented sales agreements between Winn-Dixie and OMS, and Winn-Dixie does not dispute the validity of these agreements. (Exs. A-B to Schroeder Cert.) Nor does Winn-Dixie put forth any evidence that it

negotiated directly with South Mill or Country Fresh on the prices of mushrooms or directly paid those entities. Although Country Fresh and South Mill may have packaged and shipped OMS mushrooms sold to Winn-Dixie, this does not affect the economic substance of the transaction between OMS and Winn-Dixie. Plaintiff's argument fails to create a genuine issue of material fact that Winn-Dixie purchased mushrooms directly from Defendants Country Fresh or South Mill, rather than from non-party OMS.

The Court concludes that Winn-Dixie is an indirect purchaser in a distribution chain impacted by a horizontal conspiracy, which is exactly the circumstance in which *Illinois Brick* and its progeny apply. Therefore, Winn-Dixie cannot recover damages from Defendants based on purchases from OMS—an alleged co-conspirator that is not joined as a defendant—unless an exception to the *Illinois Brick* doctrine applies to those purchases. The Court will next consider the exception to *Illinois Brick* that may govern Winn-Dixie's purchases from OMS.

### 2. *The Ownership or Control Exception to* Illinois Brick

*Illinois Brick* set forth a potential limited exception to the direct purchaser rule for situations "where the direct purchaser is owned or controlled by its customer." 431 U.S. at 736 n.16. The Court described that in such a situation "market forces have been superseded" such that the general reasoning to prevent indirect purchasers from recovering might no longer apply. *Id.* Although *Illinois Brick* described this exception in the context of a direct purchaser that was owned or controlled by the customer, courts have since applied the exception where the direct purchaser is owned or controlled by the antitrust conspirator. *See* Areeda & Hovenkamp, *supra*, ¶ 346f.

The Third Circuit has allowed a plaintiff to sue for damages based on its purchases from a conspiring defendant's wholly-owned subsidiary. *In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13 (3d Cir. 1978). *In re Sugar* alleged a conspiracy among major sugar refiners to fix the prices of

refined sugar. *Id.* at 15. The plaintiff was a candy wholesaler that had purchased candy from a subsidiary of a defendant. *Id.* After considering the facts of the case, the court concluded that "at least for this purpose and in this context, the subsidiary should be treated as the alter ego of the parent." *Id.* at 18-19. The following year, in *Mid-West Paper Products Co. v. Continental Group. Inc.*, the Third Circuit again faced the question of whether a plaintiff could pursue antitrust damages based on purchases from a defendant's subsidiary. 596 F.2d 573, 588-89 (3d Cir. 1979). The Third Circuit remanded to the district court to determine whether *Illinois Brick* should prevent plaintiff's recovery. *Id.* at 589. The *Mid-West Paper* court assessed that in certain circumstances courts could regard a parent and its' subsidiary as one entity, "when the parent dominates and controls the subsidiary to such an extent that the subsidiary is deemed to be an agent of the parent." *Id.* In finding remand necessary, the court stated that "[i]f [plaintiff] can establish facts that…as a consequence of [defendant's] domination the subsidiary's prices were determined in accordance with the general price-fixing conspiracy, [plaintiff] would be entitled to sue defendants for damages resulting from its purchases from [the subsidiary]." *Id*. A few years later, in dicta, the Third Circuit summarized the standard set forth in *Mid-West Paper* as requiring that a "violator must dominate [the] subsidiary's prices in accordance with the general price fixing conspiracy" in order for the indirect purchaser to be able to sue for damages when it purchased from a subsidiary or division of a co-conspirator. *Merican, Inc. v. Caterpillar Tractor Co.*, 713 F.2d 958, 967 n.20 (3d Cir. 1983).

