**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WINN-DIXIE STORES, INC. and** | : | |
| | : | **CIVIL ACTION** |
| | : | |
| *Plaintiff* | : | |
| | : | |
| v. | : | |
| | : | **No. 15-cv-6480** |
| **EASTERN MUSHROOM MARKETING** | : | |
| **COOPERATIVE, INC., et al.** | : | |
| | : | |
| *Defendants.* | : | |

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF, WINN DIXIE STORES,**
**INC.'s MOTION FOR JUDGMENT AS A MATTER OF LAW PRUSUANT TO**
**FEDERAL RULE OF CIVIL PROCEURE 50(b) OR, IN THE ALTERNATIVE,**
<u>**A NEW TRIAL PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 59(a)**</u>

Following a three-week jury trial during which Plaintiff did not orally, or in writing, file a motion under Fed. R. Civ. P. 50(a), Plaintiff filed the instant post-verdict motions for judgment as a matter of law under Rule 50(b) or, in the alternative, a new trial under Rule 59(a).  In this Circuit, a party must file a Rule 50(a) motion in order to preserve its right to file a post-verdict motion under Rule 50(b).  Moreover, a party cannot seek post-trial redress under Rule 59(a) – claiming the jury overlooked "overwhelming evidence" – when that party did not first seek relief under Rule 50(a).  Because Winn Dixie did not timely file a Rule 50(a) motion, it would be an abuse of the Court's discretion to consider Winn-Dixie's post-trial motions.  Thus, the Court should deny Winn-Dixie's motions.

In addition to the procedural deficiencies that preclude Winn Dixie's claimed relief, Winn Dixie's argument ignores the substantial trial evidence Defendants adduced and instead, Winn Dixie grounds its position on what it claims to be overwhelming evidence contra to the jury's answers to Questions 2 and 4 of the Special Verdict Form.  Winn Dixie then "ups the

SL1 1783929v1 107141.00002

ante" by falsely claiming that there was overwhelming evidence at trial supporting judgment as a matter of law in its favor—or a new trial—as to all of the other elements of its § 1 Sherman Act claim.  Not so.

Even if the Court considers Plaintiff's post-trial motions—which it should not—ample trial evidence was adduced to support the Jury's responses to Questions 2 and 4 of the Special Verdict Form as well as the other liability issues presented in the Verdict Form.  Per the Court's instructions, the Jury did not have to reach any issue of liability or damages after it responded "NO" to Questions 2 (as to all Defendants except the EMMC) and 4 (as to all Defendants including the EMMC).

Moreover, Winn Dixie did not object to the final version of the Court's Jury Instructions or to the Verdict Form before the Court submitted the case to the jury.  Under these circumstances, Winn Dixie's claim that the Jury's overall findings were inconsistent or were the product of jury confusion ring hollow and do not provide an independent basis for Winn Dixie's alternative motion for a new trial.  The entry of judgement in favor of all Defendants and against Winn Dixie does not "shock the conscientious" or operate to create "a manifest injustice." Rather, ample evidence supports a judgment in favor of Defendants and against Winn Dixie.  No basis exists to justify Winn Dixie's alternative request for a new trial.

Under the foregoing circumstances we respectfully submit that the Court not only deny Win Dixie's Rule 50(b) and 59(a) motions as it must under Third Circuit precedential opinions, but also enter judgment in favor of all Defendants and against Winn Dixie with respect to its claims under Section 1 of the Sherman Act.[1]

---

[1]  The Court entered Judgment in this case on March 23, 2022.  On April 7, 2022, Defendants timely filed a motion under Fed. R. Civ. P 59(e) to alter or amend the Judgment to reflect a liability verdict in favor of Defendants and against Winn Dixie.  Dkt. Nos. 494 & 498.  Winn Dixie did not oppose that motion.  Thus, the Court should grant Defendants' unopposed motion.