The Third Circuit most recently described the contours of the ownership or control exception in *Hess I*, 424 F.3d at 371-72 (3d Cir. 2005). The *Hess I* opinion stated that courts which have expanded the ownership or control exception beyond a direct subsidiary have limited the exception to "relationships involving such functional economic or other unity between the direct

purchaser and either the defendant or the indirect purchaser that there effectively has been only one sale." *Id.* at 372 (quoting *Jewish Hosp. Ass'n of Louisville, Ky. v. Stewart Mech. Enters.*, 628 F.2d 971, 975 (6th Cir. 1980)). "Modes of control that might qualify for the control exception include 'interlocking directorates, minority stock ownership, loan agreements that subject the wholesalers to the manufacturers' operating control, [or] trust agreements.'" *Id.* (quoting *In re Brand Name Prescription Drugs Antitrust Litig.*, 123 F.3d 599, 605 (7th Cir. 1997) (alteration in original)). Plaintiffs in *Hess I* were dental laboratories that alleged an exclusive-dealing and price-fixing conspiracy between Dentsply, which marketed artificial teeth, and its dealer intermediaries, which sold the artificial teeth to plaintiffs. *Id.* at 366-67. The Third Circuit held the ownership or control exception did not allow plaintiffs to sue Dentsply for damages because Dentsply did not "own any interest in" the dealers and "no functional unity" existed between Dentsply and the dealers, so the *Illinois Brick* policy concerns of double recovery and damages apportionment would apply. *Id.* at 372. Thus, while the Third Circuit did not apply the control exception to *Illinois Brick* in *Hess I*, the opinion recognized the continuing viability of the exception. *See In re: Domestic Drywall Antitrust Litig.*, 322 F.R.D. 188, 196-97 (E.D. Pa. 2017).

In light of this precedent, the question for the Court is whether there is any genuine dispute as to whether non-party OMS should be treated as the alter ego of Defendant OMF. The Court must assess whether OMF has functional unity with OMS or exercises control over OMS as a result of interlocking directorates or other agreements. The Court must also consider whether, as a consequence of OMF's domination or control, OMS's prices were determined in accordance with EMMC minimum pricing policy.

In their respective arguments regarding the ownership or control exception in this case, the parties each rely on earlier decisions in the related class action litigation. Judge O'Neill ruled on

the application of the ownership or control exemption to *Illinois Brick* in two instances. In one instance, Judge O'Neill ruled that plaintiff Diversified Foods was an indirect purchaser and could not recover damages because distributor South Mill of New Orleans, from which it had purchased mushrooms, was not owned or controlled by Defendants Kaolin Mushroom Farms, Inc. or Defendant South Mill Mushroom Sales, Inc. ("South Mill/Kaolin"). *In re Mushroom Direct Purchaser Antitrust Litig.*, 319 F.R.D. 158, 181-84 (E.D. Pa. 2016). John and Michael Pia were the 100% owners of Defendants South Mill/Kaolin, but they were only 50% owners of the South Mill Distribution entities; the remaining 50% of the distribution entities were owned by Stuart Thomas. *See id.* at 183-84; *In re Mushroom Direct Purchaser Antitrust Litig.*, 54 F. Supp. 3d 382, 388 n.6 (E.D. Pa. 2014). In finding that the Defendants South Mill/Kaolin did not own or control the direct purchaser South Mill of New Orleans, the court reasoned,

> "[w]hile some overlap existed in ownership between the affiliated distributors and the member growers, they were not under common control in the same sense as is a corporation and its wholly-owned subsidiary, a corporation and its divisions or as are *two corporations owned in identical proportions by the same set of investors*."

319 F.R.D. at 183 (quoting *In re Mushroom*, 621 F.Supp.2d 274, 290 (E.D. Pa. 2009) (emphasis added)). The court further reasoned that the lack of unity of interest between the entities was demonstrated by the fact that there had been a lawsuit between South Mill/Kaolin and a South Mill distribution center concerning mushroom pricing. *Id*. at 184; *see* 54 F. Supp. 3d at 388-89. The court concluded this history of litigation implicated the potential for double recovery that *Illinois Brick* had attempted to avoid, so Diversified Foods could not proceed with its claims for damages as class representative. 319 F.R.D. at 184.