## I.      RELEVANT PROCEDURAL HISTORY

Trial on Winn Dixie claims under §1 of the Sherman Act commenced on February 28, 2022.  It consumed 14 trial days.  Twenty-two fact witnesses[2] and 3 expert witnesses were called by the respective parties.  Significantly, 21 of the 22 fact witnesses were corporate representatives or employees of the EMMC, an agricultural cooperative, or the Defendants who were former members of the agricultural cooperative.[3]

On Thursday, March 17, 2022, Defendants rested their case.  Plaintiff made no written or oral Rule 50(a) motion at that time nor at any time prior to submission of the case to the jury. *See* N.T. 3/17/22 – 3/21/22.  Moreover, the Court circulated draft Jury Instructions and a draft Verdict Form after the close of Court on March 17, 2022, and held a charge conference the next day, March 18, 2022.  Following the charge conference, the Court revised the Jury Instructions and the Verdict Form.  The revised versions were made available to all counsel shortly after 12:00 p.m. on Friday, March 18.  Significantly, Winn Dixie did not object to the revised versions of either document before the Court instructed the jury on Monday, March 21.  The Verdict Form and a copy of the Court's Jury Instructions were submitted to the jury for its deliberations. *See* N.T. 3/18/22 and 3/21/22.  Approximately 3 hours later, including a lunch break, the Jury returned to the courtroom with its verdict.  The Jury responded "YES" to Question 1 as to the existence of an overarching conspiracy.  As to whether any Defendants participated in the

---

[2] Seventeen witnesses testified live, five testified via videotaped deposition.

[3] As discussed below, Plaintiff's Rule 50(b) motion and alternative 59(a) motion are precluded by Plaintiff's failure to move under Rule 50(a) for judgment as a matter of law on sufficiency of the evidence grounds.   Nevertheless, as we discuss in Section II. C below,  these witnesses as well as Defendants' two expert witnesses provided ample evidence from which a reasonable jury could find in favor of the Defendants as to not only the jury's findings in response to Questions 2 and 4 on the Verdict form but also as to all other elements of Plaintiff's claims under § 1 of the Sherman Act.

conspiracy, the Jury answered "NO" with the exception of the EMMC.  The Jury further responded "NO" as to the anticompetitive nature of the alleged overarching conspiracy, a necessary showing by the Plaintiff with respect to restraints examined under the Rule of Reason. In view of the Court's instructions on the Verdict Form that the Jury's deliberations would be complete upon a "NO" answer to any of the Questions describing the elements of Plaintiff's Sherman Act claim, the Jury did not reach questions as to Defendants' liability to Winn Dixie or to the injury or damages Winn Dixie claimed.[4]  (See N.T. 3/21/22).

## II.     ARGUMEMT

### A.  Plaintiff's Post-Trial Motions Boil Down To Challenging The Sufficiency Of The Evidence At Trial.

Plaintiff grounds its Rule 50(b) and alternative 59(a) motion on a single group of arguments that boil down to challenging the sufficiency of the evidence underlying the jury's negative answers to Questions 2 and 4 on the Special Verdict Form.  These negative answers corresponded to two elements that Winn Dixie was required to prove by a preponderance of evidence in order to establish its claim under Section 1 of the Sherman Act.  Plaintiff goes on to argue that essentially there was overwhelming evidence to support judgment in its favor (or alternatively a new trial) on each of the other elements of its Sherman Act claim that the jury did not have to reach including unreasonableness, injury and damages (as instructed by the Court on the Verdict Form).

---

[4] The Jury also answered "YES" to Question 3.  That question related to whether Oakshire Mushroom Farms, Inc. ("Oakshire Farms") "owned and controlled" non-party Oakshire Mushroom Sales, LLC ("Oakshire Sales").  The Jury's affirmative response to that inquiry merely indicated that Oakshire Sales' mushroom sales to Plaintiff were not "indirect sales" and thus, had Oakshire Farms' liability been established, the antitrust laws would not have precluded Plaintiff from seeking damages associated with Oakshire Sales' mushroom sales.  Given the Jury's responses to Questions 2 and 4, its response to Question 3 bears no relevance to Winn-Dixie's Motion.