Separately, Judge O'Neill found that there were genuine issues of material fact as to whether M.D. Basciani owned or controlled a distribution entity to which it sold mushrooms. *In*

*re Mushroom Direct Purchaser Antitrust Litig.*, Civ. A. No. 06-620, 2016 WL 8459462, at *5 (E.D. Pa. Dec. 13, 2016). There, M.D. Basciani moved for summary judgment arguing that plaintiffs were indirect purchasers because M.D. Basciani sold all of its mushrooms to a distributor, which took possession of and title to the mushrooms, and which was not an EMMC member or defendant. *Id.* at *2. M.D. Basciani argued that it was a separate corporate entity from this distributor, and that the two entities had separate financial statements, bank accounts, boards of directors, shareholder meetings, and payrolls. *Id.* However, the two entities had identical owners, who each owned the same percentage of shares in M.D. Basciani and the distributor. *Id.* The court denied the motion for summary judgment, and found it notable that "M.D. Basciani and [the distributor] were owned and operated and controlled by the same individuals and that he and the other co-owners made decisions for both…." *Id.* at *5. Judge O'Neill concluded that there were material questions of fact as to whether "sufficient functional unity" existed between the two entities to warrant application of the control exception to *Illinois Brick* and permit plaintiffs' claims against M.D. Basciani. *Id.*

The situation here regarding OMF and OMS is much more akin to that of M.D. Basciani in the related class case than to South Mill/Kaolin. Here, the parties do not dispute that Gary Schroeder is the sole shareholder and President of both OMS and OMF. (Schroeder Cert. ¶ 1; Schroeder Tr. 95:3-10, 96:11-15.) Indeed, Schroeder himself certifies that OMS and OMF "shared some common employees and used a common ordering system." (Schroeder Cert. ¶ 10.) OMF had already been growing, packaging, and selling mushrooms for 17 years when Schroeder formed OMS "for the purpose of obtaining a license from the Dole Company—which it did in 2003—to market and sell all types of mushrooms…under the DOLE brand name…." (Schroeder Cert. ¶¶ 3-4.) OMS "kept separate books and records from OMF" and had separate financial reporting. (*Id.* ¶

10; *accord* Schroeder Tr. 96:16-19, 98:21-99:8.)

In 2001, OMF joined the EMMC, and Schroeder was elected Treasurer of the EMMC. (*Id.* ¶ 3.) Schroeder avers that OMS did not offer or attempt to join the EMMC, and he did not agree that OMS would follow "any of the rules[,] regulations or pricing policies adopted by the EMMC." (*Id.* ¶ 5.) Schroeder states that any mushrooms that OMS purchased from OMF and "re-sold" to Winn-Dixie were at "prices that included the packaging and delivery costs…." (*Id.* ¶ 8.) Schroeder further states the sales prices between OMS and Winn-Dixie "were negotiated between Winn Dixie's Procurement Officers and OMS[,]" and "were not affected or influenced by any rule, regulation or program adopted by the EMMC." (*Id.* ¶ 7.) As a result, Defendants argue OMS is not owned or controlled by OMF.

Winn-Dixie argues that there is sufficient evidence to raise a genuine dispute of material fact as to whether OMF owned or controlled OMS. Plaintiff first points to the bankruptcy filings of OMF and OMS, which designate the two entities as "affiliates," pursuant to the Bankruptcy Code. (Pl.'s SUMF ¶¶ 2-3; Pl.'s Ex. 2 ¶ 14.) OMF and OMS's affiliation in bankruptcy does not indicate any functional unity or control beyond what is already evident from the entities' common ownership by Gary Schroeder. *See* 11 U.S.C. § 101(2)(B) (an "affiliate" is a "corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned or controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns…20 percent or more of the outstanding voting securities of the debtor…").

Next, in support of its argument that genuine issues of material fact exist as to the control of OMS by OMF, Plaintiff submits the deposition of Kirk Reichert, who was the controller for OMF and testified in the related class action as a corporate designee of OMF. (Pl.'s SUMF ¶ 4; Pl.'s Ex. 4 [Reichert Tr.] 9:5-9.) Reichert did not mention the existence of "Oakshire Mushroom