We submit that the gravamen of Plaintiff's motion boils down to a challenge to the sufficiency of the trial evidence.  Plaintiff makes essentially four arguments in furtherance of its motions, all of which include or rely on what Plaintiff falsely characterizes as "overwhelming evidence."  *See* Plaintiff's Memorandum at pp. 1 and 2.  However, the first two arguments going to the sufficiency of the evidence, as to the jury's responses to Questions 2 and 4 are, in part, couched on disingenuous claims.  First, Plaintiff asserts that these answers are inconsistent with the jury's finding of an overarching conspiracy in response to Question 1.  Second, Plaintiff contends this inconsistency is indicative of jury confusion with respect to certain portions of the Court's instructions.

A review of the evidence and the Court's instructions as a whole shows that there is no inconsistency between these findings and that they are fully consistent with the Court's jury instructions.  For example, the jury did not find that none of the EMMC member companies did not participate in the alleged conspiracy but only that the Defendants in this case did not participate.[5]  Moreover, the jury's negative response to Question 4 corresponds to an element that Plaintiff must prove in a rule of reason case in order to shift the burden to the Defendants to show procompetitive effects of the alleged restraint of the alleged overarching conspiracy and is fully consistent with the Court's jury instructions.  Moreover, as discussed above, Plaintiff  did not object to either the Court's final jury instructions, nor did it object to the questions and supplemental instructions on the Verdict Form.  Thus, we submit that Plaintiff's arguments as to inconsistency of the Jury's findings as well as possible jury confusion are disingenuous.

---

[5] This finding is fully supported and in accordance with Jury Instruction 25 that informed the Jury that mere membership in a trade organization is insufficient to trigger liability.

SL1 1783929v1 107141.00002

Plaintiff's failure to object to the Court's final jury instructions and Verdict Form precluded these arguments as they pertain to both motions.

> **B.    The Court Cannot Consider Plaintiff's Alternative Motions Because Plaintiff Forfeited Its Ability To File A Post-Verdict Motion Under Fed. R. Civ. P. 50(b) And Fed. R. 59(a) By Not Moving Prior To The Submission Of The Case To The Jury On The Grounds Provided In Rule 50(a).**

It is beyond debate that a party is precluded from filing a post-trial motion based on the sufficiency of the evidence without so moving prior the submission of the case to the jury.  Fed. R. Civ. P. 50(b) and advisory committee's note (1991); *Exxon Shipping Co. v. Baker,* 554 U.S. 471, 485 n.5, 128 S. Ct. 2605, 2617 n.5, 171 L. Ed. 2d 570 (2008) ("A motion under Rule 50(b) is not allowed unless the movant sought relief on similar grounds under Rule 50(a) before the case was submitted to the jury."); *Unitherm Food Systems, Inc. v. Swift-Eckrich, Inc*., 546 U.S. 394, 404–05, 126 S. Ct. 980, 163 L. Ed. 2d 974, 63 Fed. R. Serv. 3d 1142 (2006).

Moreover, in this Circuit, a party's failure to move for judgment as a matter of law under Rule 59(a) wholly waives its right to mount any post trial attack on the sufficiency of the evidence.  *Lesende v. Borrero,* 752 F. 3d 324 n.3 (3d Cir. 2014 citing *Yohannon v. Keene Corp.* 924 F 2d 1255, 1262 (3d Cir. 1991).  In *Yohannon,* the Court held that:

> On sufficiency, the failure to move for a directed verdict at the close of all evidence does more than limit an aggrieved party's remedy to a new trial.  In this Circuit, it wholly waives the right to mount any post trial attack on sufficiency of the evidence. citing,  *Gebhardt  v. Wilson Freight Forwarding Co.,* 348 F. 2d 129, 132 (3d Cir. 1965) (citations omitted).

While the Court noted that that the Second Circuit criticized *Gebhardt,* it remains law in this Circuit unless overruled *en banc.*

As noted above, Plaintiff attempts to do an end run around the holdings of *Lesende, Yohannon* and *Gebhardt* by implying that at least its alternative motion of a new trail raises legitimate issues of inconsistent verdicts or jury confusion.  However, is clear that these

arguments are speculative at best and are precluded by Winn Dixie's failure to object to either the Court's final jury instructions or the questions and/or instructions on the Verdict Form.