Sales" throughout his deposition. While Reichert testified on behalf of OMF, he also testified about sales data from OMS. (*See* Pl.'s SUMF ¶¶ 15-17; Pl.'s Ex 5; Reichert Tr. 17:25-18:17.) Reichert testified that Schroeder usually completed the negotiations on behalf of "Oakshire" (*see* Reichert Tr. 25:23-26:13), and that Schroeder completed all negotiations of rebates and pricing, without specifying whether this testimony applied to OMF or OMS. (*Id.* at 54:13-23, 65:9-15.) He testified to the electronic operating system and operations of a customer service employee, again without differentiating between OMF and OMS. (*See id.* at 21:10-23; 26:7-27:9; Pl.'s SUMF ¶¶ 10-11, 13.) Reichert further testified that in 2003, "we got the Dole license." (Reichert Tr. 65:19-23.) Plaintiff argues that this testimony, as well as an article on the website of OMF, indicate it was OMF, not OMS, which began selling mushrooms under the Dole license. (Pl.'s SUMF ¶¶ 5, 27-30.) Whether it was OMS or OMF that acquired the Dole license is irrelevant to the Court's inquiry of OMF's domination or control over OMS. However, Reichert's failure to distinguish between the two entities throughout his testimony signals to the Court a potential functional unity of operation and management between OMF and OMS.

Plaintiff next argues that OMF required OMS to follow EMMC minimum pricing. (Pl.'s SUMF ¶¶ 32-36.) In support of this argument, Plaintiff presents the EMMC Membership Agreement signed by Schroeder on behalf of OMF, which required EMMC members "not to sell or otherwise dispose of mushrooms except as provided under the terms of this Agreement" and "to sell mushrooms to all customers only on the terms authorized by the Cooperative." (Pl.'s Ex. 8 ¶¶ 6-7.) Plaintiff points to the testimony John Pia, President of South Mill Mushroom Sales, stating that the EMMC minimum prices applied to sales to "[f]resh market consumers[.]" (Pl.'s SUMF ¶ 49; Pl.'s Ex. 11 [Pia Tr.] 8:16-18, 251:11-20.) Schroeder similarly testified that one of the prices set by EMMC minimum pricing was for sales to retail customers. (*See* Pl.'s SUMF ¶

46; Schroeder Tr. 118:4-25.) Plaintiff also presents the testimony of representatives of several defendants stating that they believed EMMC minimum pricing applied to sales from EMMC members' packaging and shipping operations to retail or wholesale consumers, rather than sales from members' growing operations to their packaging and shipping operations. (*See* Pl.'s SUMF ¶¶ 47-48, Pl.'s Ex. 13 (Johnson Tr. 191:19-192:17, 195:3-14; Reitnauer Tr. 98:5-11, 98:24-99:10; Ferranto Tr. 33:9-21; Cutone Tr. 82:4-22; Cardile Tr. 145:6-12, 146:10-21; D'Amico Tr. 171:17-172:3).) Plaintiff also cites to Judge O'Neill's finding that "the price fixing in which the EMMC admits it participated was applied to integrated and affiliated distributors' sales and not at the growers level." *In re Mushroom Direct Purchaser Antitrust Litig.*, 621 F. Supp. 2d 274, 285 n.11 (E.D. Pa. 2009). Finally, Plaintiff asserts that the prices OMS actually charged Winn-Dixie in its sales contracts were higher than the EMMC minimum prices. (*See* Pl.'s SUMF ¶¶ 51-52; Pl.'s Ex. 16, Leffler Rebuttal Report at 8 n.23.) Defendants do not dispute this assertion.

The Court concludes that there is a genuine dispute of material fact whether OMF controlled OMS in order to satisfy the exception to *Illinois Brick*. OMF and OMS are 100% commonly owned and controlled by Gary Schroeder. OMS shared common employees, a common ordering system, and functional operations with OMF. Schroeder was also solely responsible for negotiating OMF's and OMS's sales prices. As EMMC Treasurer and President of EMMC member OMF, it is a reasonable inference that Schroeder was aware of the EMMC minimum prices. While Schroeder avers that the EMMC minimum pricing did not affect OMS's sale prices to Winn-Dixie, Defendants present no evidence or explanation of how OMS's sales prices were determined or negotiated, for either its sales to Winn-Dixie or to other customers. Moreover, certain other EMMC members seem to have applied the minimum pricing policies to their retail sales operations, even if those were separate entities than their growing enterprises. On this record,

and drawing all inferences in the light most favorable to Winn-Dixie, the Court concludes that a reasonable juror could find that OMF exercised sufficient control over OMS to satisfy the exception to *Illinois Brick*. As a result, the Court cannot find, as a matter of law, that the *Illinois Brick* doctrine prevents Winn-Dixie from suing for damages for its purchases of mushrooms from OMS.