**C.  Even If Plaintiff Had Not Forfeited Its Ability To File Post-Verdict Motions Under Rules 50(b) or 59(a), The Court Would Be Required To Deny These Motions Given The Substantial Evidence Supporting A Defense Verdict To One Or More Of The Essential Elements Of Plaintiff's Sherman Act Claim.**

Plaintiff's Memorandum ignores substantial evidence elicited by Defendants during trial. A motion for judgment as a matter of law should be granted only if, viewing the evidence in the light most favorable to the non-movant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.  In determining whether the evidence is sufficient to sustain liability the court must not weigh the evidence, determine credibility of witnesses or substitute its version of the facts from the jury's version.  *Finerman v. Armstrong World Industries, Inc*. 980 F. 2d 171, 190 (3d Cir. 1992) *cert. denied* 507 U.S. 921 (1992).  *Lightning Lube, Inc. v. Witco Corp*. 4 F. 3d 1153 (3d Cir. 1993).  A new trial a new trial should only be granted where a miscarriage of justice would occur if the verdict were to stand, or where the verdict cries out to be overturned or where the verdict shocks the conscience.  *Williamson v. Consolidated Rail Corp.,* 926 F. 2d 1344, 1352 (3d Cir. 1991). Here, the evidence was sufficient to legally sustain the Jury's responses to Questions 2 and 4 of the Verdict Form.  Moreover, the trial evidence established that the alleged conduct was not unreasonable and that Plaintiff was not injured.  Therefore, there was no reason for the Jury to proceed to the remaining questions of withdrawal and damages.

Although the trial witnesses largely acknowledged that they or other company employees signed a membership agreement in order to join the EMMC,[6] it was shown that the Membership

---

[6] There is no evidence that United Mushroom Farm Cooperative, Inc. ("United") ever signed an EMMC membership agreement. J. Beltran, for United, testified that he could not recall ever seeing or signing the EMMC agreement.  Further, United never followed minimum pricing; it

Agreement itself did not obligate the Defendants to agree to or abide by the EMMC minimum or target pricing policies.  Rather, the Agreement only obligated the member to abide by the EMMC By-Laws, which in turn, enabled the EMMC to establish reasonable rules and regulations.  *See generally*, PTX65 (EMMC Membership Agreement) and PTX430 (EMMC By-Laws).  While the Defendant members conceded that the EMMC circulated minimum price lists, along with various rules and regulations relating to the minimum price listed styled as "current policies," (*see* Verdict Form, Question 1), members denied that they agreed to follow, or actually followed rules and regulations for multiple reasons which they explained.[7]

Moreover, the trial evidence revealed that members competed on pricing: (1) among themselves, (2) against several U.S. and Canadian mushroom growers that did not join the EMMC, and (3) against former EMMC member growers that resigned shortly after the EMMC was formed (2001) and continuing through 2005.  Moreover, by 2005, the EMMC membership had declined by more than 50%.  *See* D064.  Then, in August 2005, the EMMC formally suspended its minimum pricing policy "being that such guidelines have been largely ineffective from their inception."  *See* PTX 252.

Defendants also offered several reasons why they did not agree to or abide by any of the minimum pricing policies including: (1) the product's extreme perishability; (2) price

---

sold to packers in Chester County and lacked the equipment to wash, pack, wrap and distribute mushrooms to buyers such as Winn-Dixie.

[7] *See* Schroeder N.T. 3/8/2022 at 67:16-68:3 ("current policies" were always changing, that is why they never became a rule or regulation, minimum prices never turned into what the By-Lays call rules or regulations), 70:6-11 (pricing agreements were never stable and never rose to the level of being enforceable); *see* Reitnauer N.T. 3/9/2022 at73:15-24 (exceptions to the minim pricing policies were constantly being rewritten, there was never a final list of the exceptions because they kept changing); *see* Kazemi N.T. 3/2/2022 at 119:8-121-2 (nothing in the membership agreement obligated members to comply with the minimum pricing policy).

competition for customers who engaged in competitive bidding; and (3) the necessity to keep customers, such as Winn Dixie, who entered into 1-3 year contracts for substantial amounts of their farms' output, which if lost, would bankrupt their farming operations.[8]  This evidence fully supports the Jury's conclusions as to the participation of the Defendants in the alleged conspiracy (Question 2) and the Jury's conclusion that the overarching conspiracy was not anticompetitive