### 3. Winn-Dixie's Pleading Deficiency Regarding Purchases from OMS

Defendants further argue that Plaintiff cannot sustain a claim for damages premised on the ownership or control exception to *Illinois Brick* because it did not plead this exception in its First Amended Complaint. (Defs.' Mot. at 8-9.) Defendants rely on *Hess I*, in which the Third Circuit found that the plaintiffs could not claim they were direct purchasers from Dentsply to avoid the *Illinois Brick* doctrine because their complaint had specifically defined the plaintiff class as dental laboratories "who purchased such products *through Dentsply Dealers*." 424 F.3d at 372.

Here, Plaintiffs pleaded that during the "Conspiracy Period" Winn-Dixie "purchased Agaricus mushrooms directly from one or more Defendants." (First Am. Comp. ¶ 18.) Plaintiffs defined the "Conspiracy Period" as January 1, 2001 through 2008. (*Id.* ¶ 3.) Winn-Dixie did not plead that it purchased mushrooms from OMS or that OMS was owned or controlled by OMF. As a result, Defendants posit that "Winn-Dixie's 'ownership or control' argument comes too late." (Defs.' Mot. at 9.)

The Federal Rules do not require a plaintiff to set out a legal theory at the pleadings stage and "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 11 (2014). When a party has a valid claim, it should be able to recover provided that the change in theory will not prejudice the other party in maintaining a defense upon the merits. 5 Wright & Miller, *Federal*

*Practice & Procedure* § 1219 (3d ed.); *see also Perma Life Mufflers, Inc. v. Int'l Parts Corp.*, 392 U.S. 134, 142 (1968), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984) (remanding case for trial despite objections that antitrust plaintiffs' "particular theories of conspiracy" were not pleaded with specificity because "[t]he gist of petitioners' cause of action [was] clear from the outset, and respondents will in no way be prejudiced if petitioners are permitted to rely on these alternative theories of conspiracy.").

Defendants have not argued any prejudice in being able to prepare a defense to the ownership and control exception to *Illinois Brick* premised on Winn-Dixie's purchases from OMS. To the contrary, they have asserted that Gary Schroeder can attest to the relationship between OMF and OMS and has access to contracts and sales data concerning Winn-Dixie's purchases from OMS. (*See* Schroeder Cert.) Moreover, Defendants assert that the parties explicitly discussed Winn-Dixie's indirect purchases from OMS before the close of discovery, and Plaintiff referenced the ownership or control exception in its filings concerning discovery disputes. (Defs.' Mot. at 11-12 (citing Document No. 256 at 8-14).) Thus, Defendants are not surprised or prejudiced by Plaintiff's assertion of the ownership and control exception to *Illinois Brick*. The Court concludes that Winn-Dixie's failure to plead that it purchased from OMS, and that OMS was owned or controlled by OMF, should not prohibit Winn-Dixie from asserting this theory of recovery in opposition to summary judgment or at trial.

### 4.    *Mushrooms OMS Purchased from Conspirators Besides OMF*

Defendants next argue that even if there is a dispute of material fact concerning whether OMS is owned or controlled by OMF, *Illinois Brick* still prohibits Winn-Dixie from recovering damages stemming from any mushrooms that originated from any member of the conspiracy besides OMF. (Defs.' Mot. at 12.) Defendants argue that 75% of OMS's sales to Winn-Dixie were

mushrooms that OMS purchased from Country Fresh or South Mill, citing to Exhibit C to the Schroeder Certification. (*Id.*) As described in Section III.A.1 *supra*, the Court will not consider Exhibit C in support of Defendants' motion. But the Court will consider Defendants' argument in the abstract, since it is evident that at least some share of Winn-Dixie's purchases from OMS were originally acquired from Country Fresh or South Mill. (Pl.'s Ex. 5; *see* Schroeder Tr. 50:11-24.)