---

[8] *See* Carroll N.T. 3/3/2022 at 17:21-24 (the EMMC members realized they could not control the entire market), 26:7-9 (Canadian mushrooms were sold throughout the entire U.S.), 52:23-53:12 (minimum pricing was suspended in 2005 as it was largely ineffective; growers did not "have the power to market the product against the buying power of the purchasers"), 59:24-60:4 (explaining that pre-existing contracts, the meet-not-beat policy, and permissibility issues eviscerated the minimum pricing policy), 57:17-58:3 (the EMMC recognized that it was impossible to follow the pricing policy), 80:11-13 (explaining that mushroom buyers had so much control over the grower's pricing because of perishability); *see* Carroll N.T. 3/16/2022 at 12:19-15:11 (his company gained and lost accounts to/from EMMC members), 15:18-20 (price was the overwhelming factor in competition), 32:25-33:8 (explaining there was too much pressure to move product and you could not afford to lose customers); *see* Reitnauer N.T. 3/9/2022 at 73:5-12 (customer's use of reverse auctions and customer demand prevented adherence to the minimum pricing policy), 73:25-74:7 (Modern did not hesitate to charge below the minimum prices in order to gain a new customer or keep an existing customer), 78:13-18 (same), 76:21-77:13 (members resigned shortly after the EMMC was formed including Cutone, M&T, Kitchen Pride, JM, the Mushroom Alliance and Creekside), 84:4-85:11 (after the 2003-2005 time period, the EMMC continued to lose members including Modern, Basciani, Monterey and Franklin); *see* Kazemi N.T. 3/2/2022 at 102:10-14 (EMMC members did not comply with minimum pricing), 119:8-121-2 (minimum pricing did not apply to pre-existing contracts), 122:12-123:11 (meet-not-beat exception allowed members to price competitively, EMMC members competed among themselves and against non-EMMC members), 136:17-137:7 (there was always competition within the EMMC because of noncompliance issues, it was a "free-for-all"); *see* Pia N.T. 3/1/2022 at 48:7-10 (discussing Canadian competition), 139:17-19 (no members followed the EMMC rules, including his company), 157:4-7 (because of the industry's competitive nature, there were always people not complying with the minimum pricing); *see* Pia N.T. 3/2/2022 at 50:15-22 (members resigned because of non-compliance issues, members lost business to other EMMC members), 51:17-18 (EMMC members undercut each other), 78:12-15 (mushroom perishability incentivized EMMC members to not follow the minimum pricing policy), 78:22-79:11 (meet-not-beat policy allowed members to price below the minimum prices to maintain an account); *see* Gaspari N.T. at 51:9-24 (lost his two biggest customers to other EMMC members due to pricing); *see* Cardile N.T. 3/3/2022 at 125:2-126:2 (confirming that his company had no alternative but to commonly sell mushrooms below the minimums); *see* Schroeder N.T. 3/8/2022 at 184:2-4 (minimum pricing was not relevant to Mr. Schroeder's business).

(Question 4).  While the Jury did not have to reach the reasonableness, injury or damages questions given its negative response to Question 4, the evidence overwhelming established that the alleged conduct was not unreasonable, nor did it injure or damage Plaintiff.

In addition to the foregoing evidence, the Defendants elicited expert testimony that the average inflation adjusted prices for *agaricus* mushrooms in the relevant geographic market substantially declined during the existence of the alleged overarching conspiracy while prices in the Western United States substantially increased during the same time-period.[9]  Moreover, there was substantial evidence that several of the EMMC member growers including Franklin, Creekside, Harvest Fresh, Blue Mountain and Cardile were forced to close their farms due to the inability to at least break even on the sale of *agaricus* mushrooms in the Eastern United States. *See* Kazemi N.T. 3/2/2022 at 139:5-141:3; *see* Cardile N.T. 3/3/2022 (confirming that Cardile Mushrooms filed for bankruptcy).