Defendants argue the ownership or control exception to *Illinois Brick* cannot apply to products purchased from a company owned or controlled by a conspirator that originated from members of the conspiracy other than its parent company. Defendants cite no case law in support of this assertion, and the Court has found no controlling authority from the Third Circuit on this question. *See In re Sugar Indus. Antitrust Litig.,* 579 F.2d at 20 (3d Cir. 1978) (denying petition for rehearing and expressly declining to address this issue because it was not raised in the lower court or briefed on appeal); *In re Fine Paper Antitrust Litig.*, 98 F.R.D. 48, 117 n.61 (E.D. Pa. 1983), *aff'd in part, rev'd in part*, 751 F.2d 562 (3d Cir. 1984) (noting that the Third Circuit did not rule on this question in *In re Sugar*).

In opposition, Plaintiffs rely on *Royal Printing Co. v. Kimberly Clark Corp*., 621 F.2d 323 (9th Cir. 1980). In *Royal Printing*, the Ninth Circuit approved of an indirect purchaser's antitrust standing in the circumstances alleged here—where a wholly owned or controlled entity sold plaintiff goods acquired from its parent's co-conspirator rather than the parent itself. 621 F.2d at 326. The court considered the purpose behind the *Illinois Brick* doctrine, specifically the possibility of double recovery, stating, "[t]here is little reason for the price-fixer to fear a direct purchaser's suit when the direct purchaser is a subsidiary or division of a co-conspirator." *Id*. "The co-conspirator parent will forbid its subsidiary or division to bring a lawsuit that would only reveal the parent's own participation in the conspiracy." *Id*.

The *Royal Printing* court did note that extending the *Illinois Brick* exception to goods originating from co-conspirators, rather than the direct purchaser's parent company, created a slightly increased risk of multiple liability. *Id.* at 326 n.6 ("Of course, if the plaintiff purchased a defendant's goods through the defendant's own wholesaling subsidiary, there would be even less likelihood that the direct-purchaser subsidiary would ever also sue the defendant and create a potential multiple liability."). For example, the court hypothesized that "[t]he parent might be under government pressure or discover that the conspiracy is not sufficiently profitable; and if a subsidiary has outside shareholders, a derivative suit might be a possibility. In such an event, multiple liability might lurk." *Id.* at 326. But the *Royal Printing* opinion also noted that even if a subsidiary did sue a parent's co-conspirators, it might be prevented from recovering if the subsidiary had true and complete involvement and participation in the antitrust activity. *Id.* at 326 n.5 (citing *Perma Life Mufflers*, 392 U.S. at 146-47, 149, 154 (1968) (White, J. concurrence) (Marshall, J. concurrence) (Harlan, J. concurrence), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752 (1984)). Thus, a subsidiary's true and complete involvement and participation in the conspiracy lowers the risk of multiple liability.

Notwithstanding "some small chance that such a subsidiary or division might wish to sue its parent's co-conspirators[,]" the Ninth Circuit ultimately concluded,

> "as a practical matter the chance of a direct-purchaser suit is so small, the correspondingly small risk of multiple recovery does not disturb us. This is especially so when our only alternative is to effectively immunize the transactions here from private antitrust liability, thus thwarting a vital part of the antitrust enforcement scheme and the expressed purpose of *Illinois Brick*."

*Id.* at 326 (footnotes omitted). Thus, in allowing recovery for purchases from a defendant's subsidiary for goods created by any co-conspirator, the Ninth Circuit balanced the dual concerns of *Illinois Brick* to avoid multiple recovery and to encourage private antitrust enforcement.

Although it did not address this particular question, the Third Circuit similarly considered the dual risks of multiple recovery and encouraging private antitrust enforcement in its decision to apply the ownership or control exception in *In re Sugar*, 579 F.2d 13, 18-19 (3d Cir. 1978). The plaintiff had purchased from a wholly owned subsidiary of a defendant, and in this context, the court concluded that the subsidiary should be treated as the alter ego of the parent. *Id.* at 18-19. "To adopt any other view would invite evasion by the simple expedient of inserting a subsidiary between the violator and the first noncontrolled purchaser." *Id.* at 19 (footnote omitted). The *In re Sugar* court reasoned that, "[a]lthough the subsidiary does have a separate legal existence, it is owned by the parent company, and would not ordinarily sue it." *Id.* at 18. Thus, in condoning the existence of an exception to *Illinois Brick*, the Third Circuit considered whether there would be a low risk of multiple recovery by the direct purchaser and expressed a desire to prevent complete evasion of private antitrust liability. Two years after the Third Circuit's decision in *In re Sugar*, the Ninth Circuit considered these same factors in *Royal Printing* and concluded that the same logic should extend to products sold by a co-conspirator's subsidiary. 621 F.2d at 326 (9th Cir. 1980).[2]