As for the so called Target Price Lists, which were not circulated until 2007 when the EMMC membership had declined even further, there was testimony that there were no rules or regulations attached to these price lists and those members were not obligated to charge the so called Target prices.[10]

As for the EMMC's Supply Control Program, which entailed the EMMC's purchase of dilapidated, unprofitable and already closed mushroom farms and the re-selling of some of them

---

[9] *See* David N.T. 3/16/2022 at 94:12-19 (explaining that mushroom prices in the West went up), 97:4-20 (during the time the minimum pricing policy was in effect, actual prices and prices adjusted for inflation trended down).

[10] *See* Carroll N.T. 3/3/2022 at 35:17-24 (target prices were not "approved" and there was no requirement that they be charged); *see also* Pia N.T. 3/2/2022 (there was no obligation to charge target prices).

with deed restrictions, the Defendants uniformly testified that this activity did not entail a reduction in the overall supply of *agaricus* mushrooms in the relevant geographic market.[11] Moreover, Plaintiff's expert witness, Dr. Leffler, testified that the EMMC's supply control program did not increase prices in the relevant market or to Winn Dixie itself.  *See* Leffler N.T. 3/14/2022 at 84:22-85:3, 85:9-11.

Thus, more than sufficient evidence supported the Jury's responses to Questions 2 and 4 on the Verdict Form.  The evidence supported the Jury's determination that no Defendants, aside from the EMMC, participated in the alleged overarching conspiracy.  It also supported the Jury's conclusion that the overarching conspiracy was not anticompetitive since it did not raise prices to levels higher than they would otherwise have been during the relevant time-period.

## III.   CONCLUSION

For the foregoing reasons, we respectfully submit that Plaintiff's Motions or Judgment Notwithstanding the Verdict or in the alternative, for a New Trial be DENIED and, as previously requested without opposition by the Plaintiff, the Court alter the prior judgment to reflect judgment in favor of all Defendants and against the Plaintiff.

Date:  May 4, 2022

Respectfully submitted,

*/s/ William A. DeStefano*
William A. DeStefano
Terri A. Pawelski

---

[11] *See*  David N.T. 3/16/2022 at 84:3-85:20 (mushroom production increased in Pennsylvania from 1999-2008, general production dips in the overall market were attributable to farms going out of business, they were not attributable to the EMMC's conduct), *see* Carroll N.T. 3/3/2022 at 65:3-25 (Giorgi increased its production during the relevant time and there was never an agreement to limit production capacity), 66:1-3 (other growers also increased production), *see* Gaspari N.T. 3/8/2022 at 52:9-12 (EMMC never had a rule that prohibited members from expanding their mushroom production).

Matthew C. Brunelli
**STEVENS & LEE**
1500 Market Street, East Tower 18th Floor -
Philadelphia, PA 19103

*Counsel for Defendants, Brownstone Mushroom
Farms, Inc.; C&C Carriage Mushroom Co.;
Country Fresh Mushroom Co.; Gino Gaspari &
Sons, Inc.; Giorgi Mushroom Company;  Kaolin
Mushroom Farms, Inc.; Louis M. Marson, Jr. Inc.;
Modern Mushroom Farms, Inc.; Monterey
Mushrooms, Inc.; Phillips Mushrooms, Inc.;
Oakshire Mushroom Farms, Inc.; South Mill
Mushroom Sales, Inc.; Eastern Mushroom
Marketing Cooperative, Inc. (EMMC); and To-Jo
Fresh Mushrooms, Inc.*


*/s / Jane M. Shields*
Jane  M. Shields
Patrick J. Gallo
**MACELEE HARVEY**
17 West Minor Street
West Chester, PA

*Counsel for Defendant, United Mushroom Farm
Cooperative, Inc.*

12

## <u>CERTIFICATE OF SERVICE</u>

I, William A. DeStefano, hereby certify that, on May 4, 2022, a true and correct copy of the foregoing Memorandum in Opposition to Plaintiff's Motion for Judgment Notwithstanding the Verdict or In The Alternative, a New Trial, on counsel for all parties by ecf filing and notification.

<u>*/s/ William A. DeStefano*</u>

SL1 1783929v1 107141.00002