The reasoning in *In re Sugar* leads the Court to anticipate that that the Third Circuit would agree with the Ninth Circuit's holding in *Royal Printing* that the ownership and control exception

---

[2] In dicta, the Third Circuit has compared these decisions, stating, "[t]he *Royal Printing* decision parallels the exception to *Illinois Brick* that we recognized in *In re Sugar Indus. Antitrust Litig.*, 579 F.2d 13 (3d Cir.1979)." *Merican*, 713 F.2d 958, 967 n. 20 (3d Cir. 1983). The Court in *Merican* noted one key difference between the Ninth Circuit's interpretation in *Royal Printing* and the Third Circuit's interpretation of the ownership or control exception: in the Third Circuit, for the exception to apply, the antitrust conspirator "must dominate the subsidiary's prices in accordance with the general price fixing conspiracy." *Id.* (citing *Mid-West Paper Prods.*, 596 F.2d 573, 589 (3d Cir. 1979)). The *Merican* opinion noted no other disagreement between the circuits' interpretation of the exception.

to *Illinois Brick* applies equally to goods originating from any member of the conspiracy. In general, a direct purchaser that is owned or controlled by a member of the conspiracy is unlikely to sue its parent company or other members of the conspiracy. When a direct purchaser acquires price-fixed products from a co-conspirator that is not its parent company, there may be a minimally increased risk of multiple liability in certain circumstances. But the Court concludes this risk is generally outweighed by the risk of the antitrust violators' complete evasion of private enforcement through insertion of a corporate entity that is owned or controlled by a conspirator into the distribution chain.

The Court's anticipation that the Third Circuit would condone this conclusion is further bolstered by a footnote in a recent opinion addressing a different antitrust liability question. In *In re Processed Egg Prod. Antitrust Litig.*, the Third Circuit held that the plaintiffs could seek overcharge damages for all egg products purchased from a conspirator, even where those egg products included some amount of eggs from a third-party non-conspirator. 881 F.3d 262, 274-76 (3d Cir. 2018). The question was not governed by *Illinois Brick* because the plaintiffs were direct purchasers from conspirators, so the holding is of limited relevance here. But, in a footnote, the opinion stated,

> "certain Defendants obtained shell eggs from other conspirator-Defendants. These eggs are within the scope of what this Opinion refers to as 'internal' eggs, as they were produced within the conspiracy. For purposes of the issues before us, it does not matter whether a Defendant's 'internal' eggs came from a flock owned by that same Defendant or instead from a flock that belonged to a fellow conspirator-Defendant."

*Id.* at 266 n.4. Thus, the court treated equally any eggs originating from any member of the conspiracy, regardless of which defendant ultimately sold the eggs outside of the conspiracy. Applying the same reasoning here would require the Court to treat equally any mushrooms that

were grown by any Defendant, regardless of which Defendant—or which entity controlled by a Defendant—ultimately sold the mushrooms outside the conspiracy. This is precisely how the Court will proceed.

The Court declines to hold that Winn-Dixie is barred from seeking damages for any mushrooms OMS purchased from Country Fresh, South Mill, or any other Defendant. The Court will treat these mushrooms equivalently to those mushrooms OMS purchased from OMF. Of course, the Court has not issued any opinion as to whether an exception to *Illinois Brick* would allow Winn-Dixie to seek damages from Defendants for its mushroom purchases from OMS. The Court has merely determined that there is a genuine dispute of material fact on this question that cannot be resolved at summary judgment.

IV.     **CONCLUSION**

For the foregoing reasons, Defendants' motion for partial summary judgment is denied. An Order consistent with this Memorandum will be docketed separately.